## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IEH AUTO PARTS HOLDING LLC, *et al.*,[1] | ) | Case No. 23-90054 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### COMBINED DISCLOSURE STATEMENT AND
### JOINT PLAN OF LIQUIDATION OF IEH AUTO PARTS HOLDING LLC
### AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Matthew D. Cavenaugh (TX Bar No. 24062656)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna F. Anaya (TX Bar No. 24091225)
Emily Meraia (TX Bar No. 24129307)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email: mcavenaugh@jw.com
Email: vpolnick@jw.com
Email: vanaya@jw.com
Email: emeraia@jw.com

*Counsel for the Debtors and Debtors in Possession*

Elizabeth C. Freeman (TX Bar No. 24009222)
**LAW OFFICE OF LIZ FREEMAN**
PO Box 61209
Houston, TX 77208-1209
Telephone:  (832) 779-3580
Email:  liz@lizfreemanlaw.com

*Co-Counsel and Conflicts Counsel for the
Debtors and Debtors in Possession*

---

[1]    The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: IEH Auto Parts Holding LLC (6529); AP Acquisition Company Clark LLC (4531); AP Acquisition Company Gordon LLC (5666); AP Acquisition Company Massachusetts LLC (7581); AP Acquisition Company Missouri LLC (7840); AP Acquisition Company New York LLC (7361); AP Acquisition Company North Carolina LLC (N/A); AP Acquisition Company Washington LLC (2773); Auto Plus Auto Sales LLC (6921); IEH AIM LLC (2233); IEH Auto Parts LLC (2066); IEH Auto Parts Puerto Rico, Inc. (4539); and IEH BA LLC (1428).  The Debtors' service address is: 112 Townpark Drive NW, Suite 300, Kennesaw, GA 30144.

**TABLE OF CONTENTS**

Article I

DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME...................................................................................................................... 4

    A.    Defined Terms ................................................................................................... 4

    B.    Rules of Interpretation and Computation of Time ........................................... 13

        1.    Rules of Interpretation ...................................................................... 13

        2.    Computation of Time ........................................................................ 13

        3.    Controlling Document ....................................................................... 13

Article II

DEBTORS' HISTORY AND THE BANKRUPTCY CASE ................................. 14

    A.    Debtors' History............................................................................................... 14

        1.    Debtors' Background, Corporate Structure, and Operations ............ 14

        a.    Debtors' Background ........................................................................ 14

        b.    Corporate Structure.......................................................................... 14

        c.    Operations ........................................................................................ 14

    B.    Events Leading to the Chapter 11 Cases ......................................................... 15

    C.    Debtors in Possession Financing ..................................................................... 15

    D.    Main Bankruptcy Events .................................................................................. 16

        1.    First Day Orders ............................................................................... 16

        2.    Employment Applications ................................................................. 17

        3.    Schedules and Statements ................................................................. 17

        4.    341 Meeting ..................................................................................... 17

        5.    General Bar Date and Governmental Bar Date................................. 17

    E.    Summary of Treatment of Claims and Equity Interests and Estimated Recoveries .................... 18

Article III

CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............................... 18

    A.    Unclassified Claims ......................................................................................... 18

        1.    Payment of Administrative Expense Claims .................................... 18

        2.    Payment of Priority Tax Claims ....................................................... 20

        3.    Treatment of DIP Facility Claims..................................................... 20

    B.    Classification of Claims and Interests.............................................................. 21

    C.    Treatment of Claims and Interests ................................................................... 21

        1.    Priority Claims (Class 1)................................................................... 21

        2.    General Unsecured Claims (Class 2) ................................................ 21

        3.    Intercompany Claims (Class 3)......................................................... 22

        4.    Equity Interests in the Debtors (Class 4) .......................................... 22

    D.    Reservation of Rights Regarding Claims ......................................................... 22

| | E. | Postpetition Interest on Claims | 22 |
|---|---|---|---|
| | F. | Insurance | 22 |
| | G. | Confirmation Without Acceptance by All Impaired Classes | 22 |
| | H. | Class Without Voting Claim Holders | 22 |
| Article IV | | MEANS FOR IMPLEMENTATION OF THE PLAN | 23 |
| | A. | The Plan Agent and the Wind-Down Debtors | 23 |
| | B. | Settlement of Claims | 24 |
| | C. | Abandonment of Assets by the Plan Agent | 24 |
| | D. | Cancellation and Surrender of Instruments, Securities and Other Documentation | 25 |
| | E. | Release of Liens | 25 |
| | F. | Effectuating Documents; Further Transactions | 25 |
| Article V | | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 25 |
| | A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 25 |
| | B. | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 26 |
| | C. | Insurance Policies | 26 |
| Article VI | | PROVISIONS REGARDING DISTRIBUTIONS | 27 |
| | A. | Distributions for Claims Allowed as of the Effective Date | 27 |
| | B. | Method of Distributions to Holders of Claims | 27 |
| | C. | Disbursing Agent | 27 |
| | | 1. Powers of the Disbursing Agent | 27 |
| | | 2. Expenses Incurred on or After the Effective Date | 27 |
| | | 3. No Liability | 27 |
| | D. | Disputed Claims Reserves | 27 |
| | | 1. Establishment of Disputed Claims Reserves | 27 |
| | | 2. Maintenance of Disputed Claims Reserves | 28 |
| | E. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 28 |
| | | 1. Delivery of Distributions | 28 |
| | | 2. Undeliverable Distributions Held by Disbursing Agents | 28 |
| | F. | Distribution Record Date | 28 |
| | G. | De Minimis Distributions | 29 |
| | H. | Compliance with Tax Requirements | 29 |
| | I. | Manner of Payment Under the Plan | 29 |
| | J. | Time Bar to Cash Payments | 29 |
| | K. | Setoffs | 30 |
| | L. | Allocation Between Principal and Accrued Interest | 30 |

| | M. | Distributions to Holders of Disputed Claims | 30 |
|---|---|---|---|
| | N. | Claims Paid or Payable by Third Parties | 30 |
| | | 1. | Claims Paid by Third Parties | 30 |
| | | 2. | Claims Payable by Insurance | 30 |

Article VII — DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS ............ 31

| | A. | Allowance of Claims | 31 |
|---|---|---|---|
| | B. | Prosecution of Objections to Claims | 31 |
| | | 1. | Authority to Prosecute and Settle Claims | 31 |
| | | 2. | Pending Objections | 31 |
| | | 3. | Application of Bankruptcy Rules | 31 |
| | | 4. | Authority to Amend Schedules | 31 |
| | C. | Estimation of Claims | 32 |
| | D. | Offer of Judgment | 32 |

Article VIII . — CONFIRMATION OF THE PLAN ............ 32

| | A. | Conditions Precedent to Confirmation | 32 |
|---|---|---|---|
| | B. | Conditions Precedent to the Effective Date | 32 |
| | C. | Waiver of Conditions to Confirmation or the Effective Date | 33 |
| | D. | Notice of Occurrence of Effective Date | 33 |
| | E. | Effect of Nonoccurrence of Conditions to the Effective Date | 33 |
| | F. | Effect of Confirmation | 33 |
| | | 1. | Binding Effect | 33 |
| | | 2. | Dissolution of Official Committees | 33 |
| | | 3. | Releases by the Debtors | 33 |
| | | 4. | Releases by Releasing Parties | 34 |
| | | 5. | Exculpation | 35 |
| | | 6. | Injunction | 35 |
| | | 7. | Gatekeeper Provision | 36 |
| | G. | Votes Solicited in Good Faith | 36 |

Article IX — RETENTION OF JURISDICTION ............ 36

Article X — MISCELLANEOUS PROVISIONS ............ 38

| | A. | Modification of the Plan | 38 |
|---|---|---|---|
| | B. | Revocation of the Plan or Non-Occurrence of the Confirmation Date or Effective Date | 38 |
| | C. | Reservation of Rights Regarding Certain Matters | 38 |
| | D. | Exhibits and Schedules | 38 |

| | | | |
|---|---|---|---|
| E. | | Severability ................................................................ | 38 |
| F. | | Successors and Assigns ................................................ | 38 |
| G. | | Service of Documents .................................................. | 39 |
| Article XI | | CONFIRMATION OF THE PLAN ................................ | 39 |
| A. | | VOTING PROCEDURES AND REQUIREMENTS ........ | 39 |
| B. | | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ........ | 39 |
| | 1. | The Best Interest of Creditors Test .......................... | 40 |
| | 2. | Liquidation Analysis ................................................ | 41 |
| | 3. | Feasibility ................................................................ | 41 |
| | 4. | Acceptance by an Impaired Class ............................. | 41 |
| | 5. | Confirmation Without Acceptance by All Impaired Classes ........ | 42 |
| Article XII | | PLAN-RELATED RISK FACTORS ............................... | 43 |
| A. | | GENERAL BANKRUPTCY LAW AND PLAN RELATED CONSIDERATIONS ........ | 43 |
| | 1. | Parties in Interest May Object to the Classification of Claims and Equity Interests ........ | 43 |
| | 2. | Failure to Satisfy Vote Requirement ........................ | 43 |
| | 3. | The Debtors May Not Be Able to Secure Confirmation of the Plan or Confirmation May Be Delayed ........ | 44 |
| | 4. | Nonconsensual Confirmation - "Cramdown" ............ | 44 |
| | 5. | The Debtors May Object to the Amount or Classification of a Claim ........ | 44 |
| | 6. | Risk of Nonoccurrence of the Effective Date ........... | 45 |
| | 7. | Risk Affecting Potential Recoveries of Holders of Claims in Voting Classes ........ | 45 |
| B. | | RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS ........ | 45 |
| C. | | DISCLOSURE STATEMENT DISCLAIMER .............. | 45 |
| | 1. | Information Contained Herein Is for Soliciting Votes ........ | 45 |
| | 2. | This Plan and Disclosure Statement Was Not Reviewed or Approved by the Securities and Exchange Commission ........ | 45 |
| | 3. | This Plan and Disclosure Statement May Contain Forward Looking Statements ........ | 45 |
| | 4. | No Legal or Tax Advice Is Provided to You by this Plan and Disclosure Statement ........ | 45 |
| | 5. | No Admissions Made ................................................ | 46 |
| | 6. | Failure to Identify Litigation Claims or Projected Objections ........ | 46 |
| | 7. | No Waiver of Right to Object or Right to Recover Transfers and Assets ........ | 46 |
| | 8. | Information Was Provided by the Debtors and Was Relied Upon by the Debtors' advisors. ........ | 46 |
| | 9. | Potential Exists for Inaccuracies, and the Debtors have No Duty to Update ........ | 46 |
| | 10. | No Representations Outside the Plan and Disclosure Statement are Authorized ........ | 46 |

D.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............. 46

      1.      Alternative Plan(s) of Liquidation ................................................................. 47

      2.      Liquidation under Chapter 7 .......................................................................... 47

      3.      Dismissal of the Chapter 11 Cases ................................................................ 47

Article XIII      CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............................. 47

A.      General Tax Considerations ...................................................................................... 47

B.      Certain Federal Income Tax Consequences to the Debtors ....................................... 48

C.      Certain Federal Income Tax Consequences to Holders of Claims .............................. 48

D.      Reservation of Rights ............................................................................................... 51

CONCLUSION, RECOMMENDATION, AND CONFIRMATION REQUEST ..................................... 52

## <u>TABLE OF EXHIBITS</u>

Exhibit 1          Liquidation Analysis (to come)

Exhibit 2          9019 Order with attachments (to come)

## INTRODUCTION AND DISCLAIMERS

IEH Auto Parts Holding LLC and the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Auto Plus"), propose the following Combined Disclosure Statement and Joint Plan of Liquidation of IEH Auto Parts Holding LLC, et al., (this "Disclosure Statement," "Plan and Disclosure Statement," or "Plan") for the resolution of the outstanding Claims against, and Interests in, the Debtors pursuant to chapter 11 of the Bankruptcy Code.  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.  Other agreements and documents supplement this Plan and have been, or will be, Filed with the Bankruptcy Court.  These supplemental agreements and documents are referenced in this Plan and Disclosure Statement and will be available for review prior to the Voting Deadline.

The Plan is a liquidating plan.  The Debtors are selling substantially all of their Assets.

This Plan and Disclosure Statement contain certain statutory provisions, describes certain events in these Chapter 11 Cases and certain documents related to the Plan and Disclosure Statement that may be attached and are incorporated by reference.  Although the Debtors believe that this information is fair and accurate, this information is qualified in its entirety to the extent that it does not set forth the entire text of such documents or statutory provisions or every detail of such events.  The information contained herein or attached hereto is made only as of the date of this Plan and Disclosure Statement.  There can be no assurances that the statements contained herein will be correct at any time after this date.

This Plan and Disclosure Statement was prepared in accordance with sections 1123 and 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other nonbankruptcy laws.  This Plan and Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association, nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.  No other governmental or other regulatory agency approvals have been obtained as of the date of the mailing of this Plan and Disclosure Statement.

The Debtors submit the Disclosure Statement, as may be amended from time to time, under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016, to all of the Debtors' known creditors and Interest Holders entitled to vote on the Plan.

The purpose of this Disclosure Statement is to provide adequate information to enable all Holders of Claims and/or Interests who are entitled to vote on the Plan to arrive at a reasonably informed decision in exercising their respective right to vote on the Plan.

This Disclosure Statement is not intended to replace a careful review and analysis of the Plan, including the specific treatment of Claims and Interests under the Plan. It is submitted as an aid and supplement to your review of the Plan and to explain the terms of the Plan.  Every effort has been made to fairly summarize the Plan and to inform Holders of Claims and Interests how various aspects of the Plan affect their respective positions.  If any questions arise, the Debtors urge you to contact the Debtors' counsel.  These attorneys will attempt to resolve your questions. You are also encouraged to consult with your own counsel. Counsel for the Debtors are likewise available to answer any questions that your counsel may have regarding the Plan and Disclosure Statement.

In preparing this Plan and Disclosure Statement, the Debtors relied on financial data derived from their books and records or that was otherwise made available to them at the time of such preparation and on various assumptions regarding the Debtors' businesses.  Although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof, and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' businesses and their future results and operations. Except where specifically noted, the financial information contained in this Plan and Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States or any other jurisdiction.

This Plan and Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver.  A party with standing may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Plan and Disclosure Statement identifies any such objections to Claims.

The Debtors are making the statements and providing the financial information contained in this Plan and Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the Debtors may update the information in this Plan and Disclosure Statement, the Debtors do not have an affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise. Holders of Claims and Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed. Information contained herein is subject to completion or amendment. The Debtors reserve the right to File an amended Plan and Disclosure Statement.

Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described in Article VIII. There is no assurance that the Plan will be confirmed or, if confirmed, that such material conditions precedent will be satisfied or waived. You are encouraged to read this Plan and Disclosure Statement in its entirety, including, but not limited to Article XII, entitled "Plan-Related Risk Factors," before submitting your Ballot to vote to accept or reject the Plan.

The Debtors have not authorized any entity to give any information about, or concerning, the Plan and Disclosure Statement other than that which is contained in this Plan and Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Plan and Disclosure Statement.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims or Interests who are not entitled to vote on the Plan) will be bound by the terms of the Plan and any transactions contemplated thereby.

The contents of this Plan and Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of Claims or Interests should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest. This Plan and Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

Nothing contained herein shall constitute an admission of any fact or liability by any party or be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests.

**The Debtors support confirmation of the Plan and recommend all Holders of Claims entitled to vote on the Plan to vote to accept the Plan.**

## THE SOLICITATION

This Plan and Disclosure Statement is submitted by the Debtors to be used in connection with the solicitation of votes on the Plan and to describe the terms of the liquidation of the Debtors.

The Debtors requested that the Bankruptcy Court hold a hearing on conditional approval of this Plan and Disclosure Statement to determine whether this Disclosure Statement contains "adequate information" in accordance with section 1125.[1] The Bankruptcy Court entered an order conditionally approving the Disclosure Statement on [●] [Docket No. ●]. Pursuant to § 1125(a)(1), "adequate information" is defined as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . ." All Holders of Claims and Interests are encouraged to read and carefully consider this Plan and Disclosure Statement in its entirety before voting to accept or reject the Plan.

In making a decision to accept or reject the Plan, each Holder of a Claim or Interest must rely on its own examination of the Debtors as described in this Plan and Disclosure Statement, including the merits and risks involved; thus, this Plan and Disclosure Statement shall not be construed to be providing any legal, business, financial or tax advice. Each Holder of a Claim or Interest should consult with his, her, or its own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan, or the transactions contemplated thereby. Additionally, Confirmation and Consummation of the Plan are subject to conditions precedent that could lead to delays in Consummation of the Plan. There can be no assurance that each of these conditions precedent will be

---

[1]   All citations to "§" and "section" references the applicable section of the Bankruptcy Code.

satisfied or waived or that the Plan will be consummated. Even after the Effective Date, distributions under the Plan may be subject to delay so that disputed Claims can be resolved.

A hearing to consider the final approval of the Disclosure Statement and confirmation of the Plan is scheduled for **May 31, 2023**, at **[●] (prevailing Central Time)** (the "Confirmation Hearing").

Objections to the final approval of the Disclosure Statement or objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the Notice Parties to ensure receipt by them on or before **5:00 p.m. (prevailing Central Time) on May 26, 2023**.  Bankruptcy Rule 3007 governs the form of any such objection.

## Answers to Commonly Asked Questions

### What is chapter 11 bankruptcy?

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code that allows financially distressed businesses to reorganize their debts or to liquidate their Assets in a controlled fashion.  The commencement of a chapter 11 case creates an "estate" containing all of the legal and equitable interests of the debtor in property as of the date the bankruptcy case is filed.  During a chapter 11 bankruptcy case, the debtors remain in possession of their Assets unless the Bankruptcy Court orders the appointment of a trustee.  No trustee has been appointed in the Debtors' cases.  The Plan is being proposed by the Debtors.  The Debtors worked to propose a plan of liquidation in an effort to minimize the overall administrative costs associated with these bankruptcy cases and maximize value to creditors and Interest Holders.

### How do I determine how my Claim or Interest is classified?

To determine the classification of your Claim or Interest, you must determine the nature of your Claim or Interest.  Under the Plan, Claims and Interests are classified into a series of Classes.  The pertinent articles and sections of the Plan and Disclosure Statement disclose, among other things, the treatment that each Class of Claims or Interests will receive if the Plan is confirmed.

### How do I determine what I am likely to recover on account of my Claim or Interest?

After you determine the classification of your Claim or Interest, you can determine the likelihood and range of potential recovery with respect to your Claim or Interest by referring generally to the discussions of potential Assets and the liquidation analysis attached hereto as **Exhibit 1**, as well as to Article III, Article VII, and Article XII.

### What is necessary to confirm the Plan?

Under applicable provisions of the Bankruptcy Code, Confirmation of the Plan requires that, among other things, at least one Class of impaired Claims or Interests vote to accept the Plan.  Acceptance by a Class of Claims or Interests means that at least two-thirds in the total dollar amount and more than one-half in number of the Allowed Claims or Interests actually voting in the class vote in favor of the Plan.  Because only those claims or interests who vote on a plan will be counted for purposes of determining acceptance or rejection of a plan by an impaired class, a plan can be approved with the affirmative vote of members of an impaired class who own less than two-thirds in amount and one-half in number of the claims/interests.  Besides acceptance of the Plan by each Class of Impaired creditors or Interests, the Bankruptcy Court also must find that the Plan meets a number of statutory tests before it may confirm the Plan.  These requirements and statutory tests generally are designed to protect the Interests of Holders of Impaired Claims or Interests who do not vote to accept the Plan but who will nonetheless be bound by the Plan's provisions if the Bankruptcy Court confirms the Plan.

If one or more Classes vote to reject the Plan, the Debtors may still request that the Bankruptcy Court confirm the Plan under § 1129(b) of the Bankruptcy Code.  To confirm a plan not accepted by all classes, the Debtors must demonstrate that the Plan does not discriminate unfairly, and is fair and equitable with respect to each Class of Claims or Interests that is Impaired under, and that has not accepted, the Plan.  This method of confirming a plan is commonly

called a "cramdown." In addition to the statutory requirements imposed by the Bankruptcy Code, the Plan itself also provides for certain conditions that must be satisfied as conditions to Confirmation.

**Is there a Committee in this case?**

Yes. An official committee of unsecured creditors was appointed on February 14, 2023 [Docket No. 99]. The Committee is represented by the law firm of Kane Russell Coleman Logan PC.

**When is the deadline for returning my Ballot?**

The Bankruptcy Court directed that, to be counted for voting purposes, your Ballot must be received by the designated claims and noticing agent, Kurtzman Carson Consultants LLC ("KCC") by **4:00 p.m. (prevailing Central Time) on May 26, 2023**.

**It is important that all Impaired creditors and Interest Holders vote on the Plan. The Debtors believe that the Plan provides the best possible recovery to creditors and Interest Holders. The Debtors therefore believe that acceptance of the Plan is in the best interest of creditors and Interest Holders and recommends that all Impaired creditors and Interest Holders vote to accept the Plan.**

If you would like to obtain copies of this Plan and Disclosure Statement or any of the documents attached or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact KCC, by either (a) visiting the Document Website at https://www.kccllc.net/autoplus or (b) calling (888) 802-7207 (toll-free) or (781) 575-2107 (international).

## OVERVIEW OF PLAN

An overview of the Plan is set forth below. This overview is qualified in its entirety by reference to the Plan. If the Bankruptcy Court confirms the Plan and, in the absence of any applicable stay, all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date.

On the Effective Date, a Plan Agent will be appointed by the Debtors to administer the Plan and wind down the Debtors' Estates. As of the Effective Date of the Plan, the Plan Agent will be responsible for all payments and distributions to be made under the Plan to the Holders of Allowed Priority Claims and Allowed Administrative Expense Claims. Each Executory Contract and Unexpired Lease to which the Debtors are a party shall be deemed rejected unless the Debtors expressly assume such agreements before the Effective Date.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

### A.    Defined Terms

Capitalized terms used in this Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.    "503(b)(9) Claim" means a Claim pursuant to section 503(b)(9) of the Bankruptcy Code for the value of goods received by the Debtors in the 20 days immediately prior to the Petition Date and sold to the Debtors in the ordinary course of the Debtors' business.

2.    "9019 Motion" means the *Debtors' Emergency Motion for Entry of an Order Approving the Settlement Between the IEH Debtors, AEP, the Committee, and the AEP Related Parties* [Docket No. ●]

3.    "9019 Order" means the *Order Approving the Debtors' Emergency Motion for Entry of an Order Approving the Settlement Between the IEH Debtors, AEP, the Committee, and the AEP Related Parties* [Docket No. ●] and the attachments thereto.

4

4.     "Administrative Expense Bar Date" means the date by which a request for payment of an administrative expenses must be filed and is thirty (30) days after the Effective Date.

5.     "Administrative Expense Claim" means a Claim against the Debtors or their Estates for costs or expenses of administration of the Estates pursuant to sections 364(c)(1), 503(b), 503(c), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code, including Professional Fee Claims; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; and (d) 503(b)(9) Claims.

6.     "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

7.     "Allowed" means with respect to Claims:  (a) any Claim (i) for which a proof of Claim has been timely filed on or before the applicable Bar Date (or for which a proof of Claim is not required to be filed pursuant to the Bankruptcy Code or a Final Order) or (ii) that is identified in the Schedules as of the Effective Date as not disputed, not contingent and not unliquidated, and for which no proof of Claim has been timely Filed; *provided* that, in each case, any such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been filed or such an objection has been filed and the Claim thereafter has been Allowed by a Final Order; or (b) any Claim expressly deemed allowed by the Plan or allowed by a Final Order of the Bankruptcy Court (including pursuant to any stipulation or settlement agreement approved by the Bankruptcy Court).  Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims.

8.     "Asset" means all of the Debtors' property, rights and interest that are property of the Estates pursuant to section 541 of the Bankruptcy Code, including all Assets of the Debtors as of the Effective Date, including but not limited to, cash on hand, the DIP Facility, and any Retained Causes of Action.

9.     "Asset Purchase Agreement" means any closing document entered into pursuant to any Sale Transaction.

10.     "Auction" means any proceeds of any Sale Transaction.

11.     "Avoidance Actions" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 541, 542, 544 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent and voidable transfer laws.

12.     "Ballot" means the applicable form or forms of ballot(s) distributed to each Holder of an impaired Claim entitled to vote on the Plan on which the Holder indicates either acceptance or rejection of the Plan and (when applicable) any election for treatment of such Claim under the Plan.

13.     "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases.

14.     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the District Court.

15.     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

16.     "Bar Date" means the applicable bar date by which a proof of Claim or request for payment of an Administrative Expense Claim must be, or must have been, Filed, as established by an order of the Bankruptcy Court, including the Bar Date Order and Confirmation Order.

17.     "Bar Date Order" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests and (IV) Approving Notice of Bar Dates* entered by the Bankruptcy Court on March 13, 2023 [Docket No. 222]

18.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

19.     "Cash" means legal tender of the United States of America and equivalents thereof.

20.     "Causes of Action" means any action, Claim, cause of action, controversy, demand, right, action, Lien, indemnity, Interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any Claim for breach of contract or for breach of duties imposed by law or in equity; (b) any Claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate or disallow Claims or Interests; (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar Claim.

21.     "Chapter 11 Cases" means the bankruptcy cases commenced in the Bankruptcy Court by the Debtors under chapter 11 of the Bankruptcy Code and jointly administered under the caption *IEH Auto Parts Holding LLC, et al.*, Case No. 23-90054 (CML).

22.     "Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

23.     "Claims and Noticing Agent" means Kurtzman Carson Consultants ("KCC"), in its capacity as the Debtors' Bankruptcy Court-appointed claims, noticing, and solicitation agent in these Chapter 11 Cases.

24.     "Class" means a class of Claims, as described in Article III of this Plan and Disclosure Statement.

25.     "Committee" means the official committee of unsecured creditors appointed on February 14, 2023 [Docket No. 99] and represented by the law firm of Kane Russell Coleman Logan PC.

26.     "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of these Chapter 11 Cases.

27.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of these Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

28.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of this Plan, as such hearing may be continued.

29.     "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the adequacy of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code.

30.　　"Consummation" means the occurrence of the Effective Date.

31.　　"Cure Amount" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties to an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

32.　　"Debtors" has the meaning set forth in the introduction hereof.

33.　　"DIP Lender" means American Entertainment Properties Corp., in its capacity as the lender under the DIP Facility.

34.　　"DIP Facility" has the meaning set forth in the DIP Orders.

35.　　"DIP Facility Claims" means any Claims arising under the DIP Facility.

36.　　"DIP Loan Documents" means the DIP Term Sheet attached as Exhibit 1 to the Interim DIP Order and any other agreement related to the DIP Facility.

37.　　"DIP Orders" means the Interim DIP Order and Final DIP Order.

38.　　"Disbursing Agent" means:  (a) the Plan Agent, in its capacity as disbursing agent hereunder; (b) the Debtors solely with respect to Distributions that are required to be made on or before on the Effective Date by the Debtors under this Plan and Disclosure Statement; (c) any Third Party Disbursing Agent employed by the Plan Agent or the Committee to assist with making distributions as permitted by the Plan; and (d) the Committee in its capacity as disbursing agent hereunder.

39.　　"Disclosure Statement Order" means the order entered by the Bankruptcy Court conditionally approving this Disclosure Statement [Docket No. ●].

40.　　"Disputed Claim" means:

a.　　a Claim that is listed on the Debtors' Schedules as either disputed, contingent or unliquidated, whether or not a proof of Claim has been Filed;

b.　　a Claim that is listed on the Debtors' Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted by the Holder in a proof of Claim varies from the nature or amount of such Claim as it is listed on the Schedules;

c.　　a Claim that is not listed on the Debtors' Schedules;

d.　　a Claim as to which the Debtors or, prior to the Confirmation Date, any other party in interest, has Filed an objection and such objection has not been withdrawn or denied by a Final Order; or

e.　　a Claim for which a proof of Claim or request for payment of Administrative Expense Claim is required to be Filed under the Plan and no such proof of Claim or request for payment of Administrative Expense Claim is or was timely Filed.

41.　　"Disputed Claims Reserve" means any of the reserve funds established pursuant to Article VID of this Plan.

42.　　"Distribution" means a distribution under the Plan of property to a Holder of a Claim on account of such Claim.

43. "<u>Distribution Date</u>" means a date selected by a Distributing Agent in accordance with the terms of the Plan to make Distributions on account of Allowed Claims.

44. "<u>Distribution Record Date</u>" means the Confirmation Date.

45. "<u>District Court</u>" means the United States District Court for the Southern District of Texas.

46. "<u>Document Website</u>" means the internet address https://kccllc.net/autoplus, at which the Plan and Disclosure Statement and any amendments or supplements thereto shall be available to any party in interest and the public, free of charge.

47. "<u>Effective Date</u>" means a day, as determined by the Debtors, that is the Business Day as soon as reasonably practicable after all conditions precedent to the Effective Date set forth in Article VIIIB have been met or waived in accordance with Article VIIIC.

48. "<u>Entity</u>" has the meaning set forth in section 101(15) of the Bankruptcy Code.

49. "<u>Equity Interest</u>" means an interest in an "equity security" as such term is defined in section 101(16) of the Bankruptcy Code.

50. "<u>Estates</u>" means the estates created for the Debtors in their Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

51. "<u>Exculpated Parties</u>" means, collectively, each of the following in their capacity as such (a) the Debtors and their Estates; (b) the Icahn Entities; (c) the Committee, in its capacity as such; (d) the members of the Committee in their individual capacities, and (e) each Related Party of each Entity in clause (a) through clause (d).

52. "<u>Executory Contract</u>" means a contract to which the Debtors are a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code, as applicable.

53. "<u>File</u>," "<u>Filed</u>," or "<u>Filing</u>" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

54. "<u>Final DIP Order</u>" means any final order approving the Debtors debtor-in-possession financing.

55. "<u>Final Distribution Date</u>" means, with respect to a particular Class of Claims, the Distribution Date upon which final Distributions to claimants in the Class are to be made.

56. "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in these Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceeding for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order shall not prevent such order from being a Final Order.

57. "<u>General Bar Date</u>" means the date by which each Entity that asserts a Claim (whether secured, unsecured, priority, or non-priority) against any of the Debtors that arose or is deemed to have arisen before the Petition Date, including 503(b)(9) Claims, must file an original, written proof of Claim.

58.     "General Unsecured Claim" means any Claim against the Debtors that is (a) unpaid as of the Effective Date, and (b) is not an Administrative Expense Claim, DIP Facility Claim, Priority Claim, Priority Tax Claim, Secured Claim, or Cure Amount.

59.     "Governmental Bar Date" means the date by which each Governmental Unit that asserts a Claim (whether secured, unsecured, priority, or non-priority) against the Debtors that arose or is deemed to have arisen before the Petition Date, including 503(b)(9) Claims and Claims for unpaid Taxes arising from prepetition Tax years or periods or prepetition transactions, must file an original, written proof of Claim.

60.     "Governmental Unit" means a "governmental unit," as defined in section 101(27) of the Bankruptcy Code.

61.     "GUC Claim Reconciliation" means the objection, reconciliation, and distribution of the GUC Pool to Allowed Holders of General Unsecured Claims.

62.     "GUC Pool" means GUC Payment, as that term is defined in the 9019 Motion and any proceeds from any Retained Causes of Action.

63.     "Holder" means an Entity (or parent, Affiliate, subsidiary, assignee, or agent of an Entity) holding a Claim against, or an Interest in, the Debtors, as the context requires.

64.     "IAG" means Icahn Automotive Group LLC.

65.     "Icahn Entities" means Icahn Enterprises Holdings, L.P. and all of its direct and indirect subsidiaries other than the Debtors.  The Icahn Entities include, for the avoidance of doubt, the Pep Boys Entities.

66.     "IEH Holding" means Debtor IEH Auto Parts Holding LLC.

67.     "IEP" means Icahn Enterprises L.P.

68.     "Impaired" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

69.     "Insurance Policies" means any and all insurance policies, insurance settlement agreements, coverage-in-place agreements, and other agreements, documents, or instruments relating to the provision of insurance entered into by or issued to or for the benefit of, at any time, the Debtors or its predecessors.

70.     "Insurer" means any company or other entity that issued an Insurance Policy, any third party administrator of or for any Insurance Policy, and any respective predecessors and/or Affiliates of any of the foregoing.

71.     "Interest" means the rights of the Holders of the partnership interests, membership interests or other equity interests in the Debtors and outstanding immediately prior to the Petition Date, and any options, warrants or other rights with respect thereto, or any other instruments evidencing an ownership interest in the Debtors and the rights of any Entity to purchase or demand the issuance of any of the foregoing, including:  (a) redemption, conversion, exchange, voting, participation and dividend rights (including any rights in respect of accrued and unpaid dividends); (b) liquidation preferences; and (c) stock options and warrants.

72.     "Intercompany Claim" means any Claim against the Debtors held by a non-Debtor Affiliate.

73.     "Interim Compensation Order" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* entered by the Bankruptcy Court on March 27, 2023 [Docket No. 264].

74.     "Interim DIP Order" means the *Interim Order (I) Authorizing Post-Petition Financing Secured by Senior Liens, (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 90].

75.     "IRS" means the United States Internal Revenue Service.

76.     "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

77.     "Notice of Occurrence of Effective Date" means the notice Filed in accordance with Article VIIID of this Plan.

78.     "Notice Parties" means, collectively, the parties listed in Article XG.

79.     "Objection Deadline" means the deadline to File objections to Confirmation of this Plan, which is May 26, 2023, at 5:00 p.m. (prevailing Central Time) or any other deadline to File objections to Confirmation of this Plan established by the Disclosure Statement Order.

80.     "Ordinary Course Professionals Order" means the *Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* entered by the Bankruptcy Court on April 10, 2023 [Docket No. 355].

81.     "Pep Boys Entities" means The Pep Boys—Manny, Moe & Jack Holding Corp., Icahn Automotive Service LLC, and each of their respective direct and indirect subsidiaries.

82.     "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

83.     "Petition Date" means January 31, 2023, the date on which the Debtors Filed their petitions for relief commencing these Chapter 11 Cases.

84.     "Plan" has the meaning set forth in the introduction hereof.

85.     "Plan Agent" means the Person or Persons identified in the Plan Supplement (as determined by the Debtors) to be appointed by the Debtors on the Effective Date and who will serve as the trustee and administrator overseeing the wind down and dissolution of the Debtors and their Estates in accordance with this Plan.

86.     "Plan Supplement" means the documents, schedules and any exhibits Filed prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time, which shall include (a) the schedule of Retained Contracts (if any) and (b) the identity of the Plan Agent.

87.     "Priority Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Expense Claim or a Priority Tax Claim.

88.     "Priority Tax Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

89.     "Pro Rata" means, when used with reference to a Distribution of property to Holders of Allowed Claims in a particular Class or any other specified group of Claims pursuant to this Plan, proportionately, so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of the amount of property to be distributed on account of such Claim to the amount of such Claim is the same as the ratio of the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to the amount of all Allowed Claims in such Class or group of Claims.  Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their face amount for purposes of calculating Pro Rata distribution of property to Holders of Allowed Claims in such Class.

90.     "Professional" means any Entity (a) employed in the Chapter 11 Cases by the Debtors pursuant to a Final Order in accordance with sections 327, 328, 363 or 1103 of the Bankruptcy Code (other than a professional entitled to receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order) or (b) for which compensation or reimbursement has been Allowed by the Bankruptcy Court in the Chapter 11 Cases for services to the Debtors, and expenses incurred in connection with such services, pursuant to section 503(b)(4) of the Bankruptcy Code.

91.     "Professional Fee Claim" means any Administrative Expense Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

92.     "Professional Fee Escrow Account" means an account funded by the Debtors with Cash as soon as possible after Confirmation and not later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

93.     "Professional Fee Escrow Amount" means the reasonable estimate of the aggregate amount of Professional Fee Claims relating to the period prior to the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article IIIA.1 of this Plan.

94.     "Purchaser" means any Entity that purchased Assets pursuant to a Sale Order.

95.     "Related Party" means, with respect to any Person or Entity, such Person's or Entity's current or former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, directors, managers, owners, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, investment bankers, consultants, representatives, other professionals and the respective successors and assigns thereof.

96.     "Released Parties" means, collectively, and in each case in its capacity as such:  (a) the Debtors and their Estates; (b) the Icahn Entities; (c) the Committee, in its capacity as such; (d) the members of the Committee in their individual capacities, and (e) each Related Party of each Entity in clause (a) through clause (d); *provided* that any Holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan, (y) Files an objection to the releases contained in the Plan by the Objection Deadline, or (z) timely votes to reject the Plan, shall not be a "Released Party."

97.     "Releasing Parties" means collectively, and in each case in its capacity as such:  (a) the Debtors and their Estates; (b) the Icahn Entities; (c) the Committee, in its capacity as such; (d) the members of the Committee in their individual capacities, and (e) each Related Party of each Entity in clause (a) through clause (d) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided* that any Holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan, (y) Files an objection to the releases contained in the Plan by the Plan Objection Deadline, or (z) timely votes to reject the Plan, shall not be a "Released Party."

98.     "Representatives" means, with respect to any Person, any officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals of such Person, in each case, in such capacity.

99.     "Retained Causes of Action" means the Causes of Action that shall vest in the Wind-Down Debtors on the Effective Date, which, for the avoidance of doubt, shall not include any Causes of Action that are or were settled, released, waived, exculpated, or transferred (i) prior to the Petition Date by any of the Debtors or (ii) pursuant to the Plan, any Sale Transaction, or any Order of the Bankruptcy Court entered in these Chapter 11 Cases (including

the DIP Orders and the 9019 Order), as the same may be amended, modified, or supplemented from time to time by the Debtors.

100. "Retained Contracts" means those Executory Contracts and Unexpired Leases to be assumed by the Debtors (if any), which shall be set forth in a schedule included in the Plan Supplement.

101. "Sale Orders" means any order entered by the Bankruptcy Court approving the sale of all or part of the Debtors' Assets, pursuant to the *Debtors' Motion for Entry of an Order (i) Approving the Bid Procedures, (II) Approving the Sale of the Debtors' Assets Free and Clear, and (III) Granting Related Relief* [Docket No. 96] and the related *Order Approving the Bid Procedures and Granting Related Relief* [Docket No. 96].

102. "Sale Transaction" means any sale by the Debtors to the Purchasers of their Assets pursuant to any Sale Order.

103. "Schedules" means the schedules of assets and liabilities and the statement of financial affairs Filed by the Debtors, as required by section 521 of the Bankruptcy Code, as the same may have been or may be amended, modified or supplemented.

104. "Secured Claim" means a Claim that is secured by a Lien on property in which the Estates have an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the Holder of such Claim's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) or as Allowed pursuant to the Plan as a Secured Claim.

105. "Settlement" means the global settlement by and among the Debtors, the Committee, and the DIP Lender.

106. "Settlement Term Sheet" means the term sheet describing the principal terms of the Settlement.

107. "Tax" means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margin, sales, use, ad valorem, value added, transfer, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, escheat, unclaimed property or windfall, profits, custom, duty or other tax, governmental fee or like assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Person.

108. "Third Party Disbursing Agent" means any Entity designated by Plan Agent or Committee to act as a Disbursing Agent pursuant to Article VIB of this Plan.

109. "Third Party Payment" means any payment made on account of a Claim by a non-Debtor.

110. "Transition Services Agreement" means that certain transition services agreement between the Pep Boys Entities and the Debtors dated as of December 31, 2021.

111. "U.S. Trustee" means the Office of the United States Trustee for the Southern District of Texas.

112. "Unexpired Lease" means a lease to which the Debtors are a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code or section 1123 of the Bankruptcy Code, as applicable.

113.     "<u>Unimpaired</u>" means, when used in reference to a Claim, a Claim that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

114.     "<u>Voting Class</u>" means the Class of Claims entitled to vote under the Plan to accept or reject the Plan.

115.     "<u>Voting Deadline</u>" means May 30, 2023, at 4:00 p.m., prevailing Central Time, which is the deadline for submitting Ballots to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code.

116.     "<u>Wind Down</u>" means the wind-down, dissolution, and liquidation of the Debtors' Estates after the Effective Date.

117.     "<u>Wind-Down Debtors</u>" means the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

118.     "<u>Wind-Down Transactions</u>" means the transactions that the Plan Agent deems to be necessary or appropriate to implement the terms of the Plan, and that ultimately result in the dissolution or other termination of the Debtors.

**B.      Rules of Interpretation and Computation of Time**

**1.      Rules of Interpretation**

For purposes of this Plan and Disclosure Statement, unless otherwise provided herein:  (a) whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural; (b) any reference in this Plan and Disclosure Statement to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan and Disclosure Statement to an existing document or exhibit Filed or to be Filed means such document or exhibit, as it may have been or may be amended, modified or supplemented pursuant to this Plan and Disclosure Statement, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors, assigns and affiliates; (e) all references in the Plan to Sections, Articles and exhibits are references to Sections, Articles and exhibits of or to this Plan and Disclosure Statement; (f) the words "herein," "hereunder" and "hereto" refer to this Plan and Disclosure Statement in its entirety rather than to a particular portion of this Plan and Disclosure Statement; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan and Disclosure Statement; (h) subject to the provisions of any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with this Plan and Disclosure Statement, the rights and obligations arising under this Plan and Disclosure Statement shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code (other than subsection (5) thereof) shall apply to the extent not inconsistent with any other provision of this Article IB.

**2.      Computation of Time**

In computing any period of time prescribed or allowed by this Plan and Disclosure Statement, the provisions of Bankruptcy Rule 9006(a) shall apply.

**3.      Controlling Document**

In the event of any inconsistency among this Plan and Disclosure Statement or any exhibit or schedule hereto, the provisions of this Plan and Disclosure Statement shall govern.  In the event of any inconsistency among this Plan and Disclosure Statement and any document or agreement Filed in the Plan Supplement, such document or agreement shall control.  In the event of any inconsistency among this Plan and Disclosure Statement or any document or agreement Filed in the Plan Supplement and the Confirmation Order, the Confirmation Order shall control.

## ARTICLE II
## DEBTORS' HISTORY AND THE BANKRUPTCY CASE

**A.      Debtors' History**

**1.      Debtors' Background, Corporate Structure, and Operations**

**a.      Debtors' Background**

The Debtors are a leading automotive aftermarket parts distributor in the United States.  The Auto Plus brand was launched in the United States in 2010.  Auto Plus was owned by Uni-Select Inc. at that time.  Uni-Select entered the United States automotive aftermarket parts industry in 1998.  It grew Auto Plus operations through acquisitions and investment in inventory and distribution technology platforms for its facilities and customers.

In February 2015, IEH Auto Parts, LLC, a subsidiary of IEP acquired substantially all of the Assets of Uni-Select USA, Inc., including Uni-Select Inc.'s automotive parts distribution business in the United States.  The transaction included 22 distribution centers and satellite locations, 259 corporate-owned stores, and more than 3,500 team members.

In 2016, IEP, through a subsidiary merger, acquired Pep Boys®, a leading automotive aftermarket service company, with nearly a thousand locations throughout the United States.  Later, IEP formed IAG and ownership of Auto Plus and Pep Boys was transferred to IAG, bringing them together under one corporate umbrella.

Despite their common parent, the Debtors and Pep Boys have faced their customer and suppliers as separate businesses.[2]  In 2019, IAG announced its plan to more formally separate the Debtors and Pep Boys businesses into two independent aftermarket businesses—Parts (i.e., the Debtors) and Service (i.e., Pep Boys).

Pursuant to this multi-year plan, the Debtors and Pep Boys operate internally as separate businesses with standalone management teams.  Pursuant to their overall turnaround, the Debtors began to right-size the retail footprint, grow the eCommerce platform and relationships, and implement inventory optimization actions.

**b.      Corporate Structure**

The Debtors' headquarters are located in Kennesaw, Georgia.  The Debtors operate 304 store locations across 26 states, as well as 21 distribution centers—all of which are leased.  For the Debtors to serve their core customers effectively, the Debtors have distribution centers in strategically located regions and near their stores to ensure a continuous supply of products.  A typical Auto Plus store operates, in part, as a mini-distribution center that supports nearby customers (by stocking frequently purchased parts) and also as a retail store that services walk-in customers.  Ultimately, the Debtors' retail and distribution center footprint enables it to fulfill seamlessly their commitments to the stores and end-customers.

Debtor IEH Holding is the direct or indirect parent of all the other Debtors.  IEH Holding is itself wholly owned by non-Debtor IAG.

**c.      Operations**

The Debtors' business operations can be broken down into two key customer groups:  (a) installers and (b) jobbers.  The Debtors also serve several ancillary business segments, which comprise roughly one third of the Debtors' revenue.

---

[2]     For clarity, there are 53 locations where Auto Plus leases space from Pep Boys and the two businesses operate out of one location as separate businesses despite the shared space between the entities.  The Debtors will reject most, if not all, of these subleases and leases before the Effective Date.

Installers. Installers are service providers (e.g., mechanics and garages) that order automotive parts directly from the Debtors. The Debtors' installer customer base is comprised of (a) 2,000+ installers enrolled in the Auto Plus professional service center program, and (b) approximately 19,000 installers not enrolled in the professional service center program. The proximity of the Debtors' stores to the installer base enables efficient delivery of parts on an as-needed basis.

Jobbers. Jobbers are wholesalers that purchase larger quantities of automotive parts that they can distribute to their own customers. The jobber customer base is comprised of over 400 banner jobber customers that predominantly buy parts from the Debtors and over 1,600 jobbers that do not fly the Auto Plus banner. The locations of Auto Plus's stores and distribution centers allow it to fulfill its commitments to deliver daily shipments to jobbers.

Other. Approximately a third of the Debtors' revenue comes from ancillary business segments, such as (a) store sales to retail customers (tapping into the do-it-yourself customer base), (b) eCommerce, (c) national accounts, where the Debtors sell directly to large national companies, (d) exports to foreign-based jobbers, (e) large fleet companies (e.g., car rental companies), (f) governmental bids, and (h) paint body & equipment, which are autobody shops that purchase paint.

## B.      Events Leading to the Chapter 11 Cases

Over the last two years, the Debtors incurred significant losses in their operations. For fiscal year 2021, the Debtors' EBITDA was negative $153 million and for fiscal year 2022, the Debtors EBITDA was negative $84.1 million.

A number of factors contributed to the Debtors' declining financial performance. The Debtors' retail footprint was both too large and also situated in too many regions in the United States for the Debtors to effectively operate an efficient and profitable business. This resulted in high leasing, shipping, and labor costs. In addition, the Debtors' inventory management was inefficient. This resulted in excess and slow-moving products at their distribution centers and retail stores, significant warehousing costs, and a decline in sales at Auto Plus's stores.

The Debtors took significant steps to evaluate and implement cost reduction measures over the last two years. These initiatives resulted in: (a) selling their operations in California and the Pacific Northwest, (b) exiting retail stores and distribution centers in low performing markets, (c) selling excess inventory through alternative channels, (d) right-sizing the labor force, and (e) reducing G&A expenses.

The Debtors have seen an improvement in their EBITDA over the past year. However, various external factors have made an out-of-court restructuring even more difficult by negatively impacting the Debtors' business as well as the industry in general, including lessened demand, supply chain disruptions, an inflationary environment, and the effects of COVID-19. The Debtors no longer have the necessary liquidity to effectuate an out-of-court turnaround of their businesses. Beginning in late 2022, the Debtors began to explore transactions with strategic partners for a going concern sale of their businesses and also sales of certain regions where Auto Plus operates. The Debtors received informal indications of interest. However, their preliminary discussions with counterparties did not result in actionable offers.

## C.      Debtors in Possession Financing

To provide the Debtors with the liquidity needed to preserve and stabilize operations and conduct a value-maximizing sale process, the Debtors negotiated the DIP Facility, which provided the Debtors with a priming superpriority administrative claim debtors-in-possession credit facility in an aggregate maximum principal amount of up to $75 million. No alternative source of funding to satisfy the Debtors' critical liquidation objectives was available. Prior to the Petition Date, the Debtors and the DIP Lender (and their respective advisors) engaged in arm's-length negotiations regarding the terms and conditions of the DIP Facility.

**D.      Main Bankruptcy Events**

**1.      First Day Orders**

On February 1, 2023, the Bankruptcy Court held a hearing on and entered orders approving the various first day pleadings filed by the Debtors, including:

- *Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 2];

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of the Notice of Commencement, and (III) Granting Related Relief* [Docket No. 4];

- *Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Claims, Noticing, and Solicitation Agent* [Docket No. 5];

- *Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) Rule 2015.3 Financial Reports and (II) Granting Related Relief* [Docket No. 6];

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain and Administer their Existing Customer Programs and (B) Honor Certain Prepetition Obligations and (II) Granting Related Relief* [Docket No. 7];

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue the Inventory Management Program and (II) Granting Related Relief* [Docket No. 8];

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Trade Claims, (II) Confirming Administrative Expense Priority of Outstanding Purchase Orders, and (III) Granting Related Relief* [Docket No. 9];

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Trade Claims, (II) Confirming Administrative Expense Priority of Outstanding Purchase Orders, and (III) Granting Related Relief* [Docket No. 10];

- *Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* [Docket No. 11];

- *Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees, and (II) Granting Related Relief* [Docket No. 12];

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Related Prepetition Obligations, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees, and (D) Maintain the Customs Bond Program, and (II) Granting Related Relief* [Docket No. 13];

- *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Post-Petition Financing Secured by Senior Liens, (II) Authorizing the Debtors to Use Cash Collateral (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 16];

16

- *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, (C) Maintain Existing Business Firms and Books and Record and (II) Granting Related Relief* [Docket No. 26].

On March 27, 2023, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, (C) Maintain Existing Business Forms and Books and Records, and (II) Granting Related Relief* [Docket No. 267]. On [●], 2023, the Bankruptcy Court entered the Final DIP Order.

### 2. Employment Applications

**The following employment applications and orders approving employment applications were filed in these Chapter 11 Cases:**

- Jackson Walker LLP ("JW"): On March 28, 2023, the Bankruptcy Court entered an order approving the retention of JW as counsel for the Debtors. [Docket No. 273].

- Lincoln International LLC ("Lincoln"): On March 27, 2023, the Bankruptcy Court entered an order approving the retention of Lincoln as investment banker for the Debtors [Docket No. 263].

- Law Office of Liz Freeman ("Freeman"): on April 3, 2023, the Bankruptcy Court entered an order approving the retention of The Law Office of Liz Freeman, PLLC as co-counsel and conflicts counsel for the Debtors [Docket No. 320].

- Triple P RTS, LLC ("Portage Point"): on March 28, 2023, the Bankruptcy Court entered an order approving the retention of Portage Point as restructuring advisor to the Debtors [Docket No. 272].

- B. Riley Advisory Services ("B. Riley"):  on April 5, 2023, the Debtors filed the employment application for B. Riley as the inventory valuation and appraisal advisor to the Debtors [Docket No. 338].

- B. Riley Real Estate, LLC ("BRRE"): on April 11, 2023, the Bankruptcy Court entered an order approving the retention of BRRE as real estate advisors to the Debtors [Docket No. 360].

- Ordinary Course Professionals:  On April 10, 2023, the Bankruptcy Court entered the Ordinary Course Professionals Order.

### 3. Schedules and Statements

On March 31, 2023, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs [Docket Nos. 292304]. On March 31, 2023, the Debtors filed their Statements of Financial Affairs [Docket Nos. 305318]. Interested parties may review the Schedules by visiting the Document Website.

### 4. 341 Meeting

On March 9, 2023, the Debtors conducted the first 341 meeting of creditors. The 341 meeting of creditors was continued to and concluded on April 6, 2023 [Docket No. 201].

### 5. General Bar Date and Governmental Bar Date

On March 13, 2023 the Bankruptcy Court entered the Bar Date Order setting the General Bar Date to occur on May 1, 2023 at 5:00 p.m., prevailing Central Time and setting the Governmental Bar Date to occur on July 31, 2023 at 5:00 p.m., prevailing Central Time [Docket No. 222].

All proofs of claim must be actually received on or before the applicable bar date.

**E.      Summary of Treatment of Claims and Equity Interests and Estimated Recoveries**

The following chart provides a summary of treatment of each Class of Claims and Equity Interests (other than Administrative Expense Claims, Priority Tax Claims, and DIP Facility Claims) based on an estimate of the recoveries of each Class. The treatment provided in this chart is for informational purposes only and is qualified in its entirety by Article IIIC of this Plan and Disclosure Statement.

| Class | Estimated Allowed Claims[3] | Treatment / Voting Status | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 1—Priority Claims | $7 million | Unimpaired / Presumed to Accept | 100% |
| Class 2—General Unsecured Claims | $170 million | Impaired / Entitled to Vote | 10% |
| Class 3—Intercompany Claims | Unknown | Impaired / Deemed to Reject | 0% |
| Class 4—Equity Interests | $323 million | Impaired / Deemed to Reject | 0% |

**ARTICLE III**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

All Claims and Interests, except for those Claims set forth in Article IIIA below, are classified for voting and Distribution pursuant to this Plan and Disclosure Statement as set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, and DIP Facility Claims are not classified herein. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any remainder of such Claim or Interest qualifies within the description of such other Classes.

**A.      Unclassified Claims**

      **1.      Payment of Administrative Expense Claims**

            a.      Administrative Expense Claims in General

Unless otherwise agreed by the Holder of an Administrative Expense Claim and the Debtors or the Plan Agent, or unless an order of the Bankruptcy Court provides otherwise, each Holder of an Allowed Administrative Expense Claim will receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Administrative Expense Claim, Cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, which payments shall be made at the Debtors' option (i) in the ordinary course of business or (ii) on the latest

---

3      These amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by Creditors in proofs of claim or otherwise. The Debtors have not completed their analysis of Claims filed in the Chapter 11 Cases and objections to such Claims have not been fully litigated. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

to occur of (i) the Effective Date (or as soon as reasonably practicable thereafter), (ii) the date such Claim becomes an Allowed Administrative Expense Claim (or as soon as reasonably practicable thereafter), and (iii) such other date as may be agreed upon by the Plan Agent and the Holder of such Claim. Pursuant to the 9019 Order, and the Settlement Term Sheet, IAG shall backstop the payment of all Allowed Administrative Expense Claims.

      b.     Statutory Fees

On or before the Effective Date, Administrative Expense Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors or the Plan Agent in Cash equal to the amount of such Administrative Expense Claims. Fees payable pursuant to 28 U.S.C. § 1930 on behalf of the Estates after the Effective Date will be paid by the Plan Agent until the closing of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

      c.     Professional Compensation

          i.     Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims may be made any time after the Effective Date, but shall be filed no later than forty-five (45) days after the Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.

          ii.     Payment of Professional Fees Accrued Post-Effective Date

From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate. All Professional Fee Claims accrued from and after the Effective Date shall be paid in the ordinary course of business. This provision of the Plan and Disclosure Statement shall be effective immediately upon Confirmation of the Plan notwithstanding the occurrence of the Effective Date.

          iii.     Professional Fee Escrow Account

Within fourteen (14) days after the Confirmation and not later than the Effective Date, the Debtors shall establish and fund a Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, or the Plan Agent.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Claims are Allowed by a Final Order. The Debtors' and the Plan Agent's obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account and such Allowed Professional Fee Claims shall also be payable from the Wind Down Amount. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

          iv.     Estimation of Professional Fees and Expenses

Professionals providing services to the Debtors shall reasonably estimate their unpaid Professional Fee Claims against the Debtors incurred before and as of the Confirmation Date, and shall deliver such estimate to the

Debtors within five Business Days after the Confirmation Date; *provided* that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.

v.        Post-Effective Date Professional Fees and Expenses

Except as otherwise specifically provided in this Plan, from and after the Effective Date, subject only to the terms of the Plan, the Plan Agent may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.  Any such funding for Plan Agent professionals and/or expenses shall be paid from the Wind Down Amount.

        d.        Bar Date for Administrative Expense Claims

Except with respect to Professional Fee Claims or otherwise as set forth in this Plan, unless previously Filed, requests for payment of Administrative Expense Claims must be Filed and served on the Notice Parties pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than the Administrative Expense Bar Date, which is thirty (30) days after the Effective Date.  Holders of Administrative Expense Claims that are required to File and serve a request for payment of such Administrative Expense Claims and that do not File and serve such a request by the Administrative Expense Bar Date will be forever barred from asserting such Administrative Expense Claims against the Debtors, the Plan Agent or their respective property, and such Administrative Expense Claims will be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the Notice Parties and the requesting party by the later of (a) thirty 30 days after the Filing of the applicable request for payment of Administrative Expense Claims or (b) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Expense Claims.

     **2.**        **Payment of Priority Tax Claims**

        a.        Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of a Priority Tax Claim and the Debtors or the Plan Agent, as applicable, each Holder of an Allowed Priority Tax Claim will receive, at the option of the Debtors or the Plan Agent, as applicable, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Plan Agent as they become due.

        b.        Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding anything to the contrary in this Plan and Disclosure Statement, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the Holder (other than as the Holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the Debtors, the Plan Agent or their respective property.

     **3.**        **Treatment of DIP Facility Claims**

On the Effective Date, DIP Facility Claims shall receive distribution of 100% of the Auction proceeds up to and including $205 million.  Above $205 million, the DIP Facility Claims shall receive Distribution of 75% of the Auction proceeds until the DIP Facility Claims are paid in full.

20

**4.      510(b) Claims**

All 510(b) claims are waived, discharged, extinguished, and forever barred as of the Effective Date.

**B.      Classification of Claims and Interests**

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for the purposes of voting and Distribution pursuant to this Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class.  Except as otherwise specifically provided for herein, the Confirmation Order or any other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; *provided* that in the event no Holder of a Claim with respect to a specific Class timely submits a Ballot in compliance with the Disclosure Statement Order indicating acceptance or rejection of this Plan, such Class will be deemed to have accepted this Plan.  The Debtors may seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

**C.      Treatment of Claims and Interests**

Each Holder of an Allowed Claim shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim, except to the extent different treatment is agreed to by the Debtors (prior to the Effective Date) or the Plan Agent (on or after the Effective Date) and the Holder of such Allowed Claim.  Unless otherwise indicated, the Holder of an Allowed Claim shall receive such treatment on the later of (i) the Effective Date or as soon as reasonably practicable thereafter, (ii) the date on which such claim is due in accordance with its terms in the ordinary course of business, and (iii) the date on which the applicable Claim becomes an Allowed Claim.  Notwithstanding any other provision of the Plan or this Order, the Debtors shall not receive a discharge pursuant to 11 U.S.C. § 1141(d)(3) of the Bankruptcy Code.  Any provision in the Plan that violates 11 U.S.C. § 1141(d)(3) of the Bankruptcy Code shall have no force or effect. In the event there is a conflict between the provisions of this Order and the Plan (including any attachments, exhibits, or supplements to the Plan), this Order shall control.

**1.      Priority Claims (Class 1)**

a.      <u>Classification</u>.  Class 1 consists of all Priority Claims.

b.      <u>Treatment</u>.  On the applicable Distribution Date, each Holder of an Allowed Priority Claim shall receive, at the option of the Debtors (prior to the Effective Date) or the Plan Agent (on or after the Effective Date):  (i) payment in full in Cash; or (ii) such other treatment as is necessary to render such Claim Unimpaired.

c.      <u>Voting</u>.  Claims in Class 1 are Unimpaired.  Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**2.      General Unsecured Claims (Class 2)**

a.      <u>Classification</u>.  Class 2 consists of all General Unsecured Claims.

b.      <u>Treatment</u>.  On the applicable Distribution Date, each Holder of an Allowed General Unsecured Claim will receive (i) its Pro Rata share of the GUC Pool and

c.   <u>Voting</u>.  Claims in Class 2 are Impaired.  Holders of Claims in Class 2 are entitled to vote on this Plan.

**3.      Intercompany Claims (Class 3)**

a.   <u>Classification</u>.  Class 3 consists of all Intercompany Claims.

b.   <u>Treatment</u>.  Each Intercompany Claim shall be discharged, cancelled, released, and extinguished without any Distribution to Holders of such Claims.

c.   <u>Voting</u>.  Class 3 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 3 is not entitled to vote to accept or reject the Plan.

**4.      Equity Interests in the Debtors (Class 4)**

a.   <u>Classification</u>.  Class 4 consists of all Equity Interests in the Debtors.

b.   <u>Treatment</u>.  On the Effective Date, all Equity Interests in the Debtors shall be canceled.  No Distribution shall be made on account of Equity Interests in the Debtors.

c.   <u>Voting</u>.  Class 4 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 4 is not entitled to vote to accept or reject the Plan.

**D.      Reservation of Rights Regarding Claims**

Except as otherwise provided in this Plan or in other Final Orders of the Bankruptcy Court, including the DIP Orders, nothing shall affect the rights or defenses of the Debtors or Plan Agent, as applicable, whether legal or equitable, with respect to any Claim, including all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**E.      Postpetition Interest on Claims**

Except as required by applicable bankruptcy law or the DIP Orders, postpetition interest shall not accrue or be payable on account of any Claim.

**F.      Insurance**

Notwithstanding anything to the contrary herein, if any Allowed Claim is covered by an Insurance Policy, such Claim shall first be paid from proceeds of such Insurance Policy, with the balance, if any, treated in accordance with the provisions of this Plan governing the Class applicable to such Claim.

**G.      Confirmation Without Acceptance by All Impaired Classes**

The Debtors request Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept this Plan pursuant to section 1126 of the Bankruptcy Code. This Plan and Disclosure Statement shall constitute a motion for such relief.

**H.      Class Without Voting Claim Holders**

If Holders of Claims in a particular Impaired Class of Claims are entitled to vote to accept or reject this Plan, but no Holders of Claims in such Impaired Class of Claims vote to accept or reject this Plan, then such Class of Claims shall be deemed to have accepted this Plan.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.      The Plan Agent and the Wind-Down Debtors**

**1.      Vesting of Assets**

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated herein or therein, on the Effective Date, the Assets shall revest in the Estates for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, the Wind-Down Debtors may, at the direction of the Plan Agent, and subject to the Confirmation Order, use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**2.      Wind-Down Debtors**

On and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (a) resolving Claims that are not General Unsecured Claims, (b) making distributions on account of Allowed Claims that are not General Unsecured Claims, (c) establishing and funding the Disputed Claims Reserve, (d) filing appropriate Tax returns, (e) liquidating all Assets of the Debtors and winding down the Estates, and (f) otherwise administering the Plan.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, without the need or requirement for the Plan Agent to file a motion or otherwise substitution as a parties or counsel in any matter.

**3.      The Plan Agent**

The Plan Agent shall have the sole and exclusive corporate authority to act for the Debtors (all and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan and Confirmation Order.  On the Effective Date, the authority, power, and incumbency of the Persons acting as managers, directors, and officers of the Debtors shall vest in the Plan Agent.  The Plan Agent  shall be appointed as the sole manager, sole director, and sole officer of the Debtors, and shall succeed to the powers of the Debtors' managers, directors, and officers.

From and after the Effective Date, the Plan Agent shall be the sole Representative of the Debtors.  The Plan Agent shall have the authority to sell, liquidate, or otherwise dispose of any and all of the Debtors' Assets without any additional notice to or approval from the Bankruptcy Court.

The Plan Agent shall have the sole authority to file and prosecute objections to Priority Claims and Administrative Expense Claims.

The Plan Agent may retain any advisor or agent the Plan Agent deems necessary or advisable to carry out the terms of this Plan.  The fees and expenses of any such advisor or agent shall be paid after the Effective Date without further order of the Bankruptcy Court.

Without limiting the foregoing, the Plan Agent shall have the sole authority to (a) perform all actions and execute all agreements, instruments and other documents necessary to implement this Plan; (b) establish, maintain and administer any bank accounts of the Wind-Down Debtors; (c) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, supervise, prosecute, settle, and protect, as applicable, the Assets that revest in the Wind-Down Debtors (directly or through its professionals or a Third Party Disbursing Agent), in accordance with this Plan; (d) review, reconcile, settle or object to all Priority Claims and Administrative Expense Claims; (e) calculate and make Distributions to creditors other than General Unsecured Creditors; (f) pursue Retained Causes of Action; (g) retain, compensate, and employ professionals to represent the Plan Agent; (h) file appropriate Tax returns and other reports on behalf of the Wind-Down Debtors and pay Taxes or other obligations owed by the Wind-Down Debtors; (i) file,

to the extent reasonably feasible, appropriate Tax returns on behalf of the Debtors and pay Taxes or other obligations arising in connection therewith; (j) exercise such other powers as may be vested in the Wind-Down Debtors pursuant to this Plan, or as are deemed by the Plan Agent to be necessary and proper to implement the provisions of this Plan; (k) take such actions as are necessary or appropriate to close the Debtors' Chapter 11 Cases; and (l) dissolve the Wind-Down Debtors including the effectuation of the Wind-Down Transactions.

### 4.        Post-Effective Date Corporate Governance

Effective as of the Effective Date, the existing board of managers of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholder, or members, and any remaining officers, directors, managers, or managing members of the Debtors shall be dismissed without any further action required in connection therewith.  As set forth above, the Plan Agent shall act as the sole manager, sole director, and sole officer of the Debtors with respect to its affairs.

### 5.        Dissolution of the Debtors

Upon a certification to be Filed with the Bankruptcy Court by the Plan Agent of all Distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Plan Agent, including the filing of any documents with the secretary of state for the state in which the Debtors are formed or any other jurisdiction. Notwithstanding the foregoing, the Plan Agent shall retain the authority to take all necessary actions to dissolve the Wind-Down Debtors in, and withdraw the Wind-Down Debtors from, applicable states and provinces to the extent required by applicable law.

Subject in all respects to the terms of this Plan, the Plan Agent shall have the power and authority to take any action necessary to wind-down and dissolve the Wind-Down Debtors, and may: (a) file a certificate of dissolution for the Wind-Down Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Wind-Down Debtors under the applicable laws of the Debtors' state of formation; (b) complete and file all final or otherwise required federal, state, and local Tax returns and shall pay Taxes required to be paid for the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid Tax liability of any of the Debtors or their Estates for any Tax incurred during the administration of the Debtors' Chapter 11 Cases, as determined under applicable tax laws; and (c) represent the interests of the Debtors or the Estates before any taxing authority in all Tax matters, including any action, suit, proceeding, or audit.

Any filing by the Plan Agent of the Wind-Down Debtors' certificates of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholder, members, board of directors, or board of managers of the Debtors or any of their Affiliates.

As the Wind-Down Debtors will be dissolved upon completion of the administration of this Plan, no new corporate organizational documents will be executed.

### B.        Settlement of Claims

Except as otherwise provided in this Plan, on or after the Effective Date, the Plan Agent may compromise or settle any Claims, other than any Professional Fee Claims, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for liquidating expenses, professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of applications for payment of Professional Fee Claims) without application to the Bankruptcy Court.

### C.        Abandonment of Assets by the Plan Agent

After the Effective Date, the Plan Agent may abandon any Assets that the Plan Agent determines in his or her reasonable discretion to be of de minimis value or burdensome to the Plan Agent.

**D.**     **Cancellation and Surrender of Instruments, Securities and Other Documentation**

Except as provided in (a) any contract, instrument or other agreement or document entered into or delivered in connection with this Plan, or (b) any of the Asset sales effectuated during the pendency of the Debtors' Chapter 11 Cases, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article VI hereof, all notes, instruments, certificates and other documents evidencing Claims or Interests shall be deemed canceled and surrendered and of no further force and effect against the Debtors, without any further action on the part of the Debtors.

**E.**     **Release of Liens**

Except as otherwise provided in this Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Plan, any and all Liens on the property of the Estates shall be fully satisfied, settled, released, and discharged, and all of the right, title and interest of any Holder of such Liens shall be satisfied, settled, released, and discharged upon such Holder receiving its Distribution in accordance with the terms of this Plan.  Any Holder of such Liens shall be authorized and directed to release any collateral or other property of the Debtors held by such Holder (or the applicable agent for such Holder) and to take such actions as may be reasonably requested by the Debtors or the Plan Agent, as applicable, to evidence the release of such Liens, including the execution, delivery, and filing or recording of all documents reasonably requested by the Debtors or the Plan Agent, as applicable.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or Plan Agent, as applicable, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Debtors or Plan Agent, as applicable, shall be entitled to make any such filings or recordings on such Holder's behalf.

**F.**     **Effectuating Documents; Further Transactions**

The Debtors (prior to the Effective Date) and the Plan Agent (on or after the Effective Date) are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of this Plan in the name of and on behalf of the Debtors without the need for any approvals, authorization or consents except those expressly required pursuant to this Plan.

**ARTICLE V**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.**     **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, each of the Debtors' Executory Contracts or Unexpired Leases shall be deemed automatically rejected in accordance with the provisions of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date unless any such Executory or Unexpired Lease: (1) has previously been assumed by the Debtors by Final Order of the Bankruptcy Court; (2) is listed on the schedule of Retained Contracts included in the Plan Supplement; or (3) is the subject of a motion to assume or reject pending as of the Effective Date.

Except as otherwise previously approved by an order of the Bankruptcy Court, entry of the Confirmation Order by the Bankruptcy Court shall constitute an order, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, approving the assumptions and the rejections of such Executory Contracts and Unexpired Leases as set forth in the preceding paragraph.  Unless otherwise indicated herein, assumptions and rejections of Executory Contracts and Unexpired Leases pursuant to this Plan shall be effective as of the Effective Date.  Each Executory Contract or

25

Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order and not assigned to a third party on or before the Effective Date shall revest in the Estates and be fully enforceable by the Plan Agent in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing its assumption pursuant to section 365 of the Bankruptcy Code; *provided* that if an assignment is pending as of the Effective Date, the Plan Agent shall be authorized to take any and all actions necessary to implement such assignment.

To the maximum extent permitted by law, to the extent any provision (including any "change of control" provision) in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the assumption and assignment contemplated by this Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto, except for asserting and pursuing a Cure Amount. Notwithstanding anything to the contrary in this Plan, the Debtors reserve the right to alter, amend, modify or supplement the Plan Supplement prior to the Effective Date on no less than three days' notice to any counterparty to an Executory Contract or Unexpired Lease affected thereby.

**B.     Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of any Executory Contracts and Unexpired Leases pursuant to this Plan must be Filed with the Claims and Noticing Agent within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any proofs of Claim arising from the rejection of any Executory Contracts and Unexpired Leases that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Debtors or Estates without the need for any objection by the Debtors or Estates or further notice to or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of any Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article IIIC.2 hereof.

The Plan Agent reserves the right to object to, settle, compromise, or otherwise resolve any Claim Filed on account of a rejected Executory Contract or Unexpired Lease.

Holders of Claims arising from the rejection of Executory Contracts and Unexpired Leases with respect to which no proof of Claim is timely Filed will be forever barred from asserting a Claim against the Debtors, the Estates, or the property of any of the foregoing, unless otherwise expressly allowed by the Bankruptcy Court.

**C.     Insurance Policies**

All rights of the Debtors under any and all Insurance Policies under which the Debtors is an insured shall automatically become vested in the Estate as of the Effective Date without necessity for further approvals or orders. To the extent that any such Insurance Policies are deemed Executory Contracts, then, unless such Insurance Policies have been rejected pursuant to an order of the Bankruptcy Court (including the Confirmation Order), notwithstanding anything to the contrary in this Plan, this Plan shall constitute a motion by the Debtors to assume those policies, permit such policies to "ride through," or ratify such Insurance Policies. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute both approval of such assumption pursuant to section 365 of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption is in the best interests of the Estate. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed upon by the parties prior to the Effective Date, no payments shall be required to cure any defaults existing as of the Confirmation Date with respect to any Insurance Policy assumed by the Estate pursuant to this Article V. Each applicable Insurer is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to the Chapter 11 Cases, this Plan or any provision within this Plan, including the treatment or means of liquidation set out within this Plan for any insured Claims or Causes of Action. Nothing in this Plan shall impair the rights of Estate with respect to (or affect the coverage under) any Insurance Policy.

# ARTICLE VI
## PROVISIONS REGARDING DISTRIBUTIONS

**A.   Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in this Article VI, Distributions to be made on the Effective Date to Holders of Allowed Claims shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable by the Debtors or the Plan Agent.

**B.   Method of Distributions to Holders of Claims**

All Distributions to be made under this Plan shall be made by the Plan Agent or such Third Party Disbursing Agents as Plan Agent may employ in its sole discretion.  Each Disbursing Agent may serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by this Plan, if approved by the Plan Agent.

**C.   Disbursing Agent**

**1.   Powers of the Disbursing Agent**

The Disbursing Agent shall be empowered to:  (a) make all Distributions contemplated in this Plan; (b) effectuate all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan; and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**2.   Expenses Incurred on or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including Taxes) and any reasonable compensation to the Disbursing Agent for services rendered shall be paid in Cash by the Plan Agent.

**3.   No Liability**

Except on account of gross negligence or willful misconduct, the Disbursing Agent shall have no (a) liability to any party for actions taken in accordance with this Plan or in reliance upon information provided to it in accordance with this Plan or (b) obligation or liability to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a Distribution is made or who does not otherwise comply with the terms of this Plan.

**D.   Disputed Claims Reserves**

**1.   Establishment of Disputed Claims Reserves**

On the Effective Date or as soon thereafter as is reasonably practicable, the Plan Agent shall establish Disputed Claims Reserves for Disputed Administrative Expense Claims, Secured Claims, Priority Claims, Priority Tax Claims, and General Unsecured Claims, which reserves shall be administered by the Plan Agent.  The Plan Agent shall reserve, in Cash or other property, the expected recovery that such Disputed Claim would receive if it were ultimately determined to be an Allowed Claim (or such lesser amount as may be determined or estimated by the Bankruptcy Court after notice and a hearing in accordance with Article VII hereof) with respect to each such Disputed Claim.  For the avoidance of doubt, the Plan Agent may administer the Disputed Claims Reserves by book entry.

2.      **Maintenance of Disputed Claims Reserves**

To the extent that the property placed in a Disputed Claims Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account. The property in the Disputed Claims Reserves shall be held in trust for the benefit of the Holders of Claims ultimately determined to be Allowed in each applicable Class. Each Disputed Claims Reserve shall be closed by the Plan Agent when all Distributions required to be made under this Plan to the Holders of Claims in the applicable Class will have been made in accordance with the terms of this Plan. Upon closure of a Disputed Claims Reserve, all Cash (including any investment yield on the Cash) and other property held in that Disputed Claims Reserve shall be distributed in accordance with this Plan.

E.      **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.      **Delivery of Distributions**

Distributions to Holders of Allowed Claims will be made by a Disbursing Agent: (a) at the addresses set forth on the respective proofs of Claim Filed by Holders of such Claims or requests for payment of Administrative Expense Claims, as applicable; (b) at the address for a Claim transferee set forth in a valid and timely notice of transfer of Claim Filed with the Bankruptcy Court; (c) at the addresses set forth in any written notice of address change Filed with the Bankruptcy Court or delivered to the Disbursing Agent after the date of Filing of any related proof of Claim; (d) at the addresses reflected in the Debtors' Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address; or (e) if clauses (a) through (d) are not applicable, at the last address directed by such Holder after such Claim becomes an Allowed Claim.

2.      **Undeliverable Distributions Held by Disbursing Agents**

a.      Holding of Undeliverable Distributions

If any Distribution to a Holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further Distributions will be made to such Holder unless and until the applicable Disbursing Agent is notified by written certification of such Holder's then-current address. Nothing contained in the Plan shall require the Disbursing Agent or the Plan Agent to attempt to locate any Holder of an Allowed Claim.

b.      After Distributions Become Deliverable

On each Distribution Date, the applicable Disbursing Agent will make all Distributions that became deliverable to Holders of Allowed Claims after the most recent Distribution Date; *provided* that the applicable Disbursing Agent, in its sole discretion, may establish a record date prior to each Distribution Date, such that only Claims Allowed as of the record date will participate in such periodic Distribution. Notwithstanding the foregoing, the applicable Disbursing Agent reserves the right, if it determines a Distribution on any Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a Distribution Date.

c.      Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim that does not assert its right to an undeliverable Distribution prior to the date that is ninety (90) days prior to the Final Distribution Date will be forever barred from asserting any such Claim against the Debtors, the Plan Agent, or their respective property. In such cases, (a) the undeliverable Distributions shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code, (b) the Allowed Claims with respect to such Distributions shall be automatically cancelled, (c) the right of the Holders entitled to those Distributions shall be discharged and forever barred, and (d) the undeliverable Distributions will be maintained in the applicable Account for redistribution to other claimants entitled to Distribution from such Account.

F.      **Distribution Record Date**

As of 5:00 p.m. (prevailing Central Time) on the Distribution Record Date, the transfer registers for Claims shall be closed. The Disbursing Agent shall have no obligation to recognize the transfer or sale of any Claim that

occurs after such time on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make Distributions only to those Holders who are Holders of Claims as of 5:00 p.m. on the Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Central Time) on the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

**G.      De Minimis Distributions**

No Distribution of less than $100 shall be made by the Disbursing Agent.  Any Distribution less than $100 shall revest in the Estates for distribution to Holders of other Allowed Claims in the applicable Class in accordance with this Plan.  Whenever a payment of a fraction of a dollar would otherwise be called for, the actual payment may reflect a rounding down to the nearest whole dollar.

**H.      Compliance with Tax Requirements**

In connection with this Plan, to the extent applicable, the Debtors or the Plan Agent, as applicable, shall comply with all Tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to generate sufficient funds to pay applicable withholding Taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate.  The Disbursing Agent shall have the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, Liens and encumbrances.

The Disbursing Agent shall be authorized to require each Holder of a Claim to provide it with an executed Form W-9, Form W-8 or other appropriate tax form or documentation as a condition precedent to being sent a Distribution.  The applicable Disbursing Agent shall provide advance written notice of such requirement to each Holder of a Claim affected thereby.  The notice shall provide each Holder of a Claim with a specified time period after the date of mailing of such notice to provide an executed Form W-9, Form W-8 or other tax form or documentation to the Disbursing Agent.  If a Holder of an Allowed Claim does not provide the Disbursing Agent with an executed Form W-9, Form W-8 or other tax form or documentation within the time period specified in such notice, or such later time period agreed to by the Disbursing Agent in writing in its discretion, then the Disbursing Agent, in its sole discretion, may (a) make a Distribution net of any applicable withholding or (b) determine that such Holder shall be deemed to have forfeited the right to receive any Distribution, in which case, any such Distribution shall revert to the Debtors, for Distribution on account of other Allowed Claims and the Claim of the Holder originally entitled to such Distribution shall be waived, discharged and forever barred without further order of the Bankruptcy Court.

**I.      Manner of Payment Under the Plan**

Unless a Holder of an Allowed Claim and the Disbursing Agent otherwise agree, any Distribution to be made in Cash shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank.  Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**J.      Time Bar to Cash Payments**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 180 days after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the Entity to whom such check was originally issued.  Any Claims in respect of such voided check shall be discharged and forever barred and such unclaimed Distribution shall be maintained in the applicable Account for

redistribution to other claimants entitled to Distribution from such Account, notwithstanding any federal or state escheat laws to the contrary.

**K.      Setoffs**

Except with respect to Claims satisfied, settled, released, and discharged pursuant to this Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Claim (and the Distributions to be made on account of such Claim), counterclaims, rights and causes of action of any nature that the Debtors may hold against the Holder of such Claim: *provided*, *however*, that the failure to effectuate such a setoff shall not constitute a waiver or release by the Debtors, the Disbursing Agent or the Plan Agent of any Causes of Action that the Debtors or the Estates may possess against the Holder of a Claim.

**L.      Allocation Between Principal and Accrued Interest**

Interest shall not accrue on any Holder's Claim entitled to a Distribution from Assets in respect of the period from the Petition Date to the date a final Distribution is made on such Claim.  To the extent that any Allowed Claim entitled to a Distribution from Assets consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

**M.      Distributions to Holders of Disputed Claims**

Notwithstanding any other provision of this Plan:  (a) no Distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever; and (b) except as otherwise agreed to by the relevant parties, no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, any Distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  On the Distribution Date that is at least 30 days after a Disputed Claim becomes an Allowed Claim (or such lesser period as the Disbursing Agent may determine), the Holder of such Claim shall receive any Distribution to which such Holder would have been entitled under the Plan as of the Effective Date (including any Distribution such Holder would have been entitled to on the Distribution Date on which such Holder is receiving its initial Distribution) if such claim had been Allowed as of the Effective Date, without any interest to be paid on account of such Claim.

**N.      Claims Paid or Payable by Third Parties**

**1.      Claims Paid by Third Parties**

To the extent that the Holder of an Allowed Claim receives a Third Party Payment, the Plan Agent shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of the Third Party Payment, and such Claim shall be disallowed or deemed satisfied, as applicable, to the extent of the Third Party Payment without an objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

**2.      Claims Payable by Insurance**

No Distributions shall be made on account of any Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies (other than the Debtors' deductible obligation with respect to such Allowed Claim).  To the extent that any of the Debtors' Insurers agrees to satisfy in full or in part an Allowed Claim, then immediately upon such Insurers' agreement, such Claim may be noted on the claims register as satisfied in accordance with this Plan without an objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including Insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

## ARTICLE VII
## DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS

### A.    Allowance of Claims

After the Effective Date, the Plan Agent shall have any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or satisfied, settled, released, and discharged under this Plan. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

### B.    Prosecution of Objections to Claims

#### 1.    Authority to Prosecute and Settle Claims

Except as otherwise specifically provided in this Plan, the Debtors (prior to the Effective Date), the Plan Agent (after the Effective Date), shall have the sole authority to: (a) File, withdraw or litigate to judgment, objections to Claims; (b) settle or compromise any Disputed Claim (other than a Professional Fee Claim) without any further notice to or action, order or approval by the Bankruptcy Court; and (c) direct the Claims and Noticing Agent to adjust the claims register to reflect any such resolutions without any further notice to or action, order or approval by the Bankruptcy Court. The Plan Agent shall consult with the Wind-Down Debtors concerning the filing or resolution of Claims objections.

#### 2.    Pending Objections

To the extent that the Debtors Filed objections to Claims that remain pending as of the Effective Date, the Plan Agent shall be substituted as the objecting party without further action of the parties or order of the Bankruptcy Court.

#### 3.    Application of Bankruptcy Rules

To facilitate the efficient resolution of Disputed Claims, the Plan Agent shall, notwithstanding Bankruptcy Rule 3007(c), be permitted to File omnibus objections to Claims.

#### 4.    Authority to Amend Schedules

The Debtors and the Plan Agent, as applicable, will have the authority to amend the Schedules with respect to any Claim and to make distributions based on such amended Schedules (if no proof of Claim is timely Filed in response thereto) without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtors or the Plan Agent, will provide the Holder of such Claim with notice of such amendment and such parties will have 30 days to File an objection to such amendment in the Bankruptcy Court.

C.      **Estimation of Claims**

        The Debtors, prior to the Effective Date, and the Plan Agent, after the Effective Date, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to such Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under this Plan (including for purposes of Distributions), and the Debtors or the Plan Agent (as the case may be) may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

D.      **Offer of Judgment**

        The Debtors, before the Effective Date, and the Plan Agent, after the Effective Date, are authorized to serve upon a Holder of a Disputed Claim an offer to allow judgment to be taken on account of such Disputed Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment. To the extent the Holder of a Disputed Claim must pay the costs incurred by the Debtors after the making of such offer, the Debtors are entitled to set off such amounts against the amount of any Distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

**ARTICLE VIII.**
**CONFIRMATION OF THE PLAN**

A.      **Conditions Precedent to Confirmation**

        1.      The proposed Confirmation Order shall be in form and substance satisfactory to the Debtors and the DIP Lender, and the Committee.

        2.      Any exhibits or schedules incorporated as part of the Plan and Disclosure Statement shall be reasonably acceptable in form and substance to the Debtors and the DIP Lender.

B.      **Conditions Precedent to the Effective Date**

        The Effective Date will not occur, and the Plan will not be consummated, unless and until the following conditions have been satisfied or duly waived pursuant to Article VIIIC below:

        1.      The Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect.

        2.      All other documents and agreements necessary to implement this Plan on the Effective Date (if any), shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Unit in accordance with applicable laws, and all other actions required to be taken in connection with the Effective Date shall have occurred.

        3.      The Plan Agent shall have been appointed and have accepted his or her appointment.

        4.      The GUC Pool shall have been funded as described in the 9019 Motion and Settlement Term Sheet.

        5.      The GUC Claim Reconciliation process shall have been funded with $500,000 by the Debtors as described in the 9019 Motion and Settlement Term Sheet.

        6.      The Professional Fee Escrow Account shall be created and funded as set forth herein.

        7.      All statutory fees and obligations then due and payable to the U.S. Trustee shall have been paid in full.

32

**C.      Waiver of Conditions to Confirmation or the Effective Date**

Each condition to Confirmation set forth in Article VIIIA or to the Effective Date set forth in Article VIIIB, except for the conditions in clause 5 of Article VIIIB, may be waived in whole or in part at any time by the Debtors, without an order of the Bankruptcy Court.

**D.      Notice of Occurrence of Effective Date**

Within five (5) days after occurrence of the Effective Date, the Debtors shall File with the Bankruptcy Court and serve a Notice of Occurrence of Effective Date stating the date on which the Effective Date occurred.

**E.      Effect of Nonoccurrence of Conditions to the Effective Date**

The Debtors reserve the right to seek to withdraw this Plan at any time prior to the Effective Date.  If this Plan is withdrawn by the Debtors: (1) each of the provisions of this Plan and the Confirmation Order shall be null and void in all respects, including with respect to (a) the assumption, assumption or rejection of Executory Contracts and Unexpired Leases and (b) the releases described in Article VIIIF; and (2) nothing contained in this Plan or the Confirmation Order shall (a) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtors or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

**F.      Effect of Confirmation**

**1.      Binding Effect**

The Plan shall be binding upon all present and former Holders of Claims and Interests and their respective successors and assigns. To opt-out of the Releases by Releasing Parties provision, Holders of Claims must (a) validly opt out of the releases contained in this Plan by checking the designated box on such Holder's Ballot or notice of non-voting status, (b) File an objection to the releases contained in the Plan by the Plan Objection Deadline, or (c) timely vote to reject the Plan.

**2.      Dissolution of Official Committees**

Upon the Effective Date, the Committee shall remain in place for the limited purposes of:  (i) GUC Claim Reconciliation; (ii) participating in update calls with the Wind-Down Debtors on a reasonable basis, and (iii) prosecuting Retained Causes of Action, but shall be discharged from all other further duties, responsibilities, and obligations related to the Case.  The Committee's professionals shall be permitted to assert Professional Fee Claims for services rendered and expenses incurred with respect to the Committee's limited authority, and shall further be permitted to:  (i) prepare, File, and if necessary, litigate final applications for compensation and (ii) object to final fee applications Filed by other Professionals.  Upon completion of the GUC Claim Reconciliation, the Committee shall be deemed to be permanently dissolved.

**3.      Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be hereby conclusively, absolutely, irrevocably, and forever released by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and Representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Wind-Down Debtors, or their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any**

manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Debtors' capital structure, management, ownership, or operation thereof, the Sale Transactions, the sale and marketing process, the Wind Down, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or Consummation of the Disclosure Statement, any Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Sale Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date or relating to any of the forgoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Wind-Down Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

Notwithstanding anything contained herein to the contrary (except for Article VIII.G, if applicable), the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any obligations of any party under a Sale Transaction or any document, instrument, or agreement executed to implement a Sale Transaction, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, or (iv) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan.

4.      Releases by Releasing Parties

In exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on (i) the Settlement Effective Date and (ii) the Plan Effective Date, each Released Party is deemed to be hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each of the Releasing Parties (including any successor trustee or other representative in the Chapter 11 Cases and any successor cases), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action owned by the Releasing Parties, directly or derivatively, by, through, for, or because of the foregoing Entities on behalf of the Releasing Parties, from any and all direct or derivative Claims and Causes of Action asserted on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Releasing Party or other Entity, or that any Holder of any Claim against, or Interest in, a Releasing Party or other Entity could have asserted on behalf of the Releasing Party, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between one or more of the Debtors and one or more of the Debtors or their affiliates, the Chapter 11 Cases and any successor cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Loan Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), Wind-Down Transaction, or any Sale Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction,

contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the DIP Loan Documents, or the Plan, the Plan Supplement, the filing of the Chapter 11 Cases and any successor cases, the pursuit of Confirmation and the Settlement, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the distribution of property in a manner consistent with the Settlement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before, in respect of the foregoing clause (i), the Settlement Effective Date, and, in respect of the foregoing clause (ii), the Plan Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (a) any rights and remedies of any Holder of a Claim solely against any Debtor or its Estate, arising in the ordinary course of business prior to the Petition Date, including an administrative expense claim under section 503(b) of the Bankruptcy Code, to prosecute such Claim against the applicable Debtor and its Estate, and to defend any objection to such Claim; (b) any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Sale Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any Claim or obligation arising under the Plan, (c) any ordinary course obligations between the Debtors and Icahn Entities arising or to be performed on or after the Petition Date, including under that certain Transition Services Agreement dated as of December 31, 2021, (d) the Committee's right to appoint an entity to be charged with the objection, reconciliation, and distribution of the GUC Payment (as defined in the Settlement Term Sheet), or (e) any Claims or Causes of Action arising under the DIP Orders or DIP Facility.

5.      Exculpation

Except as expressly provided herein or in the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Cause of Action for any claim arising on or after the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, including the DIP Orders, the Plan (including the Plan Supplement), the Disclosure Statement, the filing of the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination, filing or Consummation of any Sale Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Sale Transaction or the Plan, the pursuit of confirmation, Consummation, administration, and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the solicitation of votes on the Plan, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or after the Petition Date through the Effective Date related or relating to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan, or such distributions made pursuant to the Plan.

This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth in the Plan shall not be construed as exculpating any party or Entity from its post-Effective Date obligations under the Plan, any Sale Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

6.      Injunction

Except as otherwise expressly provided in this Plan or for Distributions required to be paid or delivered pursuant to this Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims

**or Interests that (i) have been released pursuant to this Plan and (ii) shall be discharged pursuant to this Plan to the maximum extent permitted under applicable law, permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests satisfied, settled, released, and discharged pursuant to this Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim, by accepting, or being eligible to accept, distributions under the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIIIF.6.**

### 7. Gatekeeper Provision

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a claim or cause of action of any kind against any Released Party that arose or arises from or is related to the claim or cause of action without first (i) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such claim or cause of action represents a colorable claim against a Released Party and is not a claim that the Debtors released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (ii) obtaining from the Bankruptcy Court specific authorization for such party to bring such claim or cause of action against any such Released Party.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claims or causes of action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court *before* filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable claim or cause of action.

### G. Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and their Representatives will be deemed to have participated in good faith and in compliance with the Bankruptcy Code.  None of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan, if applicable.

### ARTICLE IX
### RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.       Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of (1) any request for payment of any Administrative Expense Claim and (2) any and all objections to the amount, allowance, priority or classification of Claims or Interests;

B.       Grant or deny any applications for allowance of any Professional Fee Claims for periods ending on or before the Confirmation Date;

C.       Resolve any matters related to the assumption or rejection of any Executory Contract or Unexpired Lease to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount;

D.       Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

E.       Decide or resolve any motions, adversary proceedings, contested matters and any other matters Filed in the Bankruptcy Court involving the Debtors that may be pending on the Effective Date or brought thereafter;

F.       Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Chapter 11 Cases, this Plan, the Disclosure Statement, or the Confirmation Order;

G.       Resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan, the Confirmation Order or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to this Plan, the Confirmation Order or the Sale Transaction;

H.       Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with this Plan in such manner as may be necessary or appropriate to consummate this Plan and the transactions contemplated hereby;

I.       Hear and determine any matter, case, controversy, suit, dispute, or Cause of Action regarding the existence, nature and scope of the releases, and injunctions provided under this Plan, and issue injunctions, enforce the injunctions contained in this Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to implement, enforce or restrain interference by any Entity with respect to the Consummation, implementation or enforcement of this Plan or the Confirmation Order, including the releases, and injunctions provided under this Plan;

J.       Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or if Distributions pursuant to this Plan are enjoined or stayed;

K.       Determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

L.       Enforce, clarify, or modify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

M.       Enter a final decree closing the Chapter 11 Cases;

N.       Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

O.      Assist in recovery of all Assets of the Debtors and their Estates, wherever located; and

P.      Hear any other matter over which the Bankruptcy Court has jurisdiction.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

**A.    Modification of the Plan**

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify this Plan before the Effective Date. Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court. Holders of Claims that have accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented, if the proposed amendment, modification or supplement does not materially and adversely change the treatment of such Claim; *provided, however,* that any Holders of Claims who were deemed to accept this Plan because such Claims were Unimpaired shall continue to be deemed to accept this Plan only if, after giving effect to such amendment, modification or supplement, such Claims continue to be Unimpaired.

**B.    Revocation of the Plan or Non-Occurrence of the Confirmation Date or Effective Date**

The Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date or at the Confirmation Hearing. If this Plan is revoked or withdrawn, or if the Confirmation Date or the Effective Date does not occur, then this Plan shall be null and void in all respects solely with respect to the Debtors, and nothing contained in this Plan shall: (a) prejudice in any manner the rights of the Debtors or any other party in interest; (b) constitute a waiver or release of any claims by or against, or any interests in, any of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

**C.    Reservation of Rights Regarding Certain Matters**

If the requisite Classes do not vote to accept this Plan or the Bankruptcy Court does not confirm this Plan, the Debtors reserve their rights to exercise their fiduciary duties regarding the resolution of the Chapter 11 Cases.

**D.    Exhibits and Schedules**

All exhibits and schedules to this Plan, including the Plan Supplement, are incorporated into and constitute a part of this Plan as if set forth herein.

**E.    Severability**

If prior to the entry of the Confirmation Order, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court may, at the request of the Debtors, alter and interpret such term or provision to the extent necessary to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remaining terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**F.    Successors and Assigns**

Except as expressly provided otherwise in this Plan, the rights, benefits and obligations of any Person named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, Representative, beneficiary or guardian, if any, of each Person.

G.      **Service of Documents**

Any pleading, notice or other document required by this Plan or the Confirmation Order to be served on or delivered to counsel to the Debtors must be sent via electronic mail, overnight delivery service, or hand delivery on:

IEH Auto Parts Holding LLC, et al

with a copy, which shall not constitute notice, to:

Jackson Walker LLP
1401 McKinney Street, Suite 1900
Houston, TX  77010
Attention:          Matthew Cavenaugh
                    Veronica A. Polnick
                    Vienna F. Anaya
                    Emily Flynn Meraia

E-mail:             mcavenaugh@jw.com
                    vpolnick@jw.com
                    vanaya@jw.com
                    emeraia@jw.com

Law Office of Liz Freeman
PO Box 61209
Houston, TX 77208
Attention:          Elizabeth C. Freeman

Email:              liz@lizfreemanlaw.com

## ARTICLE XI
## CONFIRMATION OF THE PLAN

A.      **VOTING PROCEDURES AND REQUIREMENTS**

The Debtors are providing copies of this Plan and Disclosure Statement and Ballots to all known holders of Impaired Claims who are entitled to vote on the Plan.  The procedures for voting were approved by the Bankruptcy Court by Order entered on [●] [Docket No. ●].

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims against the Debtors that are "Impaired" under the terms and provisions of the Plan and entitled to receive a Distribution thereunder are entitled to vote to accept or reject the Plan.  Accordingly, Classes of Claims or Interests that are not Impaired under the terms and provision of the Plan are *not* entitled to vote on the Plan.   In addition, Classes of Claims or Interests that are not entitled to a distribution under the terms and provisions of the Plan are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

Under the Plan, Holders of Class 2 Claims are, or may be determined to be, Impaired and are entitled to vote.   Holders of  Class 1 Claims are not Impaired and are deemed to have accepted the Plan.  Holders of Class 3 Claims and Class 4 Interests are Impaired and deemed to reject the Plan.

**Ballots will be accepted by via the internet through the Claims and Noticing Agent's website and regular mail.**

B.      **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (2) the Debtors complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith.  Specifically, in addition to others, as applicable, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

**1.**     **The Best Interest of Creditors Test**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable Distribution to Holders of each Impaired Class of Claims and Interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' Assets if these Chapter 11 Cases were converted to chapter 7 Case under the Bankruptcy Code. Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the

chapter 11 liquidation contemplated by the Plan.  However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that would be incurred as a result of the ineffectiveness associated with replacing existing management and professionals in a chapter 7 case.

To make these findings, the Bankruptcy Court must:  (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the Debtors' Chapter 11 Cases were converted to a chapter 7 case and the Assets of the Debtors' Estates were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of a Claim or Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such Holder's liquidation distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as compensation of counsel and other professionals retained by the trustee, Asset disposition expenses, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 case, litigation costs, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

In this case, notwithstanding the difficulty in quantifying recoveries to Holders of Allowed Claims, as described below, the Debtors believe that anticipated recoveries to each Class of Impaired Claims under the Plan implies a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

### 2. Liquidation Analysis

The Debtors are selling substantially all of their Assets. The Debtors believe that liquidation under chapter 11 is more beneficial to the Holders of Claims than a liquidation under chapter 7 because the Plan allows the Debtors' remaining Assets to be promptly administered by the Plan Agent.  To that end, the Plan provides that all of the Debtors' remaining Assets will revest in the Estates.  The Plan Agent will distribute the proceeds from these remaining Assets to the Holders of Allowed Claims in accordance with the priorities set forth in the Plan. Attached as **Exhibit 1** to this Disclosure Statement is a liquidation analysis (the "Liquidation Analysis").  As set forth in the Liquidation Analysis, if these Chapter 11 Cases were to be converted to chapter 7 case, the Asset available for general unsecured creditors would be reduced as the GUC Payment is only available to general unsecured creditors in a chapter 11 context and not in a chapter 7 and the Debtors' Estates would incur the additional costs of a chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee.  These costs would reduce or eliminate potential distributions to all Classes of Claims on a dollar for dollar basis.  Conversion also would likely delay the liquidation process and the ultimate distribution, if any, to unsecured creditors.  Accordingly, the Debtors believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to a chapter 7 case.

### 3. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the Debtors' liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan clearly complies with this requirement because all of the Debtors' remaining Assets will be distributed pursuant to the terms of the Plan and, provided the Plan is confirmed and consummated, the Debtors' Estates will no longer exist to be subject to future reorganization or liquidation.  Since no further reorganization of the Debtors will be possible, the Debtors believe that the Plan meets the financial feasibility requirement.  The Debtors believe that sufficient funds will exist to make all payments required by the Plan.

### 4. Acceptance by an Impaired Class

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a Chapter 11 plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect

to such class is not required. A Class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance. For a class of impaired equity interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by Equity Interest Holders that hold at least two-thirds in amount of the allowed equity interests of such class, counting only those equity interests that actually voted to accept or reject the plan.  Thus, a Class of Equity Interests will have voted to accept the plan only if two-thirds in amount actually voting cast their Ballots in favor of acceptance.

The Claims in Class 1 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and their votes will not be solicited.

The Claims in Class 2 are Impaired under the Plan.  This Class will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of Class 2 (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The Claims in Class 3 are Impaired under the Plan and will not receive a Distribution under the Plan.  Pursuant to section 1126(g) of the Bankruptcy Code, the Holders of such Class 3 Claims are deemed to reject the Plan and their votes will not be solicited.

The Interests in Class 4 are Impaired under the Plan and will not receive a distribution under the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, the Holders of such Class 4 Interests are deemed to reject the Plan and their votes will not be solicited.

### 5.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it if the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

a.      No Unfair Discrimination

This test applies to classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

b.      Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.,* secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.

42

As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

*Secured Claims:* The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the Debtors or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the Debtors' property subject to the liens.

*Unsecured Claims:* The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

*Equity Interests:* The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled, or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

Because Class 3 and Class 4 are deemed to reject the Plan, the Debtors seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan and any exhibits thereto or the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The Debtors submit that if it prosecutes a "cramdown" of the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan will be structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## ARTICLE XII
## PLAN-RELATED RISK FACTORS

### A.    GENERAL BANKRUPTCY LAW AND PLAN RELATED CONSIDERATIONS

#### 1.    Parties in Interest May Object to the Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created certain Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan or may be forced to liquidate

under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

> **3.      The Debtors May Not Be Able to Secure Confirmation of the Plan or Confirmation May Be Delayed**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of the Disclosure Statement or whether the Solicitation Procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the Solicitation Procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

The Confirmation and Consummation of the Plan also are subject to certain other conditions. No assurance can be given that these conditions will be satisfied.

If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims and Equity Interests would ultimately receive in respect of their Claims and Equity Interests. It is possible that any alternative could provide Holders of Claims with less than they would have received pursuant to the Plan.  Moreover, an inability to confirm the Plan could result in an extended chapter 11 proceeding.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.

> **4.      Nonconsensual Confirmation - "Cramdown"**

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the Debtors' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

Although the Debtors believe that the Plan will meet such tests, the Debtors cannot be certain that the Bankruptcy Court would reach the same conclusion. If the Bankruptcy Court does not confirm the Plan, the Debtors may pursue one of the following alternatives: (a) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (b) dismissal of the Chapter 11 Cases, or (c) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

> **5.      The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

6.      **Risk of Nonoccurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

7.      **Risk Affecting Potential Recoveries of Holders of Claims in Voting Classes**

The Debtors cannot state with any degree of certainty what recovery will be available to Holders of Claims in Voting Classes. Three unknown factors make certainty impossible.  First, the Debtors cannot know, at this time, how much money will remain after paying all Allowed Claims which are senior to the Claims of Holders in the Voting Classes.  Second, the Debtors cannot know with any certainty, at this time, the number or size of Claims in the Voting Classes which will ultimately be Allowed.  Third, the Debtors cannot know with certainty, at this time, the number or size of Claims in Classes senior to the Voting Classes, or Claims that are unclassified, which will ultimately be Allowed.

**B.      RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS**

**The financial information contained in this Disclosure Statement has not been audited.**   In preparing this Plan and Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors used their reasonable business judgment to ensure the accuracy of the financial information provided in this Plan Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**C.      DISCLOSURE STATEMENT DISCLAIMER**

1.      **Information Contained Herein Is for Soliciting Votes**

The information contained in this Plan and Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

2.      **This Plan and Disclosure Statement Was Not Reviewed or Approved by the Securities and Exchange Commission**

This Plan and Disclosure Statement was not filed with the Commission under the Securities Act or applicable state securities laws.  Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3.      **This Plan and Disclosure Statement May Contain Forward Looking Statements**

This Plan and Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections or other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

4.      **No Legal or Tax Advice Is Provided to You by this Plan and Disclosure Statement**

This Plan and Disclosure Statement is not legal advice to you.  The contents of this Plan and Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest.  This Plan and Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 5.      No Admissions Made

The information and statements contained in this Plan and Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Plan Agent, Holders of Allowed Claims or Equity Interest or any other parties in interest.

### 6.      Failure to Identify Litigation Claims or Projected Objections

**No reliance should be placed on the fact that a particular litigation claim, cause of action, or projected objection to claim is, or is not, identified in this Plan and Disclosure Statement.  The Debtors or the Plan Agent, as applicable, may seek to investigate, file and prosecute litigation claims, causes of action, and projected objections to claims after the confirmation or effective date of the Plan irrespective of whether this Plan and Disclosure Statement identifies any such claims or objections to claims.**

### 7.      No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or of the Plan Agent (or any party in interest, as the case may be) to object to that Holder's Allowed Claim.

### 8.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' advisors.

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

### 9.      Potential Exists for Inaccuracies, and the Debtors have No Duty to Update

The statements contained in this Plan and Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Plan and Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors used their reasonable business judgment to ensure the accuracy of all of the information provided in this Plan and Disclosure Statement, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Plan and Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Plan and Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 10.     No Representations Outside the Plan and Disclosure Statement are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Plan and Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in, or included with, this Plan and Disclosure Statement, should not be relied upon by you in arriving at your decision.

## D.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords the Holders of Claims the potential for a better realization on the Debtors' Assets than a chapter 7 liquidation, and therefore, is in the best interests of such Holders. If, however, the

Plan is not confirmed, the theoretical alternatives include (a) formulation of an alternative plan or plans of liquidation under chapter 11 or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

### 1. Alternative Plan(s) of Liquidation

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors could attempt to formulate and propose a different plan or plans of liquidation.

With respect to an alternative liquidation plan, the Debtors explored alternatives in connection with the negotiation process involved in the formulation and development of the Plan. The Debtors believe that the Plan enables creditors to realize the greatest possible value under the circumstances because it maximizes the consideration available to distribute to creditors via the 9019 Motion, the Sale Transactions, and that, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated.

### 2. Liquidation under Chapter 7

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to a liquidation case under chapter 7 of the Bankruptcy Code. In a case under chapter 7 of the Bankruptcy Code, a trustee would be appointed to liquidate the assets of the Debtors. It is impossible to predict what the Debtors' Assets would be following a conversion or precisely how the proceeds of a liquidation in chapter 7 would be distributed to Holders of Claims against the Debtors.

### 3. Dismissal of the Chapter 11 Cases

If the Plan is not confirmed, the Debtors or other parties in interests may seek dismissal of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code. Without limitation, dismissal of the Chapter 11 Cases would terminate the automatic stay and would likely lead to an elimination of support for the Debtors' wind down operations and a lack of funding for the insurance deductibles. Accordingly, the Debtors believe that dismissal of the Chapter 11 Cases would reduce the value of the Debtors' Estates.

## ARTICLE XIII
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**A.      General Tax Considerations**

THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES EXPECTED TO RESULT FROM THE CONSUMMATION OF THE PLAN, IS FOR GENERAL INFORMATION PURPOSES ONLY, AND SHOULD NOT BE RELIED UPON FOR PURPOSES OF DETERMINING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST. THIS DISCUSSION DOES NOT PURPORT TO BE A COMPLETE ANALYSIS OR LISTING OF ALL POTENTIAL TAX CONSIDERATIONS. THIS DISCUSSION DOES NOT ADDRESS ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST SUBJECT TO SPECIAL TREATMENT UNDER FEDERAL INCOME TAX LAWS (SUCH AS FOREIGN TAXPAYERS, BROKER DEALERS, BANKS, THRIFTS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, REGULATED INVESTMENT COMPANIES, REAL ESTATE INVESTMENT TRUSTS AND PENSION PLANS AND OTHER TAX EXEMPT INVESTORS), AND DOES NOT DISCUSS ANY ASPECTS OF STATE, LOCAL OR FOREIGN TAX LAWS. FURTHERMORE, THIS SUMMARY DOES NOT ADDRESS ALL OF THE FEDERAL INCOME TAX CONSEQUENCES THAT MAY BE RELEVANT TO A HOLDER OF A CLAIM OR EQUITY INTEREST, SUCH AS THE POTENTIAL APPLICATION OF THE ALTERNATIVE MINIMUM TAX.

THIS DISCUSSION IS BASED ON EXISTING PROVISIONS OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "IRC"), EXISTING AND PROPOSED TREASURY REGULATIONS PROMULGATED THEREUNDER, AND CURRENT ADMINISTRATIVE RULINGS AND COURT DECISIONS. LEGISLATIVE, JUDICIAL, OR ADMINISTRATIVE CHANGES OR INTERPRETATIONS ENACTED OR

PROMULGATED AFTER THE DATE HEREOF COULD ALTER OR MODIFY THE ANALYSES SET FORTH BELOW WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN. ANY SUCH CHANGES OR INTERPRETATIONS MAY BE RETROACTIVE AND COULD SIGNIFICANTLY AFFECT THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

NO RULING HAS BEEN REQUESTED OR OBTAINED FROM THE INTERNAL REVENUE SERVICE (THE "IRS") WITH RESPECT TO ANY TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN SOUGHT OR OBTAINED WITH RESPECT THERETO. NO REPRESENTATIONS OR ASSURANCES ARE BEING MADE TO THE HOLDERS OF CLAIMS OR EQUITY INTERESTS WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES DESCRIBED HEREIN.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN.

**Internal Revenue Service Circular 230 Disclosure: to ensure compliance with requirements imposed by the United States Internal Revenue Service, any tax advice contained in this Disclosure Statement (including any attachments) is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax related penalties under the Tax Code. Tax advice contained in this Disclosure Statement (including any attachments) is not written to support the promotion, marketing or promotion of the transactions or matters addressed by the disclosure statement. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

**B.      Certain Federal Income Tax Consequences to the Debtors**

Generally, a discharge of a debt obligation by the Debtors for an amount less than the debt's adjusted issue price (in most cases, the amount the Debtors received on incurring the obligation, with certain adjustments) gives rise to cancellation of indebtedness ("COD") income, which must be included in the Debtors' income. However, COD income is not includable in gross income if it occurs in a case of bankruptcy or to the extent of the Debtors' insolvency immediately before the COD income is recognized. The Debtors' COD income, if any, resulting from the Plan should satisfy these requirements and, therefore, should not result in recognition of gross income to the Debtors.

COD income that is excluded from gross income will reduce certain attributes of the taxpayer, including net operating losses, capital loss carryovers, the tax basis of assets, and foreign tax credit carryforwards, in a specified order of priority beginning with net operating losses, unless a taxpayer elects to have the reduction applied first to the tax basis of depreciable assets. In general, any reduction in tax attributes does not occur until the end of the tax year, after such attributes have been applied to determine the tax for the year or, in the case of any asset basis reduction, the first day of the taxable year following the tax year in which COD income occurs.

**C.      Certain Federal Income Tax Consequences to Holders of Claims**

The following discusses certain tax consequences of the transactions contemplated by the Plan to Holders that are "United States holders," as defined below. The tax consequences of the transactions contemplated by the Plan to Holders (including the character, timing and amount of income, gain or loss recognized) will depend on, among other things: (1) whether the Claim and the consideration received in respect of it are "securities" for tax purposes; (2) the manner in which a Holder acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion of it) in the current tax year or any prior tax year; (6) whether the Holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the Holder's method of tax accounting; and (8) whether the Claim is an installment obligation for tax purposes. Holders, therefore, should consult their own tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan.

For purposes of the following discussion, a "United States holder" is a Holder that is: (1) a citizen or individual resident of the United States; (2) a partnership, limited liability company, or corporation created or organized in the United States or under the laws of the United States, a political subdivision of the United States, or a State of the United States; (3) an estate whose income is subject to United States federal income taxation regardless of its source; or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust, or (ii) the trust was in existence on August 20, 1996, and properly elected to be treated as a United States person.

### 1.      Gain or Loss Generally

Each Holder of a Claim may be permitted to recognize a loss or may be required to recognize gain on its distributions under the Plan. Generally, the loss or gain to be recognized by the Holder of an Allowed Claim will equal the positive difference in the case of a loss (and negative difference in the case of a gain) between (1) the adjusted tax basis such Holder has in its Claim (excluding any adjusted tax basis attributable to accrued but unpaid interest), and (2) the fair market value of the beneficial interest distributed (or deemed distributed) to the Holder of the Claim (excluding any Cash or other property received or deemed received attributable to accrued interest).  Depending on the manner in which the Claim arose, applicability of the market discount rules and other factors, such loss or gain may be capital or ordinary in nature.  Due to limitations in the Code, a Holder of an Allowed Claim that recognizes a capital loss relating to its Claim may not be able to use such capital loss in the taxable year it arises or ever.

Although many Holders of Claims will not be required to recognize gain or income as a result of the property distributions (including Cash distributions) made or deemed to be made to them under the terms of the Plan, certain situations may exist that will require a Holder of a Claim to do so.  For example, if a Claim relates to a transaction under which the Holder is required to recognize gain on payment (for example, an installment sale), the Holder may be required to recognize gain as a result of the actual or deemed distributions made to it under the Plan.  Moreover, if (1) a Holder of a Claim previously took a deduction or loss relating to the partial or entire worthlessness of its Claim, and (2) the fair market value of the property (including Cash) it receives or is deemed to receive for its Claim under the Plan exceeds the remaining adjusted tax basis, if any, it has in its Claim, such Holder will be required to recognize gain or income.  Similarly, a Holder of a Claim that purchased its Claim at a discount may be required to recognize gain if the amount received in satisfaction of the Claim exceeds such Holder's adjusted tax basis in the Claim.  There are several other reasons why a Holder of a Claim may be required to recognize gain or income as a result of the actual or deemed distributions made to it under the Plan. Therefore, each Holder of a Claim should consult its own tax advisor to determine the tax consequences of the receipt of or deemed receipt of property (including Cash) under the Plan.

### 2.      Accrued But Untaxed Interest

To the extent that any amount received under the Plan by a Holder is attributable to accrued but untaxed interest, such amount should be taxable to the Holder as ordinary interest income, if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes.  Conversely, a Holder may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent that any accrued interest was previously included in the Holder's gross income but was not paid in full by the Debtors.

The extent to which amounts received by a Holder will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such Holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a bankruptcy plan is binding for U.S. federal income tax purposes.  However, the IRS could take the position that the consideration received by a Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 3.      Market Discount

Holders who exchange Claims for Cash or other property may be affected by the "market discount" provisions of the sections 1276 through 1278 of the IRC. Under these rules, some or all of the gain realized by a

Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory *de minimis* amount. To the extent that a Holder has not previously included market discount in its taxable income, gain recognized by a Holder on the disposition of a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the Holder's period of ownership. A holder of a market discount bond that is required to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on the disposition of such bond. In addition, any partial principal payment received by a Holder that is attributable to a market discount bond will generally be treated as ordinary interest income to the extent such payment does not exceed the market discount accrued on such bond during the Holder's period of ownership.

### 4.      Original Issue Discount

The original issue discount ("OID") rules provide an extremely detailed and complex method for determining and taxing the interest components of debt instruments. A holder of a debt instrument containing OID must include a portion of the OID in gross income in each taxable year in which the holder holds the debt instrument, regardless of whether any cash payments are received. OID is defined as the difference between the issue price and the stated redemption price at maturity of a debt instrument. As the OID rules are extremely complex, it is not certain how they will apply to the transactions contemplated by the Plan. Accordingly, each Holder must consult its own tax advisor.

### 5.      Holders of Disputed Claims

Distributions deemed issued to a Holder of a Claim on Consummation of the Plan will not include any distribution held in reserve for Holders of Disputed Claims. As a result, in determining the amount of loss or gain recognized by a Holder of a Claim on Consummation of the Plan, the Holder will not be treated as receiving any property attributable to the assets that are held by or for the benefit of Holders of Disputed Claims. As discussed below, when a Disputed Claim becomes Disallowed in whole or in part, the Holders of a Claim will be treated as receiving additional consideration in respect of their Claim at that time. It is possible, however, that the IRS or a court may conclude that the amount of consideration deemed received for tax purposes by a Holder of a Claim on Consummation of the Plan should be determined by disregarding the Disputed Claims and treating any distribution held in reserve for Holders of Disputed Claims as proportionately distributed to the Holders of Claims. In such case, appropriate downward adjustments would be made on the allowance of a Disputed Claim in whole or in part. Holders of Claims should consult with their tax advisors as to the proper amount of consideration deemed received on Consummation of the Plan.

Holders of Disputed Claims will not be treated as receiving any consideration in respect of their Claims on Consummation of the Plan. On the allowance of a Disputed Claim, the Holder of the Disputed Claim will be treated as realizing in satisfaction of its Claim the amount of Cash distributed to the Holder at such time plus the fair market value of any property distributed to such Holder. On the disallowance of a Disputed Claim, the distribution attributable to such Disputed Claim will be cancelled and the Cash attributable to the Disallowed Disputed Claim and held in reserve will be released from the reserve. While not entirely clear, at such time, Holders will likely be treated as having received additional consideration in satisfaction of their Claims equal to their proportional shares of (i) the Cash released from the reserve, less (ii) the fair market value of the cancelled distributions. If the Disputed Claim becomes disallowed in the year in which the Plan is consummated, then such additional consideration would either reduce the loss or increase the gain that was recognized with respect to Holders' Claim on Consummation of the Plan and would possess the same character (i.e., capital or ordinary) as the gain or loss recognized on Consummation of the Plan. If the Disputed Claim becomes disallowed after the year in which the Plan is consummated, then the additional amount deemed received on disallowance of the Disputed Claim will be treated as gain with the same character (i.e., capital or ordinary) as the gain or loss recognized on Consummation of the Plan. Holders of a Claim would increase the tax bases in their distribution by the additional amounts deemed received on the disallowance of a

Disputed Claim. Similarly, in the event that undeliverable Distributions are redistributed to other claimants entitled to Distribution, such recipients will likely be subject to comparable tax treatment as discussed in this paragraph.

**6.      Reinstatement of Claims**

Holders of Claims generally should not recognize gain, loss or other taxable income upon the reinstatement of their Claims under the Plan. Taxable income, however, may be recognized by those holders if they are considered to receive interest, damages or other income in connection with the reinstatement or if the reinstatement is considered for tax purposes to involve a substantial modification of the Claim.

**7.      Bad Debt and/or Worthless Securities Deduction**

A Holder who, under the Plan, receives in respect of a Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction in some amount under Section 166(a) of the IRC or a worthless securities deduction under Section 165(g) of the IRC. The rules governing the character timing and amount of bad debt and/or worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

**8.      Information Reporting and Backup Withholding**

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances.

Under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax. Amounts subject to backup withholding are credited against a Holder's United States federal income tax liability, and a Holder may obtain a refund of any excess backup withholding by filing an appropriate claim for refund with the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC.

**9.      Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**D.      Reservation of Rights**

**This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this Article XIII and the other tax related sections of the Plan prior to the date by which objections to Confirmation of the Plan must be filed and served.**

**CONCLUSION, RECOMMENDATION, AND CONFIRMATION REQUEST**

The Debtors believe that Confirmation of the Plan is desirable and in the best interests of all holders of Claims and Interests.  The Debtors urge you to vote to accept the Plan and to evidence such acceptance by returning the Ballot(s) so they will be received by the Voting Deadline.

The Debtors request Confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code.

Dated:  April 28, 2023                     Respectfully submitted,

                                           IEH Auto Parts Holding, LLC, et al.,


                                           By:      *John Michael Neyrey*
                                           Name:   John Michael Neyrey
                                           Title:    Chief Executive Officer
                                                     IEH Auto Parts Holding LLC

<u>Exhibit 1</u>

Liquidation Analysis
[To come]

<u>Exhibit 2</u>

9019 Order with attachments
[To come]

1