United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 16, 2023

Nathan Ochsner, Clerk

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| IEH AUTO PARTS HOLDING LLC, *et al.*,[1] | ) Case No. 23-90054 (CML) |
|  | ) |
|  | ) (Jointly Administered) |
| Debtors. | ) |
|  | ) **Re: Docket No. 738** |

### ORDER CONFIRMING THE THIRD AMENDED
### COMBINED DISCLOSURE STATEMENT AND JOINT PLAN OF
### LIQUIDATION OF IEH AUTO PARTS HOLDING LLC AND ITS DEBTOR
### AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

The above-captioned Debtors[2] having:

a.  on January 31, 2023 (the "Petition Date"), filed these chapter 11 cases (the "Chapter 11 Cases" or, individually, a "Chapter 11 Case") by filing voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas (the "Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

b.  continued to operate their business and manage their properties as debtors in possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code;

c.  on April 28, 2023, filed the *Combined Disclosure Statement and Joint Plan of Liquidation of IEH Auto Parts Holding LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 442];

d.  on May 2, 2023, obtained entry of the *Order (I) Conditionally Approving the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures; (III) Approving the Forms of Ballots and Notices in Connection Therewith; (IV) Approving the Combined Hearing Timeline; and (V) Granting Related Relief* [Docket No. 471] (the "Disclosure Statement Order") conditionally approving the

---

[1]  The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: IEH Auto Parts Holding LLC (6529); AP Acquisition Company Clark LLC (4531); AP Acquisition Company Gordon LLC (5666); AP Acquisition Company Massachusetts LLC (7581); AP Acquisition Company Missouri LLC (7840); AP Acquisition Company New York LLC (7361); AP Acquisition Company North Carolina LLC (N/A); AP Acquisition Company Washington LLC (2773); Auto Plus Auto Sales LLC (6921); IEH AIM LLC (2233); IEH Auto Parts LLC (2066); IEH Auto Parts Puerto Rico, Inc. (4539); and IEH BA LLC (1428). The Debtors' service address is: 112 Townpark Drive NW, Suite 300, Kennesaw, GA 30144.

[2]  All capitalized terms not otherwise defined in this Confirmation Order have the meanings ascribed to them in the Plan and Disclosure Statement

Disclosure Statement, solicitation procedures (the "Solicitation Procedures"), and related notices, forms, and ballots (collectively, the "Solicitation Packages");

e.  caused the Solicitation Packages, the Plan and Disclosure Statement, and Combined Hearing on Disclosure Statement and Plan (the "Combined Hearing Notice") (as further defined in the Disclosure Statement Order) and the deadline for objecting to confirmation of the Plan to be distributed beginning on May 8, 2023 (the "Solicitation Date"), in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), as evidenced by, among other things, the *Affidavit of Service* (the "Affidavit of Service") [Docket No. 629];

f.  on June 13, 2023, filed the *Certification of Jeffrey R. Miller with Respect to the Tabulation of Votes on the Debtors' Second Amended Joint Chapter 11 Plan of Liquidation* [Docket No. 699] and on June 16, 2023, filed the *Amended Certification of Jeffrey R. Miller with Respect to the Tabulation of Votes on the Debtors' Second Amended Joint Chapter 11 Plan of Liquidation* [Docket No. 729] (the "Final Voting Report");

g.  on June 16, 2023, filed the *Third Amended Combined Disclosure Statement and Joint Plan of Liquidation of IEH Auto Parts Holding LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 738] (as amended, the "Disclosure Statement," "Plan and Disclosure Statement" or "Plan"), a copy of which is attached hereto as **Exhibit A**; and

This Court having:

a.  entered the Disclosure Statement Order conditionally approving the Disclosure Statement on May 2, 2023;

b.  set May 26, 2023, at 4:00 p.m. (prevailing Central Time) as the deadline for voting on the Plan;

c.  set May 26, 2023, at 5:00 p.m. (prevailing Central Time) as the deadline for filing objections in opposition to the Disclosure Statement and Plan (the "Plan Objection Deadline");

d.  set June 16, 2023, at 3:00 p.m. (prevailing Central Time) as the date and time for the commencement of the hearing on final approval of the Disclosure Statement and the Confirmation Hearing on the Plan (the "Confirmation Hearing") in accordance with Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

e.  reviewed the Plan, Disclosure Statement, the Final Voting Report, and all pleadings, exhibits, declarations, affidavits, statements, responses, and comments regarding the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights filed by parties in interest on the docket of these Chapter 11 Cases;

    f.        held the Confirmation Hearing on June 16, 2023;

    g.       heard the statements and arguments made by counsel in respect of confirmation of the Plan and final approval of the Disclosure Statement;

    h.       considered all oral representations, live testimony, written direct testimony, exhibits, documents, filings and other evidence presented at the Confirmation Hearing;

    i.         made rulings on the record at the Confirmation Hearing held on June 16, 2023;

    j.        overruled any and all objections to the Disclosure Statement, the Plan, and to confirmation of the Plan, except as otherwise stated or indicated on the record, and all statements and reservations of rights not consensually resolved or withdrawn unless otherwise indicated; and

NOW, the Court having found that notice of the Confirmation Hearing and the opportunity for any party in interest to object to confirmation of the Plan and final approval of the Disclosure Statement have been adequate and appropriate as to all parties affected or to be affected by the Disclosure Statement and Plan and the transactions contemplated thereby, and the Bankruptcy Court having considered the record in these Chapter 11 Cases, the Final Voting Report, the compromises and settlements embodied in and contemplated by the Plan, the support of the Official Committee of Unsecured Creditors for the Plan, the arguments regarding confirmation of the Plan, the evidence regarding confirmation of the Plan, and the Confirmation Hearing having been held on June 16, 2023; after due deliberation, and based upon the additional findings of fact and conclusions of law on the record pursuant to Bankruptcy Rule 7052, which are incorporated herein, it is FOUND AND ORDERED THAT:

**A.    Jurisdiction and Venue**

    1.        Venue in this Court was proper as of the Petition Date and continues to be proper under 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2).  The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1334.  The Court has exclusive jurisdiction to determine whether the Plan complies with the applicable

provisions of the Bankruptcy Code and should be confirmed and to enter a final order with respect thereto.

**B.      Commencement of these Chapter 11 Cases**

2.      On the Petition Date, the Debtors commenced these Chapter 11 Cases.  The Debtors have operated their business and managed their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

**C.      Appointment of Committee**

3.      On February 14, 2023, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to § 1102 of the Bankruptcy Code (the "Committee") [Docket No. 99].

**D.      Burden of Proof—Confirmation of the Plan**

4.      The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of §§ 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for confirmation of the Plan.  In addition, and to the extent applicable, the Plan is confirmable under a clear and convincing evidentiary standard.

**E.      Notice**

5.      As evidenced by the Affidavit of Service and the Final Voting Report, the Debtors provided due, adequate, and sufficient notice of the Combined Plan and Disclosure Statement, the Confirmation Hearing Notice, and all of the other materials distributed by the Debtors in connection with the confirmation of the Plan in compliance with the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3017, 3019, 3020(b), the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Local Rules"), and the

procedures set forth in the Disclosure Statement Order. The Debtors provided due, adequate, and sufficient notice of the Plan Objection Deadline, the Confirmation Hearing, and any applicable bar dates and hearings described in the Disclosure Statement Order in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Disclosure Statement Order.

**F.     Voting**

6.     Votes to accept and reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, and the orders of this Court. Class 1 is unimpaired, presumed to accept, and not entitled to vote on the Plan. Class 2 is Impaired under the Plan. Class 2 voted to accept the Plan. Class 3 is deemed to reject the Plan and, therefore, is not entitled to vote on the Plan.

**G.     Plan Supplements**

7.     On June 9, 2023 [Docket No. 689] and June 16, 2023 [Docket No. 733] the Debtors filed their Plan Supplement and Amended Plan Supplement (the "Plan Supplements"), respectively, with the Court. The Plan Supplements comply with the terms of the Plan. The Debtors provided good and proper notice of the filing in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement Order, and the facts and circumstances of these Chapter 11 Cases. No other or further notice is or was required with respect to the Plan Supplements.

**H.     Modifications to the Plan.**

8.     Pursuant to § 1127 of the Bankruptcy Code, the modifications to the Plan described or set forth in this Confirmation Order constitute technical changes, changes with respect to particular Claims by agreement with Holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim or Interest. These modifications are consistent with the disclosures previously made pursuant to the Disclosure

Statement Order, and notice of these modifications was adequate and appropriate under the facts and circumstances of these Chapter 11 Cases.

9.      In accordance with Bankruptcy Rule 2019, these modifications do not require additional disclosure under § 1125 of the Bankruptcy Code or the re-solicitation of votes under § 1126 of the Bankruptcy Code, and they do not require that Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. The Plan, as modified, is properly before this Court, and all votes cast with respect to the Plan prior to such modifications shall be binding and shall apply to the Plan.

## I.      Approval of Disclosure Statement and Confirmation of the Plan

10.     The Disclosure Statement is APPROVED on a final basis under Bankruptcy Code § 1125, and all objections, statements, and reservations of rights with respect to the Disclosure Statement are overruled.

11.     The Plan, a copy of which is attached as **Exhibit A**, including the Plan Supplements, is confirmed pursuant to § 1129 of the Bankruptcy Code. The terms of the Plan are incorporated by reference into, and are an integral part of, this Confirmation Order.

12.     Any resolution or disposition of objections to Confirmation explained or otherwise ruled upon by the Court on the record at the Confirmation Hearing is hereby incorporated by reference. All parties have had a full and fair opportunity to be heard on all issues raised by objections to confirmation of the Plan or approval of the Disclosure Statement. Any and all objections to the confirmation of the Plan or approval of the Disclosure Statement that have not been withdrawn or resolved as of the entry of this Confirmation Order are hereby overruled on their merits. All withdrawn objections are deemed withdrawn with prejudice.

13.     The documents contained in the Plan Supplements and in the exhibits to the Plan are integral to the Plan and are approved by the Bankruptcy Court, and the Debtors are authorized

and directed to take all actions required or appropriate under the Plan and in all documents related to the Plan and the transactions contemplated thereby.

14.    The appointment of the Plan Agent is approved in all respects and the Plan Agent is authorized to carry out his rights and duties as set forth in the Plan and in accordance with the Plan Agent Agreement.  The Plan Agent Agreement is hereby approved in form and substance.

15.    The appointment of the GUC Trustee is approved in all respects and the GUC Trustee is authorized to carry out his rights and duties as set forth in the Plan and in accordance with the GUC Trust Agreement.  The GUC Trust Agreement is hereby approved in form and substance.

16.    The terms of the Plan and any exhibits thereto, including any Plan Supplements, are incorporated herein by reference, and are an integral part of this Confirmation Order. The terms of the Plan, all exhibits thereto, and all other relevant and necessary documents shall be effective and binding as of the Effective Date (unless different date(s) is/are specified in the applicable foregoing documents, in which case the applicable terms shall be effective and binding on such date(s)) on the Debtors and any holder of a Claim or Interest, whether or not the Claim or Interest is impaired under the Plan and whether or not the holder of such Claim or Interest has accepted the Plan and any other party in interest. The failure to specifically include or refer to any particular article, section, or provision of the Plan, the exhibits thereto, or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision.

17.    The compromises and settlements set forth in the Plan (including exhibits thereto) are approved and will be effective immediately and binding on all parties in interest on the

Effective Date (unless different date(s) is/are specified in the applicable foregoing documents, in which case the applicable terms shall be effective and binding on such date(s)).

18.     On the Effective Date (unless different date(s) is/are specified in the applicable foregoing documents, in which case the applicable terms shall be effective and binding on such date(s)), the Wind-Down Debtors, the Plan Agent, and the GUC Trustee are authorized to consummate the Plan and the transactions contemplated thereby, including the distributions of cash and payment of fees contemplated thereby.

**J.     Assumption, Assignment and Rejection of Executory Contracts and Unexpired Leases**

19.     Pursuant to Article V of the Plan, each of the Debtors' Executory Contracts or Unexpired Leases shall be deemed automatically rejected on the Effective Date in accordance with the provisions of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date unless any such Executory or Unexpired Lease: (1) has previously been assumed by the Debtors by Final Order of the Bankruptcy Court; (2) is listed on the schedule of Retained Contracts included in the Plan Supplement; or (3) is the subject of a motion to assume or reject pending as of the Effective Date.

20.     Except as otherwise previously approved by an order of the Bankruptcy Court, entry of this Confirmation Order by the Bankruptcy Court shall constitute an order, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, approving the assumptions and the rejections of such Executory Contracts and Unexpired Leases as set forth in the preceding paragraph.  Unless otherwise indicated herein, assumptions and rejections of Executory Contracts and Unexpired Leases pursuant to this Plan shall be effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order and not assigned to a third party on or before the Effective Date shall revest in the Estates and be rejected or fully

enforceable by the Plan Agent in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing its assumption pursuant to section 365 of the Bankruptcy Code; *provided* that if an assignment is pending as of the Effective Date, the Plan Agent shall be authorized to take any and all actions necessary to implement such assignment.  Except as otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, unless otherwise expressly assumed by the Debtors and assigned, any Executory Contract or Unexpired Lease that remains, as of the Effective Date, the subject of a pending notice of proposed or potential assumption and assignment issued in connection with any Sale Transaction, shall be deemed rejected as of such date to the extent (1) it is not included on a motion to assume or reject pending as of the Effective Date; or (2) it is not assumed and assigned to the applicable purchaser in connection with the Sale Transaction.

21.     Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of any Executory Contracts and Unexpired Leases pursuant to this Plan must be Filed with the Claims and Noticing Agent within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including this Confirmation Order) approving such rejection or, if later, within thirty (30) days after the effective date of such rejection. Any claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim is classified and shall be treated as a Class 2 General Unsecured Claim.  Any proofs of Claim arising from the rejection of any Executory Contracts and Unexpired Leases that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, or against any Assets administered by the Plan Agent

or the GUC Trust without the need for any objection by those Persons or Entities or further notice

to or action, order, or approval of the Bankruptcy Court.

## K.     Releases by the Debtors

22.     The following releases by the Debtors in Article VIII.F.3. of the Plan is approved:

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be hereby conclusively, absolutely, irrevocably, and forever released by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and Representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Wind-Down Debtors, or their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Debtors' capital structure, management, ownership, or operation thereof, the Sale Transactions, the sale and marketing process, the Wind Down, the Chapter 11 Cases, and any successor cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Loan Documents, any Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Sale Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan (including, for the avoidance of doubt, the Plan Supplement), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including any Wind-Down Transactions, issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date or relating to any of the forgoing.  In addition to the forgoing, for**

**good an valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and Representatives, are hereby deemed to have conclusively, absolutely, irrevocably, and forever released any and all Avoidance Actions.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Wind-Down Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

**Notwithstanding anything contained herein to the contrary (except for Article VIII.G, if applicable), the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Wind-Down Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any Claim or obligation arising under the Plan (iii) any obligations of any party under a Sale Transaction or any document, instrument, or agreement executed to implement a Sale Transaction, (iv) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, or (v) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan.**

**For the avoidance of doubt, and notwithstanding anything to the contrary herein, the terms of the Settlement and the 9019 Order are not modified, amended, or affected by the releases under this Article VIIIF.3.**

L.    **Releases by Releasing Parties**

23.    The following releases by Releasing Parties in Article VIII.F.4. of the Plan is

approved:

**In exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on (i) the Settlement Effective Date and (ii) the Plan Effective Date, each Released Party is deemed to be hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged**

by each of the Releasing Parties (including any successor trustee or other representative in the Chapter 11 Cases and any successor cases), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action owned by the Releasing Parties, directly or derivatively, by, through, for, or because of the foregoing Entities on behalf of the Releasing Parties, from any and all direct or derivative Claims and Causes of Action asserted on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Releasing Party or other Entity, or that any Holder of any Claim against, or Interest in, a Releasing Party or other Entity could have asserted on behalf of the Releasing Party, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between one or more of the Debtors and one or more of the Debtors or their affiliates, the Chapter 11 Cases and any successor cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Loan Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), Wind-Down Transaction, or any Sale Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the DIP Loan Documents, or the Plan, the Plan Supplement, the filing of the Chapter 11 Cases and any successor cases, the pursuit of Confirmation and the Settlement, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the distribution of property in a manner consistent with the Settlement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before, in respect of the foregoing clause (i), the Settlement Effective Date, and, in respect of the foregoing clause (ii), the Plan Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (a) any rights and remedies of any Holder of a Claim solely against any Debtor or its Estate, arising in the ordinary course of business prior to the Petition Date, including an administrative expense claim under section 503(b) of the Bankruptcy Code, to prosecute such Claim against the applicable Debtor and its Estate, and to defend any objection to such Claim; (b) any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order,

-12-

**any Sale Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any Claim or obligation arising under the Plan, (c) any ordinary course obligations between the Debtors and Icahn Entities arising or to be performed on or after the Petition Date, including under that certain Transition Services Agreement dated as of December 31, 2021, (d) the Committee's right to appoint an entity to be charged with the objection, reconciliation, and distribution of the GUC Payment (as defined in the Settlement Term Sheet), or (e) any Claims or Causes of Action arising under the DIP Orders or DIP Facility.**

**M. Exculpation**

24.     The following exculpation of the Exculpated Parties in Article VIII.F.5. of the Plan

is approved:

**Except as expressly provided herein or in the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Cause of Action for any claim arising on or after the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, including the DIP Orders, the Plan (including the Plan Supplement), the Disclosure Statement, the filing of the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination, filing or Consummation of any Sale Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Sale Transaction or the Plan, the pursuit of confirmation, Consummation, administration, and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the solicitation of votes on the Plan, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or after the Petition Date through the Effective Date related or relating to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence, or willful misconduct but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan, or such distributions made pursuant to the Plan.**

**This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth in the Plan shall not be construed as exculpating any party or Entity from its post-Effective Date obligations under the Plan, any Sale Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

N.    **Injunction**

25.    The following injunction in Article VIII.F.6. of the Plan is approved:

**Except as otherwise expressly provided in this Plan or for Distributions required to be paid or delivered pursuant to this Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to this Plan to the maximum extent permitted under applicable law, permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests satisfied, settled, and released pursuant to this Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim, by accepting, or being eligible to accept, distributions under the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F.6.**

**O.     Gatekeeper Provision**

26.     The following gatekeeper provision in Article VIII.F.7 of the Plan is approved:

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Claim, Cause of Action, or Covered Claim of any kind against any Released Party, or the Plan Agent, in each case that arose or arises from or is reasonably likely to relate to any act or omission (a) in connection with, (b) relating to, or (c) arising out of a Claim, Cause of Action, or Covered Claim against, in the case of each of (a) – (c) any Debtor or any of the Estates, as applicable, subject to Articles VIII.C.3, VIII.C.4, VIII.C.5, or VIII.C.6, in each case without first (i) requesting a determination from the Bankruptcy Court, after notice to all affected parties and a hearing, that such claim or cause of action represents a colorable claim against a Released Party and is not a claim that the Debtors released under the Plan, which request (x) must attach the complaint or petition proposed to be filed by the requesting party and (y) include a proposed attorney fee reserve, subject to court modification, that will be deposited to the Bankruptcy Court's registry to indemnify the Released Party or Parties, and/or Plan Agent Trustee named in the complaint or petition attached to the request, as applicable, against costs associated with the successful defense of any claim that is allowed to proceed and (ii) obtaining from the Bankruptcy Court specific authorization for such party to bring such claim or cause of action against any such Released Party.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claims or causes of action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by applicable law.

No party may assert a claim on any basis against the GUC Trust, the GUC Trustee or any of their professionals, agents, or representatives (collectively, the "GUC Trust Parties") arising out of or related to their roles, either prior to or after the Effective Date, in these cases without first seeking authority from the Bankruptcy Court in each case without first (i) requesting a determination from the Bankruptcy Court, after notice to all affected parties and a hearing, that such claim or cause of action represents a colorable claim against the GUC Trust Parties and is not a claim that was released under the Plan, which request (x) must attach the complaint or petition proposed to be filed by the requesting party and (y) include a proposed attorney fee reserve, subject to court modification, that will be deposited to the Bankruptcy Court's registry to indemnify the GUC Trust Parties named in the complaint or petition attached to the request, as applicable, against costs associated with the successful defense of any claim that is allowed to proceed and (ii) obtaining from the Bankruptcy Court specific authorization for such party to bring such claim or cause of action against any such GUC Trust Party.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claims or causes of action not

explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by applicable law.

27.     The Plan Agent and the GUC Trustee are hereby deemed officers of the court appointed as fiduciaries and representatives of the Debtors, the Wind-Down Debtors, the Post-Effective Date Estates, and the GUC Trust, as applicable, in order to implement the terms of the Plan, and as such are granted the protections of, inter alia, the Barton Doctrine.  *Barton v. Barbour*, 104 U.S. 126 (1881); and *In Matter of Foster*, No. 22-10310, 2023 WL 20872 (5th Cir. Jan. 3, 2023).

28.     The Bankruptcy Court shall retain jurisdiction over the Wind-Down Debtors, the Plan Agent Agreement, the Plan Agent, the GUC Trust, the GUC Trust Agreement and the GUC Trustee, to the fullest extent of the law, for the duration of the existence of each of the Wind-Down Debtors and the GUC Trust; and the Plan Agent and/or the GUC Trustee may seek relief from the Court on any matter deemed reasonable, to aid in the administration of the Wind-Down Debtors (including the Wind-Down Transactions), and the GUC Trust, as applicable.  Nothing in this paragraph O shall be deemed a waiver of any party's rights to oppose such relief.

**P.     Implementation of Other Necessary Documents and Agreements**

29.     The Debtors, the Wind-Down Debtors, the Plan Agent, the Committee, and the GUC Trustee, as applicable, are authorized, without further notice to, or action, order or approval of this Court or any other person, to execute and deliver all agreements, documents, instruments and certificates relating to such documents and agreements and to perform their obligations thereunder, including, without limitation, to pay all fees, costs and expenses thereunder in accordance with the Plan.  The terms and conditions of such documents and agreements are

reaffirmed or approved, as applicable, and shall, upon completion of documentation and execution, be valid, binding and enforceable.

**Q.  No Action Required**

30.  Under § 1142(b) of the Bankruptcy Code and applicable nonbankruptcy law, no action of the Debtors' directors or the GUC Trust is required to authorize the Debtors or the GUC Trust, as applicable, to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan.

**R.  Enforceability of Plan Documents**

31.  Pursuant to §§ 1123(a) and 1142(a) of the Bankruptcy Code and the provisions of this Confirmation Order, the Plan and all Plan Supplements (and associated documents) shall apply and be enforceable notwithstanding any otherwise applicable bankruptcy law.

**S.  Preservation of Causes of Action**

32.  Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with § 1123(b) of the Bankruptcy Code, the Debtors, Plan Agent, or GUC Trustee, as applicable, will retain and may enforce any claims, demands, rights and causes of action that any Estate may hold against any person or entity to the extent not released under the Plan, this Confirmation Order, or otherwise, including the Avoidance Actions.  The Debtors, Plan Agent, or GUC Trustee, as applicable, may pursue any such retained claims, demands, rights or causes of action, as appropriate, in accordance with the best interests of the Wind-Down Debtors or GUC Trust, as applicable.  Except as otherwise provided in the Plan or herein, in accordance with and subject to any applicable law, the Debtors' inclusion or failure to include any right of action or claim on Exhibit B of the Plan Supplement [Doc. No. 689] shall not be deemed an admission, denial or waiver of any claims,

-17-

demands, rights or causes of action that the Debtors or the Estates may hold against any Entity. The Debtors intend to preserve all such Claims, demands, Rights of Action and Causes of Action.

**T.      Waiver of 14-Day Stay**

33.     Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of this Confirmation Order will be effective and enforceable immediately upon its entry, and not subject to any stay.

**U.      Provisions Related to Specific Parties**

34.     Texas Comptroller:  Notwithstanding anything else to the contrary in the Plan or this Confirmation Order, the following provisions will govern the treatment of the claims of the Texas Comptroller (the "Texas Comptroller"):   (1) nothing provided in the Plan or this Confirmation Order shall affect or impair any statutory or common law setoff rights of the Texas Comptroller in accordance with 11 U.S.C. § 553; (2) the Texas Comptroller shall not be a Releasing Party and nothing provided in the Plan or this Confirmation Order shall affect or impair any rights of the Texas Comptroller to pursue any non-Debtor third parties for tax debts or claims; (3) nothing provided in the Plan or this Confirmation Order shall be construed to preclude the payment of interest on the Texas Comptroller's allowed priority tax claims, if any, to the extent such interest is allowable pursuant to the Bankruptcy Code; (4) to the extent that interest is payable with respect to any administrative expense, priority, or secured tax claim of the Comptroller, the rate of such interest shall be agreed by the Debtors and the Texas Comptroller or determined by the Bankruptcy Court, and nothing in this Confirmation Order or the Plan shall affect or impair any party's arguments on the appropriate rate of interest; (5) nothing provided in the Plan or this Confirmation Order shall be construed to preclude the payment of interest on the Texas Comptroller's administrative expense tax claims, if any, to the extent such interest is allowable pursuant to the Bankruptcy Code; and (6) the Texas Comptroller may seek payment of

-18-

administrative expense claims by timely filing a proof of claim form, rather than an application for payment of administrative expenses, in compliance with the applicable administrative expense bar date. In no event shall the Texas Comptroller be paid in a payment schedule that extends past sixty (60) months of the Debtors' bankruptcy petition date.

35.     <u>Texas Taxing Authorities</u>.[3]  Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Allowed 2022 and prior year claims of the Texas Taxing Authorities (the "<u>Texas Tax Claims</u>") shall be paid in full on the Effective Date, or as soon as practical after such claims are Allowed, together with applicable interest to the extent Allowed by the Bankruptcy Code.  The Texas Taxing Authorities' lien priority, if any, shall be retained against property of the Estate (including all related sale proceeds to the extent specified in the applicable sale order) in accordance with applicable state law, until such time as the Texas Tax Claims are paid in full. To the extent the Texas Tax Claims are secured by senior secured liens attached to sale proceeds from any property sold pursuant to a sale order in this case (the "<u>Sale Proceeds</u>"), no applicable Sale Proceeds shall be distributed to any other creditor without first establishing a reserve account for the payment of the Texas Tax Claims or by further order of this Court, duly noticed to the Texas Taxing Authorities.  The Texas Tax Claims shall include all accrued interest properly charged under applicable non-bankruptcy law through the date of payment, to the extent the Texas Tax Code provides for interest with respect to any portion of the Texas Taxing Authority

---

[3]     The "Texas Taxing Authorities" means collectively, the City of El Paso, the City of Mesquite, Dallas County, Fort Bend County WCID #2, Fort Bend County, Galveston County, Harris County, Irving Independent School District, Tarrant County, Texas City Independent School District, Richardson Independent School District, Plano Independent School District, Pasadena Independent School District, City of Houston, Clear Creek Independent School District, Dickinson Independent School District, Brazoria County, City of Pearland, Brazoria County Drainage District #4, Brazoria County Special Road & Bridge Fund, Pearland Independent School District, Wichita Falls City, Wichita Falls Independent School District, Wichita County, City of Vernon, Wilbarger General Hospital, Vernon College, Vernon Independent School District, Lubbock Central Appraisal District, Dallam County Appraisal District, Dallam County, Stephens County, Collin County, and Collin County Tax Assessor.

Claims and Allowed in accordance with the Bankruptcy Code. Payment for the 2023 Tax Claims shall be made in the ordinary course of business when due. All rights and defenses of the Debtors and the Reorganized Debtors under non-bankruptcy law are reserved and preserved with respect to such Texas Tax Claims. The Texas Taxing Authorities may amend the Texas Tax Claims after the Effective Date to reflect the final tax amounts for the 2023 taxes without having to receive prior authorization to do so. The Plan Agent shall have 180 days from the Effective Date to object to the Texas Tax Claims which may be extended by agreement of the parties (email agreement being sufficient) without the need to obtain a Court order.

36.     <u>Opt-Outs</u>. For the avoidance of doubt, the following parties opt out of the releases provided in Article VIII.F of the Plan and are not a Releasing Party: the United States, Continental Battery Company, Epicor Software Corporation, Icon Management I LLC, MANN + HUMMEL Filtration Technologies US LLC, the Chubb Companies, and Safety National Casualty Corporation.

37.     <u>Claim of BBB Industries, LLC</u>. Pursuant to the terms and conditions of the Plan, Plan Agent Agreement, GUC Trust Agreement, and this Confirmation Order, the Plan Agent and GUC Trustee shall use good faith efforts to reconcile and administer all claims of BBB Industries, LLC, including any Claim under section 503(b)(9) of the Bankruptcy Code and any General Unsecured Claim, by not later than 90 days after the Effective Date.

38.     <u>Safety National Casualty Corporation</u>. Pursuant to Federal Rule of Bankruptcy 9001(5), the Plan Agent shall be designated as the person authorized to act on behalf of the Debtors (or, after the Effective Date, the Wind-Down Debtors) in defense of any claim, proceeding, or suit against the Debtors for the purpose of liquidating the claim to seek to collect against the Safety National Insurance Policies. The Plan Agent shall be further authorized to assist in the defense of

such claims including by, though not limited to, providing documents and information required in the defense of any claims, proceeding, or suit, and signing interrogatory answers and other discovery responses.  The Plan Agent shall be authorized to execute such discovery materials based upon knowledge and information gained from the review of documents or other information in the Plan Agent's possession "to the best of the Plan Agent's knowledge, information and belief" and not based on personal knowledge of the Plan Agent.  The intent of this paragraph is to provide adequate provisions of the Debtors' defense obligations under the Safety National Insurance Policies, and nothing in this paragraph shall alter, modify, amend, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Debtors (or, after the Effective Date, the Wind-Down Debtors) or Safety National under the Safety National Insurance Policies.

39.    Element Fleet Corporation.  Element Fleet Corporation (as successor in interest to Element Vehicle Management Services, LLC), on its own behalf, and as servicer to D.L. Peterson Trust (collectively, "Element Fleet") filed a limited objection to confirmation of the Plan at Docket No. 619.  IEH Auto Parts LLC ("IEH") and Element Fleet are parties to:  (i) the Letter of Intent for Lease dated July 16, 2015 and the attached Motor Vehicle Fleet Open-End Lease Agreement Lease No(s). 3585 (together with any and all amendments, the "Vehicle Lease"), (ii) the Master Services Agreement dated as of October 28, 2020 (together with any and all amendments, the "MSA"), and (iii) a trade agreement (the "Trade Agreement") entered into pursuant to the authority provided to the Debtors by this Court's *Order (I) Authorizing the Debtors to Pay Certain Prepetition Trade Claims, (II) Confirming Administrative Expense Priority of Outstanding Purchase Orders, and (III) Granting Related Relief* entered on February 1, 2023 [Docket No. 42].  Pursuant to confirmation of the Plan and effective as of the entry of this Order, Debtors reject the Vehicle Lease and the MSA under and pursuant to Sections 365, 1123 and 1129 of the

-21-

Bankruptcy Code.  Debtors' rejection of the Vehicle Lease and the MSA shall be irrevocable. Upon entry of this Order, Element Fleet shall be entitled to (i) discontinue all services under the MSA, (ii) obtain possession of the vehicles subject to the Vehicle Lease (the "Leased Vehicles") in accordance with the terms and conditions of the Vehicle Lease, including by accepting the surrender of Leased Vehicles from the Debtors and/or by repossession of Leased Vehicles, and (iii) dispose of the Leased Vehicles only and apply the proceeds of disposition of the Leased Vehicles in accordance with the terms and conditions of the Vehicle Lease; and Debtors and any buyers of Debtors' assets or locations at which any of the Leased Vehicles are located shall reasonably cooperate with Element Fleet with respect to the surrender and/or repossession and disposition of the Leased Vehicles.  With respect to the Trade Agreement, Debtors and Element Fleet agree that it is not an executory contract that is subject to either assumption or rejection and the Trade Agreement is not being assumed or rejected by confirmation of the Plan.  For the avoidance of doubt, (A) Element Fleet shall not be entitled to the relief described in subsections (ii) and (iii) above with respect to any vehicles other than the Leased Vehicles.  Debtors and Element Fleet each fully reserve their rights with respect to the effectuation of transfer of any Leased Vehicles in connection with  the Debtors' asset sales approved pursuant to the Court's orders appearing at Docket Nos. 585, 586, 604 (the "Asset Sales").  Debtors and Element Fleet each agree to work together post-confirmation in good faith to effectuate  the disposition of Leased Vehicles in accordance with the Vehicle Lease and the Asset Sales.

40.     F&D Surety Bond Obligations.  Notwithstanding any other provisions of the Plan, this Confirmation Order or any other order of the Bankruptcy Court, on the Effective Date, all rights and obligations of any party related to (i) the Debtors' current surety bonds issued by Fidelity and Deposit Company of Maryland  ( "F&D" and collectively, the "F&D Bonds") and maintained

in the ordinary course of business; (ii) any surety payment and indemnity agreements, setting forth F&D's rights against the Debtors, and the Debtors' obligations, among other things, to pay, indemnify and hold F&D harmless from any loss, cost, or expense that F&D may incur, in each case, on account of the issuance of any F&D Bonds on behalf of the Debtors; (iii) any F&D collateral; (iv) collateral agreements governing collateral, if any, in connection with the Debtors' F&D Bonds; and/or (v) ordinary course premium payments to F&D for the Debtors' F&D Bonds and in connection with enforcement of any obligations under the General Indemnity Agreement ("F&D Surety Bond Obligations") shall be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect and are not discharged, enjoined, impaired or released by the Plan in any way.  On the Effective Date, all liens and security interests, if any, granted pursuant to or in connection with the F&D Surety Bond Obligations shall be valid, binding, perfected, enforceable liens and security interests to the same extent, validity, and priority as existed prior to the Petition Date, and shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or this Order.  For the avoidance of doubt, nothing in the Plan, this Confirmation Order or other agreements between the Debtors and third parties, including, without limitation, any exculpation, release, injunction, exclusions and discharge provision of the Plan, including, without limitation, any of those provisions contained in Article VIII.F of the Plan, shall bar, alter, limit, impair, release or modify or enjoin any F&D Surety Bond Obligations.  F&D is deemed to have opted out of any release, exculpation and injunction provisions of the Plan that apply or could be interpreted to apply to F&D, its rights or claims in any respect, and are otherwise not Releasing Parties under the Plan.  The F&D Surety Bond Obligations related thereto shall be treated by the Wind-Down Debtors and F&D in the ordinary course of business as if the Chapter 11 Cases had not been

commenced; and in furtherance thereof, in the event that any of the F&D Surety Bond Obligations cease to be in effect upon the Effective Date for reasons other than their expiration or termination in accordance with the terms of the applicable agreements, the Wind-Down Debtors and F&D shall execute the documents that are necessary to reinstitute such F&D Surety Bond Obligations, including, without limitation, the indemnity obligations thereunder, as such F&D Surety Bond Obligations were in effect immediately prior to the Effective Date; provided, however, that nothing in the foregoing shall be deemed to alter, limit, modify or expand any such F&D Surety Bond Obligations.  For the avoidance of any doubt, with a reservation of rights to all parties, and only to the extent applicable under law, any agreements related to the F&D Surety Bonds are assumed by the Debtors and the Wind-Down Debtors pursuant to section 365 of the Bankruptcy Code upon the Effective Date.  Nothing in the Plan or this paragraph shall affect in any way F&D's rights against any non-Debtor, or any non-Debtor's rights against F&D, including under the F&D Surety Bonds or with regard to the Surety Bond Obligations. Nothing in the Plan or this paragraph shall affect in any way any F&D's rights against any third parties.  Nothing in the Plan, Confirmation Order or any other order of the Bankruptcy Court shall require F&D or any of its affiliates to issue new or replacement surety bonds to the Wind-Down Debtors.

41.     <u>Fisher and Parts Authority</u>.    Fisher Auto Parts, Inc. ("<u>Fisher</u>") and Clutch Acquisition LLC ("<u>Parts Authority</u>") made deposits into a third party escrow account in connection with their joint bid for certain of the Debtors' assets in the Chapter 11 Cases (the "<u>Deposits</u>").  As of the date of this Order, the Deposits are still in escrow being held by the Debtors' designated escrow agent.  The Debtors, Fisher, and Parts Authority reserve all rights with respect to the Deposits and, notwithstanding anything herein or in the Plan to the contrary, no right or claim of the Debtors, Fisher, or Parts Authority relating to or in connection with the Deposits shall be

deemed to be altered, modified, or waived by the Plan or this Order.  Notwithstanding anything herein or in the Plan to the contrary, the Deposits are not and shall not be deemed to be property of the Debtors' estates or property to be disbursed or otherwise used to effectuate the Plan.  Any disbursements shall be subject to further Court Order.

42.     <u>Property Works</u>.  The Debtors and Property Works agree that the total Cure Amount due through June 30, 2023 is $38,825.80.

**V.    Controlling Documents**

43.     In the event of any inconsistency among the Plan and Disclosure Statement or any exhibit or schedule hereto, the terms of the Plan and Disclosure Statement shall control in all respects.  In the event of any inconsistency between the Plan and Disclosure Statement and any document or agreement included in the Plan Supplement, the Plan Supplement document or agreement shall control.  In the event of any inconsistency among the Plan and Disclosure Statement or any document or agreement included in the Plan Supplement and this Confirmation Order, this Confirmation Order shall control; *provided*, *however*, that notwithstanding the forgoing, the Settlement as approved by the 9019 Order shall govern the rights and obligations of the settlement parties thereto.

Signed: June 16, 2023

_____
Christopher Lopez
United States Bankruptcy Judge

**<u>Exhibit A to the Confirmation Order</u>**

**Plan**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| IEH AUTO PARTS HOLDING LLC, *et al.*,[1] | ) Case No. 23-90054 (CML) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

**THIRD AMENDED COMBINED DISCLOSURE STATEMENT AND
JOINT PLAN OF LIQUIDATION OF IEH AUTO PARTS HOLDING LLC
AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Matthew D. Cavenaugh (TX Bar No. 24062656)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna F. Anaya (TX Bar No. 24091225)
Emily Meraia (TX Bar No. 24129307)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email: mcavenaugh@jw.com
Email: vpolnick@jw.com
Email: vanaya@jw.com
Email: emeraia@jw.com

*Counsel for the Debtors and Debtors in Possession*

Elizabeth C. Freeman (TX Bar No. 24009222)
**LAW OFFICE OF LIZ FREEMAN**
PO Box 61209
Houston, TX 77208-1209
Telephone: (832) 779-3580
Email: liz@lizfreemanlaw.com

*Co-Counsel and Conflicts Counsel for the
Debtors and Debtors in Possession*

---

[1] The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: IEH Auto Parts Holding LLC (6529); AP Acquisition Company Clark LLC (4531); AP Acquisition Company Gordon LLC (5666); AP Acquisition Company Massachusetts LLC (7581); AP Acquisition Company Missouri LLC (7840); AP Acquisition Company New York LLC (7361); AP Acquisition Company North Carolina LLC (N/A); AP Acquisition Company Washington LLC (2773); Auto Plus Auto Sales LLC (6921); IEH AIM LLC (2233); IEH Auto Parts LLC (2066); IEH Auto Parts Puerto Rico, Inc. (4539); and IEH BA LLC (1428). The Debtors' service address is: 112 Townpark Drive NW, Suite 300, Kennesaw, GA 30144.

**TABLE OF CONTENTS**

Article I

    DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME .................................................................................................................. 5

    A.    Defined Terms ........................................................................................................ 5

    B.    Rules of Interpretation and Computation of Time ............................................... 15

        1.    Rules of Interpretation ........................................................................... 15

        2.    Computation of Time ............................................................................. 15

        3.    Controlling Document ............................................................................ 15

Article II

    DEBTORS' HISTORY AND THE BANKRUPTCY CASE ...................................... 16

    A.    Debtors' History .................................................................................................... 16

        1.    Debtors' Background, Corporate Structure, and Operations .................. 16

        a.    Debtors' Background .............................................................................. 16

        b.    Corporate Structure ............................................................................... 16

        c.    Operations .............................................................................................. 16

    B.    Events Leading to the Chapter 11 Cases .............................................................. 17

    C.    Debtors in Possession Financing .......................................................................... 17

    D.    Main Bankruptcy Events ...................................................................................... 18

        1.    First Day Orders ..................................................................................... 18

        2.    Employment Applications ...................................................................... 19

        3.    Schedules and Statements ...................................................................... 19

        4.    341 Meeting ........................................................................................... 19

        5.    General Bar Date and Governmental Bar Date ...................................... 19

    E.    Summary of Treatment of Classified Claims and Equity Interests and Estimated Recoveries ............................................................................................................ 20

Article III

    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............. 20

    A.    Unclassified Claims .............................................................................................. 20

        1.    Payment of Administrative Expense Claims .......................................... 20

        2.    Payment of Priority Tax Claims ............................................................. 22

        3.    Treatment of DIP Facility Claims .......................................................... 23

    B.    Classification of Claims and Interests .................................................................. 23

    C.    Treatment of Claims and Interests ....................................................................... 23

        1.    Priority Claims (Class 1) ........................................................................ 24

        2.    General Unsecured Claims (Class 2) ..................................................... 24

        3.    Equity Interests in the Debtors (Class 3) ............................................... 24

    D.    Reservation of Rights Regarding Claims .............................................................. 24

|   |   |   |   |
|---|---|---|---|
| E. | Postpetition Interest on Claims | ........................................................... | 24 |
| F. | Insurance | ........................................................................................ | 25 |
| G. | Confirmation Without Acceptance by All Impaired Classes | ........................ | 25 |
| H. | Class Without Voting Claim Holders | ...................................................... | 25 |

**Article IV**     MEANS FOR IMPLEMENTATION OF THE PLAN ................................. 25

| A. | The Plan Agent and the Wind-Down Debtors | .......................................... | 25 |
|---|---|---|---|
| B. | Settlement of Claims | ...................................................................... | 27 |
| C. | Abandonment of Assets by the Plan Agent | ............................................ | 27 |
| D. | Cancellation and Surrender of Instruments, Securities and Other Documentation | ...................... | 27 |
| E. | Release of Liens | ............................................................................. | 27 |
| F. | Effectuating Documents; Further Transactions | ........................................ | 28 |
| G. | Release of Avoidance Actions | ............................................................. | 28 |

**Article V**     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..... 28

| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | ................. | 28 |
|---|---|---|---|
| B. | Claims Based on Rejection of Executory Contracts and Unexpired Leases | ................ | 29 |
| C. | Insurance Provisions | ........................................................................ | 29 |

**Article VI**     PROVISIONS REGARDING DISTRIBUTIONS .................................... 32

| A. | Distributions for Claims Allowed as of the Effective Date | .......................... | 32 |
|---|---|---|---|
| B. | Method of Distributions to Holders of Claims | ........................................ | 33 |
| C. | Disbursing Agent | ............................................................................ | 33 |
|   | 1.    Powers of the Disbursing Agent | ................................................ | 33 |
|   | 2.    Expenses Incurred on or After the Effective Date | .......................... | 33 |
|   | 3.    No Liability | ........................................................................ | 33 |
| D. | Disputed Claims Reserves | ................................................................. | 33 |
|   | 1.    Establishment of Disputed Claims Reserves | ................................. | 33 |
|   | 2.    Maintenance of Disputed Claims Reserves | .................................. | 33 |
| E. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | ............. | 34 |
|   | 1.    Delivery of Distributions | ....................................................... | 34 |
|   | 2.    Undeliverable Distributions Held by Disbursing Agents | ................... | 34 |
| F. | Distribution Record Date | ................................................................. | 34 |
| G. | De Minimis Distributions | .................................................................. | 35 |
| H. | Compliance with Tax Requirements | ..................................................... | 35 |
| I. | Manner of Payment Under the Plan | ...................................................... | 35 |
| J. | Time Bar to Cash Payments | ............................................................... | 35 |
| K. | Setoffs | .......................................................................................... | 36 |

|  | L. | Allocation Between Principal and Accrued Interest | 36 |
|  | M. | Distributions to Holders of Disputed Claims | 36 |
|  | N. | Claims Paid or Payable by Third Parties | 36 |
|  |  | 1. Claims Paid by Third Parties | 36 |
|  |  | 2. Claims Payable by Insurance | 36 |

Article VII      DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS ........ 37

|  | A. | Allowance of Claims | 37 |
|  | B. | Prosecution of Objections to Claims | 37 |
|  |  | 1. Authority to Prosecute and Settle Claims | 37 |
|  |  | 2. Application of Bankruptcy Rules | 37 |
|  |  | 3. Authority to Amend Schedules | 37 |
|  | C. | Estimation of Claims | 38 |
|  | D. | Offer of Judgment | 38 |

Article VIII .      CONFIRMATION OF THE PLAN ........ 38

|  | A. | Conditions Precedent to Confirmation | 38 |
|  | B. | Conditions Precedent to the Effective Date | 38 |
|  | C. | Waiver of Conditions to Confirmation or the Effective Date | 39 |
|  | D. | Notice of Occurrence of Effective Date | 39 |
|  | E. | Effect of Nonoccurrence of Conditions to the Effective Date | 39 |
|  | F. | Effect of Confirmation | 39 |
|  |  | 1. Binding Effect | 39 |
|  |  | 2. Dissolution of Official Committees | 39 |
|  |  | 3. Releases by the Debtors | 40 |
|  |  | 4. Releases by Releasing Parties | 41 |
|  |  | 5. Exculpation | 42 |
|  |  | 6. Injunction | 42 |
|  |  | 7. Gatekeeper Provision | 43 |
|  | G. | Votes Solicited in Good Faith | 43 |

Article IX      RETENTION OF JURISDICTION ........ 44

Article X      MISCELLANEOUS PROVISIONS ........ 45

|  | A. | Modification of the Plan | 45 |
|  | B. | Revocation of the Plan or Non-Occurrence of the Confirmation Date or Effective Date | 45 |
|  | C. | Reservation of Rights Regarding Certain Matters | 45 |
|  | D. | Exhibits and Schedules | 45 |

| | | | |
|---|---|---|---|
| E. | | Severability .................................................................................................... | 45 |
| F. | | Successors and Assigns ................................................................................... | 46 |
| G. | | Service of Documents ..................................................................................... | 46 |
| Article XI | | **CONFIRMATION OF THE PLAN** ................................................................. | 46 |
| A. | | VOTING PROCEDURES AND REQUIREMENTS ......................................... | 46 |
| B. | | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ........... | 47 |
| | 1. | The Best Interest of Creditors Test ................................................... | 47 |
| | 2. | Liquidation Analysis .......................................................................... | 48 |
| | 3. | Feasibility ........................................................................................... | 48 |
| | 4. | Acceptance by an Impaired Class ...................................................... | 49 |
| | 5. | Confirmation Without Acceptance by All Impaired Classes .............. | 49 |
| Article XII | | **PLAN-RELATED RISK FACTORS** ............................................................... | 50 |
| A. | | GENERAL BANKRUPTCY LAW AND PLAN RELATED CONSIDERATIONS ........ | 50 |
| | 1. | Parties in Interest May Object to the Classification of Claims and Equity Interests ............................................................................................... | 50 |
| | 2. | Failure to Satisfy Vote Requirement .................................................. | 51 |
| | 3. | The Debtors May Not Be Able to Secure Confirmation of the Plan or Confirmation May Be Delayed .......................................................... | 51 |
| | 4. | Nonconsensual Confirmation - "Cramdown" ..................................... | 51 |
| | 5. | The Debtors May Object to the Amount or Classification of a Claim .......... | 52 |
| | 6. | Risk of Nonoccurrence of the Effective Date ..................................... | 52 |
| | 7. | Risk Affecting Potential Recoveries of Holders of Claims in Voting Classes ........ | 52 |
| B. | | RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS ................... | 52 |
| C. | | DISCLOSURE STATEMENT DISCLAIMER ................................................... | 52 |
| | 1. | Information Contained Herein Is for Soliciting Votes ........................ | 52 |
| | 2. | This Plan and Disclosure Statement Was Not Reviewed or Approved by the Securities and Exchange Commission ................................................. | 52 |
| | 3. | This Plan and Disclosure Statement May Contain Forward Looking Statements .......... | 52 |
| | 4. | No Legal or Tax Advice Is Provided to You by this Plan and Disclosure Statement ........................................................................................... | 53 |
| | 5. | No Admissions Made ........................................................................... | 53 |
| | 6. | Failure to Identify Litigation Claims or Projected Objections ........... | 53 |
| | 7. | No Waiver of Right to Object or Right to Recover Transfers and Assets ........ | 53 |
| | 8. | Information Was Provided by the Debtors and Was Relied Upon by the Debtors' advisors. ............................................................................................. | 53 |
| | 9. | Potential Exists for Inaccuracies, and the Debtors have No Duty to Update ........... | 53 |
| | 10. | No Representations Outside the Plan and Disclosure Statement are Authorized .......... | 53 |

D.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............. 54

     1.     Alternative Plan(s) of Liquidation ........................................................................ 54

     2.     Liquidation under Chapter 7 .................................................................................. 54

     3.     Dismissal of the Chapter 11 Cases........................................................................ 54

Article XIII      CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............................ 54

A.     General Tax Considerations ........................................................................................... 54

B.     Certain Federal Income Tax Consequences to the Debtors............................................ 55

C.     Certain Federal Income Tax Consequences to Holders of Claims ................................. 55

D.     Reservation of Rights..................................................................................................... 59

CONCLUSION, RECOMMENDATION, AND CONFIRMATION REQUEST ...................................... 59

## TABLE OF EXHIBITS

Exhibit A        Liquidation Analysis

Exhibit B        9019 Order with attachments

## INTRODUCTION AND DISCLAIMERS

IEH Auto Parts Holding LLC and the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Auto Plus"), propose the following Combined Disclosure Statement and Joint Plan of Liquidation of IEH Auto Parts Holding LLC, et al., (this "Disclosure Statement," "Plan and Disclosure Statement," or "Plan") for the resolution of the outstanding Claims against, and Interests in, the Debtors pursuant to chapter 11 of the Bankruptcy Code. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Other agreements and documents supplement this Plan and have been, or will be, Filed with the Bankruptcy Court. These supplemental agreements and documents are referenced in this Plan and Disclosure Statement and will be available for review prior to the Voting Deadline.

The Plan is a liquidating plan. The Debtors are selling substantially all of their Assets.

This Plan and Disclosure Statement contain certain statutory provisions, describes certain events in these Chapter 11 Cases and certain documents related to the Plan and Disclosure Statement that may be attached and are incorporated by reference. Although the Debtors believe that this information is fair and accurate, this information is qualified in its entirety to the extent that it does not set forth the entire text of such documents or statutory provisions or every detail of such events. The information contained herein or attached hereto is made only as of the date of this Plan and Disclosure Statement. There can be no assurances that the statements contained herein will be correct at any time after this date.

This Plan and Disclosure Statement was prepared in accordance with sections 1123 and 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other nonbankruptcy laws. This Plan and Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association, nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein. No other governmental or other regulatory agency approvals have been obtained as of the date of the mailing of this Plan and Disclosure Statement.

The Debtors submit the Disclosure Statement, as may be amended from time to time, under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016, to all of the Debtors' known creditors and Interest Holders entitled to vote on the Plan.

The purpose of this Disclosure Statement is to provide adequate information to enable all Holders of Claims and/or Interests who are entitled to vote on the Plan to arrive at a reasonably informed decision in exercising their respective right to vote on the Plan.

This Disclosure Statement is not intended to replace a careful review and analysis of the Plan, including the specific treatment of Claims and Interests under the Plan. It is submitted as an aid and supplement to your review of the Plan and to explain the terms of the Plan. Every effort has been made to fairly summarize the Plan and to inform Holders of Claims and Interests how various aspects of the Plan affect their respective positions. If any questions arise, the Debtors urge you to contact the Debtors' counsel. These attorneys will attempt to resolve your questions. You are also encouraged to consult with your own counsel. Counsel for the Debtors are likewise available to answer any questions that your counsel may have regarding the Plan and Disclosure Statement.

In preparing this Plan and Disclosure Statement, the Debtors relied on financial data derived from their books and records or that was otherwise made available to them at the time of such preparation and on various assumptions regarding the Debtors' businesses. Although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof, and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' businesses and their future results and operations. Except where specifically noted, the financial information contained in this Plan and Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States or any other jurisdiction.

This Plan and Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver. A party with standing may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Plan and Disclosure Statement identifies any such objections to Claims.

The Debtors are making the statements and providing the financial information contained in this Plan and Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the Debtors may update the information in this Plan and Disclosure Statement, the Debtors do not have an affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise. Holders of Claims and Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed. Information contained herein is subject to completion or amendment. The Debtors reserve the right to File an amended Plan and Disclosure Statement.

Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described in Article VIII. There is no assurance that the Plan will be confirmed or, if confirmed, that such material conditions precedent will be satisfied or waived. You are encouraged to read this Plan and Disclosure Statement in its entirety, including, but not limited to Article XII, entitled "Plan-Related Risk Factors," before submitting your Ballot to vote to accept or reject the Plan.

The Debtors have not authorized any entity to give any information about, or concerning, the Plan and Disclosure Statement other than that which is contained in this Plan and Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Plan and Disclosure Statement.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims or Interests who are not entitled to vote on the Plan) will be bound by the terms of the Plan and any transactions contemplated thereby.

The contents of this Plan and Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of Claims or Interests should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest. This Plan and Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

Nothing contained herein shall constitute an admission of any fact or liability by any party or be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests.

**The Debtors and Committee support confirmation of the Plan and recommend all Holders of Claims entitled to vote on the Plan to vote to accept the Plan.**

## THE SOLICITATION

This Plan and Disclosure Statement is submitted by the Debtors to be used in connection with the solicitation of votes on the Plan and to describe the terms of the liquidation of the Debtors.

The Debtors requested that the Bankruptcy Court hold a hearing on conditional approval of this Plan and Disclosure Statement to determine whether this Disclosure Statement contains "adequate information" in accordance with section 1125.[1] The Bankruptcy Court entered an order conditionally approving the Disclosure Statement on May 2, 2023 [Docket No. 474]. Pursuant to § 1125(a)(1), "adequate information" is defined as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . ." All Holders of Claims and Interests are encouraged to read and carefully consider this Plan and Disclosure Statement in its entirety before voting to accept or reject the Plan.

In making a decision to accept or reject the Plan, each Holder of a Claim or Interest must rely on its own examination of the Debtors as described in this Plan and Disclosure Statement, including the merits and risks involved; thus, this Plan and Disclosure Statement shall not be construed to be providing any legal, business, financial or tax advice. Each Holder of a Claim or Interest should consult with his, her, or its own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan, or the transactions contemplated thereby. Additionally, Confirmation and Consummation of the Plan are subject to conditions precedent that could lead to delays in Consummation of the Plan. There can be no assurance that each of these conditions precedent will be

---

[1] All citations to "§" and "section" references the applicable section of the Bankruptcy Code.

satisfied or waived or that the Plan will be consummated. Even after the Effective Date, distributions under the Plan may be subject to delay so that disputed Claims can be resolved.

A hearing to consider the final approval of the Disclosure Statement and confirmation of the Plan is scheduled for **June 1, 2023**, at **1:00 p.m. (prevailing Central Time)** (the "Confirmation Hearing").

Objections to the final approval of the Disclosure Statement or objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the Notice Parties to ensure receipt by them on or before **5:00 p.m. (prevailing Central Time) on May 26, 2023**. Bankruptcy Rule 3007 governs the form of any such objection.

## Answers to Commonly Asked Questions

### What is chapter 11 bankruptcy?

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code that allows financially distressed businesses to reorganize their debts or to liquidate their Assets in a controlled fashion. The commencement of a chapter 11 case creates an "estate" containing all of the legal and equitable interests of the debtor in property as of the date the bankruptcy case is filed. During a chapter 11 bankruptcy case, the debtors remain in possession of their Assets unless the Bankruptcy Court orders the appointment of a trustee. No trustee has been appointed in the Debtors' cases. The Plan is being proposed by the Debtors. The Debtors worked to propose a plan of liquidation in an effort to minimize the overall administrative costs associated with these bankruptcy cases and maximize value to creditors and Interest Holders.

### How do I determine how my Claim or Interest is classified?

To determine the classification of your Claim or Interest, you must determine the nature of your Claim or Interest. Under the Plan, Claims and Interests are classified into a series of Classes. The pertinent articles and sections of the Plan and Disclosure Statement disclose, among other things, the treatment that each Class of Claims or Interests will receive if the Plan is confirmed.

### How do I determine what I am likely to recover on account of my Claim or Interest?

After you determine the classification of your Claim or Interest, you can determine the likelihood and range of potential recovery with respect to your Claim or Interest by referring generally to the discussions of potential Assets and the liquidation analysis attached hereto as **Exhibit 1**, as well as to Article III, Article VII, and Article XII.

### What is necessary to confirm the Plan?

Under applicable provisions of the Bankruptcy Code, Confirmation of the Plan requires that, among other things, at least one Class of impaired Claims or Interests vote to accept the Plan. Acceptance by a Class of Claims or Interests means that at least two-thirds in the total dollar amount and more than one-half in number of the Allowed Claims or Interests actually voting in the class vote in favor of the Plan. Because only those claims or interests who vote on a plan will be counted for purposes of determining acceptance or rejection of a plan by an impaired class, a plan can be approved with the affirmative vote of members of an impaired class who own less than two-thirds in amount and one-half in number of the claims/interests. Besides acceptance of the Plan by each Class of Impaired creditors or Interests, the Bankruptcy Court also must find that the Plan meets a number of statutory tests before it may confirm the Plan. These requirements and statutory tests generally are designed to protect the Interests of Holders of Impaired Claims or Interests who do not vote to accept the Plan but who will nonetheless be bound by the Plan's provisions if the Bankruptcy Court confirms the Plan.

If one or more Classes vote to reject the Plan, the Debtors may still request that the Bankruptcy Court confirm the Plan under § 1129(b) of the Bankruptcy Code. To confirm a plan not accepted by all classes, the Debtors must demonstrate that the Plan does not discriminate unfairly, and is fair and equitable with respect to each Class of Claims or Interests that is Impaired under, and that has not accepted, the Plan. This method of confirming a plan is commonly

called a "cramdown." In addition to the statutory requirements imposed by the Bankruptcy Code, the Plan itself also provides for certain conditions that must be satisfied as conditions to Confirmation.

**Is there a Committee in this case?**

Yes. An official committee of unsecured creditors was appointed on February 14, 2023 [Docket No. 99]. The Committee is represented by the law firm of Kane Russell Coleman Logan PC.

**When is the deadline for returning my Ballot?**

The Bankruptcy Court directed that, to be counted for voting purposes, your Ballot must be received by the designated claims and noticing agent, Kurtzman Carson Consultants LLC ("KCC") by **4:00 p.m. (prevailing Central Time) on May 26, 2023**.

**It is important that all Impaired creditors and Interest Holders vote on the Plan. The Debtors believe that the Plan provides the best possible recovery to creditors and Interest Holders. The Debtors therefore believe that acceptance of the Plan is in the best interest of creditors and Interest Holders and recommends that all Impaired creditors and Interest Holders vote to accept the Plan.**

If you would like to obtain copies of this Plan and Disclosure Statement or any of the documents attached or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact KCC, by either (a) visiting the Document Website at https://www.kccllc.net/autoplus or (b) calling (888) 802-7207 (toll-free) or (781) 575-2107 (international).

## OVERVIEW OF PLAN

An overview of the Plan is set forth below. This overview is qualified in its entirety by reference to the Plan. If the Bankruptcy Court confirms the Plan and, in the absence of any applicable stay, all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date.

On the Effective Date, a Plan Agent will be appointed by the Debtors to administer the Plan and wind down the Debtors' Estates. As of the Effective Date of the Plan, the Plan Agent will be responsible for all payments and distributions to be made under the Plan to the Holders of Non-GUC Claims. The GUC Trustee will be responsible for all payments and distributions to be made under the Plan to the Holders of Allowed General Unsecured Claims through a post-confirmation trust. Each Executory Contract and Unexpired Lease to which the Debtors are a party shall be deemed rejected unless the Debtors expressly assume such agreements before the Effective Date.

The Plan is premised upon the substantive consolidation of the Debtors solely for the purposes of voting, determining which class or classes have accepted the Plan, confirming the Plan, and the resulting treatment of Claims and Interests and Distributions under the Plan.

Except as otherwise expressly provided in the Plan, each Debtor shall continue to maintain its separate corporate existence for all purposes other than the treatment of Claims under the Plan. On the Effective Date, all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the Assets and Liabilities of each other solely for the purposes of this Plan. As a result, each Claim filed against one Debtor shall be deemed filed against the consolidated Debtors for the purposes of this Plan, and shall be deemed a single Claim against the consolidated Debtors' Estates for Plan purposes. The Debtors' substantive consolidation solely for Plan purposes shall not affect the legal and corporate structures of the Debtors, and shall not constitute a transfer of assets or liabilities between the Debtors for any tax purposes.

# ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

**A.      Defined Terms**

Capitalized terms used in this Plan have the meanings set forth in this Section I.A.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.      "503(b)(9) Claim" means a Claim pursuant to section 503(b)(9) of the Bankruptcy Code for the value of goods received by the Debtors in the 20 days immediately prior to the Petition Date and sold to the Debtors in the ordinary course of the Debtors' business.

2.      "9019 Motion" means the *Debtors' Emergency Motion for Entry of an Order Approving the Settlement Between the IEH Debtors, AEP, Pep Boys, the Committee, and the Committee Members* [Docket No. 444]

3.      "9019 Order" means the *Order Approving the Settlement Between the IEH Debtors, AEP, Pep Boys, the Committee, and the Committee Members* [Docket No. 469] and the attachments thereto, which are incorporated by reference into this Plan.

4.      "Administrative Expense Bar Date" means the date by which a request for payment of an administrative expenses must be filed and is thirty (30) days after the Effective Date.

5.      "Administrative Expense Claim" means a Claim against the Debtors or their Estates for costs or expenses of administration of the Estates pursuant to sections 364(c)(1), 503(b), 503(c), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code, including Professional Fee Claims; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; and (d) 503(b)(9) Claims.

6.      "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

7.      "Allowed" means with respect to Claims:  (a) any Claim (i) for which a proof of Claim has been timely filed on or before the applicable Bar Date (or for which a proof of Claim is not required to be filed pursuant to the Bankruptcy Code or a Final Order) or (ii) that is identified in the Schedules as of the Effective Date as not disputed, not contingent and not unliquidated, and for which no proof of Claim has been timely Filed; *provided* that, in each case, any such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been filed or such an objection has been filed and the Claim thereafter has been Allowed by a Final Order; or (b) any Claim expressly deemed allowed by the Plan or allowed by a Final Order of the Bankruptcy Court (including pursuant to any stipulation or settlement agreement approved by the Bankruptcy Court).  Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims.

8.      "Asset" means all of the Debtors' property, rights and interest that are property of the Estates pursuant to section 541 of the Bankruptcy Code, including all Assets of the Debtors as of the Effective Date, including but not limited to, cash on hand, the DIP Facility, and any Retained Causes of Action.

9.      "Asset Purchase Agreement" means any closing document entered into pursuant to any Sale Transaction.

10.      "Auction" means the auction convened starting May 10, 2023 in connection with the Sale Transaction.

11.    "<u>Avoidance Actions</u>" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 541, 542, 544 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent and voidable transfer laws.

12.    "<u>Ballot</u>" means the applicable form or forms of ballot(s) distributed to each Holder of an impaired Claim entitled to vote on the Plan on which the Holder indicates either acceptance or rejection of the Plan and (when applicable) any election for treatment of such Claim under the Plan.

13.    "<u>Bankruptcy Code</u>" means title 11 of the United States Code, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases.

14.    "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of Texas and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the District Court.

15.    "<u>Bankruptcy Rules</u>" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

16.    "<u>Bar Date</u>" means the applicable bar date by which a proof of Claim or request for payment of an Administrative Expense Claim must be, or must have been, Filed, as established by an order of the Bankruptcy Court, including the Bar Date Order and Confirmation Order.

17.    "<u>Bar Date Order</u>" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests and (IV) Approving Notice of Bar Dates* entered by the Bankruptcy Court on March 13, 2023 [Docket No. 222].

18.    "<u>Business Day</u>" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

19.    "<u>Cash</u>" means legal tender of the United States of America and equivalents thereof.

20.    "<u>Causes of Action</u>" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guaranty, suit, obligation, liability, damage, remedy, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "Causes of Action" include:  (a) any right of setoff, counterclaim, or recoupment and any claim under contract or for breach of duties imposed by law or in equity; (b) any Claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate or disallow Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar Claim.

21.    "<u>Chapter 11 Cases</u>" means the bankruptcy cases commenced in the Bankruptcy Court by the Debtors under chapter 11 of the Bankruptcy Code and jointly administered under the caption *IEH Auto Parts Holding LLC, et al.*, Case No. 23-90054 (CML).

22.    "<u>Chubb Companies</u>" means ACE American Insurance Company, Indemnity Insurance Company of North America, ACE Fire Underwriters Insurance Company, Westchester Surplus Lines Insurance Company, Illinois

Union Insurance Company, ACE Property and Casualty Insurance Company, Federal Insurance Company, Northwestern Pacific Indemnity Company, each of their respective U.S.-based affiliates, and all of the predecessors and successors of each of the foregoing.

23.     "Chubb Insurance Contracts" means all insurance policies issued by the Chubb Companies and that provide, or that have provided, coverage at any time to any of the Debtors (or any of their predecessors), and all agreements, documents or instruments relating thereto.

24.     "Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

25.     "Claims and Noticing Agent" means Kurtzman Carson Consultants ("KCC"), in its capacity as the Debtors' Bankruptcy Court-appointed claims, noticing, and solicitation agent in these Chapter 11 Cases.

26.     "Class" means a class of Claims, as described in Article III of this Plan and Disclosure Statement.

27.     "Committee" means the official committee of unsecured creditors appointed on February 14, 2023 [Docket No. 99] and represented by the law firm of Kane Russell Coleman Logan PC.

28.     "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of these Chapter 11 Cases.

29.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of these Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

30.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of this Plan, as such hearing may be continued.

31.     "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the adequacy of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code.

32.     "Consummation" means the occurrence of the Effective Date.

33.     "Covered Claim" means any Claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the DIP Facility, the Settlement, the Disclosure Statement, the Plan, the Plan Supplement, or any Wind-Down Transaction, any contract, instrument, release, or other agreement or document created or entered into in connection with the DIP Facility, the Settlement the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the DIP Loan Documents, the DIP Orders, the solicitation of votes on the Plan, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place prior to the Effective Date.

34.     "Cure Amount" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties to an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

35.     "Debtors" has the meaning set forth in the introduction hereof.

36.     "Deductible" means any deductible under an Insurance Policy.

37.     "DIP Lender" means American Entertainment Properties Corp., in its capacity as the lender under the DIP Facility.

38. "DIP Facility" has the meaning set forth in the DIP Orders.

39. "DIP Facility Claims" means any Allowed Claims arising from DIP Obligations, as defined in the Final DIP Order.

40. "DIP Liens" has the meaning set forth in the DIP Orders.

41. "DIP Loan Documents" has the meaning set forth in the Final DIP Order.

42. "DIP Orders" means the Interim DIP Order and Final DIP Order.

43. "Disbursing Agent" means: (a) the Plan Agent, in its capacity as disbursing agent hereunder; (b) the Debtors solely with respect to Distributions that are required to be made on or before on the Effective Date by the Debtors under this Plan and Disclosure Statement; (c) any Third Party Disbursing Agent employed by the Plan Agent or the GUC Trustee to assist with making distributions as permitted by the Plan; and (d) the GUC Trustee in its capacity as disbursing agent hereunder.

44. "Disclosure Statement Order" means the order entered by the Bankruptcy Court conditionally approving this Disclosure Statement [Docket No. 474].

45. "Disputed Claim" means:

a. a Claim that is listed on the Debtors' Schedules as either disputed, contingent or unliquidated, whether or not a proof of Claim has been Filed;

b. a Claim that is listed on the Debtors' Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted by the Holder in a proof of Claim varies from the nature or amount of such Claim as it is listed on the Schedules;

c. a Claim that is not listed on the Debtors' Schedules;

d. a Claim as to which the Debtors or, prior to the Confirmation Date, any other party in interest, has Filed an objection and such objection has not been withdrawn or denied by a Final Order; or

e. a Claim for which a proof of Claim or request for payment of Administrative Expense Claim is required to be Filed under the Plan and no such proof of Claim or request for payment of Administrative Expense Claim is or was timely Filed.

46. "Disputed Claims Reserve" means any of the reserve funds established pursuant to Article VI.D of this Plan.

47. "Distribution" means a distribution under the Plan of property to a Holder of an Allowed Claim on account of such Allowed Claim.

48. "Distribution Date" means a date selected by a Distributing Agent in accordance with the terms of the Plan to make Distributions on account of Allowed Claims.

49. "Distribution Record Date" means the Confirmation Date.

50. "District Court" means the United States District Court for the Southern District of Texas.

51. "Document Website" means the internet address https://kccllc.net/autoplus, at which the Plan and Disclosure Statement and any amendments or supplements thereto shall be available to any party in interest and the public, free of charge.

52. "<u>Effective Date</u>" means a day, as determined by the Debtors, that is the Business Day as soon as reasonably practicable after all conditions precedent to the Effective Date set forth in Article VIIIB have been met or waived in accordance with Article VIIIC.

53. "<u>Entity</u>" has the meaning set forth in section 101(15) of the Bankruptcy Code.

54. "<u>Equity Interest</u>" means an interest in an "equity security" as such term is defined in section 101(16) of the Bankruptcy Code.

55. "<u>Estates</u>" means the estates created for the Debtors in their Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

56. "<u>Exculpated Parties</u>" means, collectively, each of the following in their capacity as such (a) the Debtors; (b) the Committee, in its capacity as such; and (c) the members of the Committee in their individual capacities.

57. "<u>Executory Contract</u>" means a contract to which the Debtors are a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code, as applicable.

58. "<u>File</u>," "<u>Filed</u>," or "<u>Filing</u>" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

59. "<u>Final DIP Order</u>" means the *Final Order (I) Authorizing Post-Petition Financing Secured by Senior Liens, (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection, and (IV) Granting Related Relief* [Docket No. 478].

60. "<u>Final Distribution Date</u>" means, with respect to a particular Class of Claims, the Distribution Date upon which final Distributions to claimants in the Class are to be made.

61. "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in these Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceeding for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order shall not prevent such order from being a Final Order.

62. "<u>General Bar Date</u>" means the date by which each Entity that asserts a Claim (whether secured, unsecured, priority, or non-priority) against any of the Debtors that arose or is deemed to have arisen before the Petition Date, including 503(b)(9) Claims, must file an original, written proof of Claim.

63. "<u>General Unsecured Claim</u>" means any Claim against the Debtors that is (a) unpaid as of the Effective Date, and (b) is not an Administrative Expense Claim, DIP Facility Claim, Intercompany Claim, Priority Claim, Priority Tax Claim, Secured Claim, or Cure Amount.

64. "<u>Governmental Bar Date</u>" means the date by which each Governmental Unit that asserts a Claim (whether secured, unsecured, priority, or non-priority) against the Debtors that arose or is deemed to have arisen before the Petition Date, including 503(b)(9) Claims and Claims for unpaid Taxes arising from prepetition Tax years or periods or prepetition transactions, must file an original, written proof of Claim.

65. "<u>Governmental Unit</u>" means a "governmental unit," as defined in section 101(27) of the Bankruptcy Code.

66.    "<u>GUC Claim Reconciliation</u>" means the objection to and reconciliation of General Unsecured Claims, and the distribution of the GUC Pool to Holders of Allowed General Unsecured Claims.

67.    "<u>GUC Claim Reconciliation Fund</u>" means the $500,000 fund established by the Debtors (in addition to the GUC Payment) to (i) fund the GUC Trust after the Effective Date and the GUC Trustee's reconciliation of the General Unsecured Claims (including the filing and resolution of objection), (ii) to pay all of the costs and expenses of the GUC Trust and the GUC Trustee, including any professional fees, (iii) all costs and expenses incurred in connection with the establishment of the GUC Trust and/or the GUC Trust Agreement incurred on or after the Confirmation Date, (iv) all costs and expenses incurred by any professionals employed by the Committee, any professionals employed by any Committee members, and/or any Committee members on or after the Confirmation Date subject to payment under the GUC Trust Agreement, and (v) for disbursement of the GUC Payment, as further described and approved in the 9019 Order.

68.    "<u>GUC Payment</u>" means, as defined and further described in the 9019 Motion, the payment of $17 million to be used solely for payment of Allowed General Unsecured Claims, and not for any satisfaction of any other Claims or for any other purpose, which payment shall be funded on or before the earlier of (i) the effective date of a Sale Transaction, (ii) the Effective Date, and (iii) July 31, 2023.  The GUC Payment shall be funded from the DIP Facility, the Debtors' Cash on hand, or proceeds of the Debtors' accounts receivable, *provided, however*, that if such sources are insufficient, the DIP Lender shall independently be responsible for funding any shortfall.

69.    "<u>GUC Pool</u>" means the GUC Payment; 25% of Sale Proceeds above $205 million from the Auction until the DIP Facility Claim is paid in full; all additional Sale Proceeds after the DIP Facility Claim is paid in full, and any Assets of the Estates after satisfaction of all Allowed Claims of superior priority to General Unsecured Claims under the Bankruptcy Code and the conclusion of the Wind-Down Transactions.

70.    "<u>GUC Trust</u>" means that certain trust to be established on the Effective Date, in accordance with the GUC Trust Agreement and this Plan, to, as applicable, administer process, settle, resolve, litigate, satisfy, and pay Allowed General Unsecured Claims.

71.    "<u>GUC Trustee</u>" means Person or Persons identified in the Plan Supplement (as determined by the Committee) to be appointed by the Committee on the Effective Date and who will serve as the trustee of the GUC Trust, and overseeing the GUC Claim Reconciliation in accordance with this Plan.  The GUC Trustee shall be deemed an officer by the Bankruptcy Court appointed as a fiduciary and representative of the trust established by the Plan Supplement in order to implement the terms of the Plan with respect to General Unsecured Claims, the GUC Claim Reconciliation, the GUC Claim Reconciliation Fund, and the GUC Pool.

72.    "<u>GUC Trust Agreement</u>" means that certain trust agreement to be executed on or prior to the Effective Date, that, among other things, (i) establishes and governs the GUC Trust and (ii) establishes, *inter alia*, the procedures governing the rights of the GUC Trustee with respect to the objections to, or allowance of General Unsecured Claims, which agreement shall be in form and substance reasonably acceptable to the Debtors and the Committee.  The GUC Trust Agreement and the identification of the GUC Trustee will be included in the Plan Supplement.

73.    "<u>Holder</u>" means an Entity (or parent, Affiliate, subsidiary, assignee, or agent of an Entity) holding a Claim against, or an Interest in, the Debtors, as the context requires.

74.    "<u>IAG</u>" means Icahn Automotive Group LLC.

75.    "<u>Icahn Entities</u>" means Icahn Enterprises Holdings, L.P. and all of its direct and indirect subsidiaries other than the Debtors.  The Icahn Entities include, for the avoidance of doubt, IAG, and the Pep Boys Entities.

76.    "<u>IEH Holding</u>" means Debtor IEH Auto Parts Holding LLC.

77.    "<u>IEP</u>" means Icahn Enterprises L.P.

78.     "Impaired" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

79.     "Insurance Policies" means the Chubb Insurance Contracts and any and all insurance policies, insurance settlement agreements, coverage-in-place agreements, and other agreements, documents, or instruments relating to the provision of insurance entered into by or issued to or for the benefit of, at any time, the Debtors or its predecessors.

80.     "Insurer" means each and all of the Chubb Companies and any company or other entity that issued an Insurance Policy, any third party administrator of or for any Insurance Policy, and any respective predecessors and/or Affiliates of any of the foregoing.

81.     "Interest" means the rights of the Holders of the partnership interests, membership interests or other equity interests in the Debtors and outstanding immediately prior to the Petition Date, and any options, warrants or other rights with respect thereto, or any other instruments evidencing an ownership interest in the Debtors and the rights of any Entity to purchase or demand the issuance of any of the foregoing, including: (a) redemption, conversion, exchange, voting, participation and dividend rights (including any rights in respect of accrued and unpaid dividends); (b) liquidation preferences; and (c) stock options and warrants.

82.     "Intercompany Claim" means any Claim against a Debtor held by another Debtor or a Non-Debtor Affiliate.

83.     "Interim Compensation Order" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* entered by the Bankruptcy Court on March 27, 2023 [Docket No. 264].

84.     "Interim DIP Order" means the *Corrected Interim Order (I) Authorizing Post-Petition Financing Secured by Senior Liens, (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 90].

85.     "IRS" means the United States Internal Revenue Service.

86.     "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

87.     "Non-Debtor Affiliates" means all non-Debtor affiliates of any of the Debtors including, without limitation, IAG, IEP, all of the Icahn Entities, and any and all other direct and indirect non-Debtor parents of any of the Debtors and any direct or indirect subsidiaries thereof.

88.     "Non-GUC Claims" means all Claims other than General Unsecured Claims.

89.     "Notice of Occurrence of Effective Date" means the notice Filed in accordance with Article VIIID of this Plan.

90.     "Notice Parties" means, collectively, the parties listed in Article XG.

91.     "Objection Deadline" means the deadline to File objections to Confirmation of this Plan, which is May 26, 2023, at 5:00 p.m. (prevailing Central Time) or any other deadline to File objections to Confirmation of this Plan established by the Disclosure Statement Order.

92.     "Ordinary Course Professionals Order" means the *Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* entered by the Bankruptcy Court on April 10, 2023 [Docket No. 355].

93.     "Pep Boys" means The Pep Boys—Manny, Moe & Jack Holding Corp.

94. "<u>Pep Boys Entities</u>" means The Pep Boys—Manny, Moe & Jack Holding Corp., Icahn Automotive Service LLC, and each of their respective direct and indirect subsidiaries.

95. "<u>Person</u>" has the meaning set forth in section 101(41) of the Bankruptcy Code.

96. "<u>Petition Date</u>" means January 31, 2023, the date on which the Debtors Filed their petitions for relief commencing these Chapter 11 Cases.

97. "<u>Plan</u>" has the meaning set forth in the introduction hereof.

98. "<u>Plan Agent</u>" means the Person or Persons identified in the Plan Supplement (as determined by the Debtors) to be appointed by the Debtors on the Effective Date and who will serve as the trustee and administrator overseeing the wind down and dissolution of the Debtors and their Estates in accordance with this Plan.

99. "<u>Plan Agent Agreement</u>" means the documents included in the Plan Supplement identifying the Plan Agent and setting forth the terms and conditions of the Plan Agent's retention and implementation of the Plan.

100. "<u>Plan Supplement</u>" means the documents, schedules and any exhibits Filed prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time, which shall include (a) the schedule of Retained Contracts (if any), (b) the identity of the Plan Agent and Plan Agent Agreement, (c) the identity of the GUC Trustee and GUC Trust Agreement, and (d) the schedule of Retained Causes of Action.

101. "<u>Priority Claim</u>" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Expense Claim or a Priority Tax Claim.

102. "<u>Priority Tax Claim</u>" means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

103. "<u>Pro Rata</u>" means, when used with reference to a Distribution of property to Holders of Allowed Claims in a particular Class or any other specified group of Claims pursuant to this Plan, proportionately, so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of the amount of property to be distributed on account of such Claim to the amount of such Claim is the same as the ratio of the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to the amount of all Allowed Claims in such Class or group of Claims. Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their face amount for purposes of calculating Pro Rata distribution of property to Holders of Allowed Claims in such Class.

104. "<u>Professional</u>" means any Entity (a) employed in the Chapter 11 Cases by the Estates or the Committee pursuant to a Final Order in accordance with sections 327, 328, 363 or 1103 of the Bankruptcy Code (other than a professional entitled to receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order) or (b) for which compensation or reimbursement has been Allowed by the Bankruptcy Court in the Chapter 11 Cases for services to the Estates, and expenses incurred in connection with such services, pursuant to section 503(b)(4) of the Bankruptcy Code.

105. "<u>Professional Fee Claim</u>" means any Administrative Expense Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court and any fees incurred after the Confirmation Date but before the Effective Date only to the extent reasonably required to compel a party's performance under the 9019 Order and/or Settlement Term Sheet. To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

106.    "Professional Fee Escrow Account" means an account funded by the Debtors with Cash as soon as possible after Confirmation and not later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

107.    "Professional Fee Escrow Amount" means the reasonable estimate of the aggregate amount of Professional Fee Claims relating to the period prior to the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article IIIA.1 of this Plan.

108.    "Purchaser" means any Entity that purchased Assets pursuant to a Sale Order.

109.    "Related Party" means, with respect to any Person or Entity, such Person's or Entity's current or former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, directors, managers, owners, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, investment bankers, consultants, representatives, other professionals and the respective successors and assigns thereof.

110.    "Released Parties" means, collectively, and in each case in its capacity as such:  (a) the Debtors and their Estates; (b) the Icahn Entities; (c) the Committee, in its capacity as such; (d) the members of the Committee in their individual capacities, and (e) each Related Party of each Entity in clause (a) through clause (d); *provided* that any Holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan, (y) Files an objection to the releases contained in the Plan by the Objection Deadline, or (z) timely votes to reject the Plan, shall not be a "Released Party."

111.    "Releasing Parties" means collectively, and in each case in its capacity as such:  (a) the Debtors and their Estates; (b) the Icahn Entities; (c) the Committee, in its capacity as such; (d) the members of the Committee in their individual capacities, (e) all Holders of Claims, Interests, and Causes of Action, and (f) each Related Party of each Entity in clause (a) through clause (e) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided* that any Holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan, (y) Files an objection to the releases contained in the Plan by the Plan Objection Deadline, or (z) timely votes to reject the Plan, shall not be a "Releasing Party."

112.    "Representatives" means, with respect to any Person, any officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals of such Person, in each case, in such capacity.

113.    "Retained Causes of Action" means the Causes of Action that shall vest in the Wind-Down Debtors on the Effective Date, which, for the avoidance of doubt, shall not include any Causes of Action that are or were settled, released, waived, exculpated, or transferred (i) prior to the Petition Date by any of the Debtors or (ii) pursuant to the Plan, any Sale Transaction, or any Order of the Bankruptcy Court entered in these Chapter 11 Cases (including the DIP Orders and the 9019 Order), as the same may be amended, modified, or supplemented from time to time by the Debtors prior to the Effective Date.

114.    "Retained Contracts" means those Executory Contracts and Unexpired Leases to be assumed or assumed and assigned by the Debtors (if any), which shall be set forth in a schedule included in the Plan Supplement.

115.    "Sale Orders" means any order entered by the Bankruptcy Court approving the sale of all or part of the Debtors' Assets, pursuant to the *Debtors' Motion for Entry of an Order (i) Approving the Bid Procedures, (II) Approving the Sale of the Debtors' Assets Free and Clear, and (III) Granting Related Relief* [Docket No. 96] and the related *Order Approving the Bid Procedures and Granting Related Relief* [Docket No. 96].

116.    "Sale Proceeds" means the proceeds of any Sale Transaction.

117. "Sale Transaction" means any sale by the Debtors to the Purchasers of their Assets pursuant to any Sale Order.

118. "Schedules" means the schedules of assets and liabilities and the statement of financial affairs Filed by the Debtors, as required by section 521 of the Bankruptcy Code, as the same may have been or may be amended, modified or supplemented.

119. "Secured Claim" means a Claim that is secured by a Lien on property in which the Estates have an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the Holder of such Claim's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) or as Allowed pursuant to the Plan as a Secured Claim.

120. "Settlement" means the global settlement by and among the Debtors, the Committee, the members of the Committee, the DIP Lender, and Pep Boys, as approved by the 9019 Order.

121. "Settlement Term Sheet" means the term sheet describing the principal terms of the Settlement, filed at Docket No. 444.

122. "SIR" means any self-insured retention under an Insurance Policy.

123. "Tax" means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margin, sales, use, ad valorem, value added, transfer, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, escheat, unclaimed property or windfall, profits, custom, duty or other tax, governmental fee or like assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Person.

124. "Third Party Disbursing Agent" means any Entity designated by Plan Agent or GUC Trustee to act as a Disbursing Agent pursuant to Article VIB of this Plan.

125. "Third Party Payment" means any payment made on account of a Claim by a non-Debtor.

126. "Transition Services Agreement" means that certain transition services agreement between the Pep Boys Entities and the Debtors dated as of December 31, 2021.

127. "U.S. Trustee" means the Office of the United States Trustee for the Southern District of Texas.

128. "Unexpired Lease" means a lease to which the Debtors are a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code or section 1123 of the Bankruptcy Code, as applicable.

129. "Unimpaired" means, when used in reference to a Claim, a Claim that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

130. "Voting Class" means the Class of Claims entitled to vote under the Plan to accept or reject the Plan.

131. "Voting Deadline" means May 30, 2023, at 4:00 p.m., prevailing Central Time, which is the deadline for submitting Ballots to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code.

132.  "Wind Down" means the wind-down, dissolution, and liquidation of the Debtors' Estates after the Effective Date.

133.  "Wind-Down Budget" means a budget agreed upon by the Debtors or Wind-Down Debtors, as applicable, and the DIP Lender to govern the expenses incurred by the Wind-Down Debtors to execute the Wind-Down Transactions.

134.  "Wind-Down Debtors" means the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.  Except as otherwise expressly stated herein, references to the Debtors on or after the Effective Date shall be construed as a reference to the Wind-Down Debtors.

135.  "Wind-Down Transactions" means the transactions that the Plan Agent deems to be necessary or appropriate to implement the terms of the Plan, and that ultimately result in the dissolution or other termination of the Debtors.

## B.  Rules of Interpretation and Computation of Time

### 1.  Rules of Interpretation

For purposes of this Plan and Disclosure Statement, unless otherwise provided herein:  (a) whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural; (b) any reference in this Plan and Disclosure Statement to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan and Disclosure Statement to an existing document or exhibit Filed or to be Filed means such document or exhibit, as it may have been or may be amended, modified or supplemented pursuant to this Plan and Disclosure Statement, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors, assigns and affiliates; (e) all references in the Plan to Sections, Articles and exhibits are references to Sections, Articles and exhibits of or to this Plan and Disclosure Statement; (f) the words "herein," "hereunder" and "hereto" refer to this Plan and Disclosure Statement in its entirety rather than to a particular portion of this Plan and Disclosure Statement; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan and Disclosure Statement; (h) subject to the provisions of any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with this Plan and Disclosure Statement, the rights and obligations arising under this Plan and Disclosure Statement shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code (other than subsection (5) thereof) shall apply to the extent not inconsistent with any other provision of this Article IB.

### 2.  Computation of Time

In computing any period of time prescribed or allowed by this Plan and Disclosure Statement, the provisions of Bankruptcy Rule 9006(a) shall apply.

### 3.  Controlling Document

In the event of any inconsistency among the Plan and Disclosure Statement or any exhibit or schedule hereto, the terms of the Plan and Disclosure Statement shall control in all respects.  In the event of any inconsistency between the Plan and Disclosure Statement and any document or agreement included in the Plan Supplement, the Plan Supplement document or agreement shall control.  In the event of any inconsistency among the Plan and Disclosure Statement or any document or agreement included in the Plan Supplement and the Confirmation Order, the Confirmation Order shall control; *provided*, *however*, that notwithstanding the forgoing, the Settlement as approved by the 9019 Order shall govern the rights and obligations of the settlement parties thereto.

## ARTICLE II
## DEBTORS' HISTORY AND THE BANKRUPTCY CASE

A.      **Debtors' History**

      1.      **Debtors' Background, Corporate Structure, and Operations**

            a.      **Debtors' Background**

The Debtors are a leading automotive aftermarket parts distributor in the United States. The Auto Plus brand was launched in the United States in 2010. Auto Plus was owned by Uni-Select Inc. at that time. Uni-Select entered the United States automotive aftermarket parts industry in 1998. It grew Auto Plus operations through acquisitions and investment in inventory and distribution technology platforms for its facilities and customers.

In February 2015, IEH Auto Parts, LLC, a subsidiary of IEP acquired substantially all of the Assets of Uni-Select USA, Inc., including Uni-Select Inc.'s automotive parts distribution business in the United States. The transaction included 22 distribution centers and satellite locations, 259 corporate-owned stores, and more than 3,500 team members.

In 2016, IEP, through a subsidiary merger, acquired Pep Boys®, a leading automotive aftermarket service company, with nearly a thousand locations throughout the United States. Later, IEP formed IAG and ownership of Auto Plus and Pep Boys was transferred to IAG, bringing them together under one corporate umbrella.

Despite their common parent, the Debtors and Pep Boys have faced their customer and suppliers as separate businesses.[2] In 2019, IAG announced its plan to more formally separate the Debtors and Pep Boys businesses into two independent aftermarket businesses—Parts (i.e., the Debtors) and Service (i.e., Pep Boys).

Pursuant to this multi-year plan, the Debtors and Pep Boys operate internally as separate businesses with standalone management teams. Pursuant to their overall turnaround, the Debtors began to right-size the retail footprint, grow the eCommerce platform and relationships, and implement inventory optimization actions.

            b.      **Corporate Structure**

The Debtors' headquarters are located in Kennesaw, Georgia. The Debtors operate 304 store locations across 26 states, as well as 21 distribution centers—all of which are leased. For the Debtors to serve their core customers effectively, the Debtors have distribution centers in strategically located regions and near their stores to ensure a continuous supply of products. A typical Auto Plus store operates, in part, as a mini-distribution center that supports nearby customers (by stocking frequently purchased parts) and also as a retail store that services walk-in customers. Ultimately, the Debtors' retail and distribution center footprint enables it to fulfill seamlessly their commitments to the stores and end-customers.

Debtor IEH Holding is the direct or indirect parent of all the other Debtors. IEH Holding is itself wholly owned by non-Debtor IAG.

            c.      **Operations**

The Debtors' business operations can be broken down into two key customer groups: (a) installers and (b) jobbers. The Debtors also serve several ancillary business segments, which comprise roughly one third of the Debtors' revenue.

---

[2]    For clarity, there are 53 locations where Auto Plus leases space from Pep Boys and the two businesses operate out of one location as separate businesses despite the shared space between the entities. The Debtors will reject most, if not all, of these subleases and leases before the Effective Date.

Installers. Installers are service providers (e.g., mechanics and garages) that order automotive parts directly from the Debtors. The Debtors' installer customer base is comprised of (a) 2,000+ installers enrolled in the Auto Plus professional service center program, and (b) approximately 19,000 installers not enrolled in the professional service center program. The proximity of the Debtors' stores to the installer base enables efficient delivery of parts on an as-needed basis.

Jobbers. Jobbers are wholesalers that purchase larger quantities of automotive parts that they can distribute to their own customers. The jobber customer base is comprised of over 400 banner jobber customers that predominantly buy parts from the Debtors and over 1,600 jobbers that do not fly the Auto Plus banner. The locations of Auto Plus's stores and distribution centers allow it to fulfill its commitments to deliver daily shipments to jobbers.

Other. Approximately a third of the Debtors' revenue comes from ancillary business segments, such as (a) store sales to retail customers (tapping into the do-it-yourself customer base), (b) eCommerce, (c) national accounts, where the Debtors sell directly to large national companies, (d) exports to foreign-based jobbers, (e) large fleet companies (e.g., car rental companies), (f) governmental bids, and (h) paint body & equipment, which are autobody shops that purchase paint.

## B.    Events Leading to the Chapter 11 Cases

Over the last two years, the Debtors incurred significant losses in their operations. For fiscal year 2021, the Debtors' EBITDA was negative $153 million and for fiscal year 2022, the Debtors EBITDA was negative $84.1 million.

A number of factors contributed to the Debtors' declining financial performance. The Debtors' retail footprint was both too large and also situated in too many regions in the United States for the Debtors to effectively operate an efficient and profitable business. This resulted in high leasing, shipping, and labor costs. In addition, the Debtors' inventory management was inefficient. This resulted in excess and slow-moving products at their distribution centers and retail stores, significant warehousing costs, and a decline in sales at Auto Plus's stores.

The Debtors took significant steps to evaluate and implement cost reduction measures over the last two years. These initiatives resulted in: (a) selling their operations in California and the Pacific Northwest, (b) exiting retail stores and distribution centers in low performing markets, (c) selling excess inventory through alternative channels, (d) right-sizing the labor force, and (e) reducing G&A expenses.

The Debtors have seen an improvement in their EBITDA over the past year. However, various external factors have made an out-of-court restructuring even more difficult by negatively impacting the Debtors' business as well as the industry in general, including lessened demand, supply chain disruptions, an inflationary environment, and the effects of COVID-19. The Debtors no longer have the necessary liquidity to effectuate an out-of-court turnaround of their businesses. Beginning in late 2022, the Debtors began to explore transactions with strategic partners for a going concern sale of their businesses and also sales of certain regions where Auto Plus operates. The Debtors received informal indications of interest. However, their preliminary discussions with counterparties did not result in actionable offers.

## C.    Debtors in Possession Financing

To provide the Debtors with the liquidity needed to preserve and stabilize operations and conduct a value-maximizing sale process, the Debtors negotiated the DIP Facility, which provided the Debtors with a priming superpriority administrative claim debtors-in-possession credit facility in an aggregate maximum principal amount of up to $75 million. No alternative source of funding to satisfy the Debtors' critical liquidation objectives was available. Prior to the Petition Date, the Debtors and the DIP Lender (and their respective advisors) engaged in arm's-length negotiations regarding the terms and conditions of the DIP Facility.

D.    **Main Bankruptcy Events**

1.    **First Day Orders**

On February 1, 2023, the Bankruptcy Court held a hearing on and entered orders approving the various first day pleadings filed by the Debtors, including:

- *Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 2];

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of the Notice of Commencement, and (III) Granting Related Relief* [Docket No. 4];

- *Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Claims, Noticing, and Solicitation Agent* [Docket No. 5];

- *Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) Rule 2015.3 Financial Reports and (II) Granting Related Relief* [Docket No. 6];

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain and Administer their Existing Customer Programs and (B) Honor Certain Prepetition Obligations and (II) Granting Related Relief* [Docket No. 7];

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue the Inventory Management Program and (II) Granting Related Relief* [Docket No. 8];

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Trade Claims, (II) Confirming Administrative Expense Priority of Outstanding Purchase Orders, and (III) Granting Related Relief* [Docket No. 9];

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Trade Claims, (II) Confirming Administrative Expense Priority of Outstanding Purchase Orders, and (III) Granting Related Relief* [Docket No. 10];

- *Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* [Docket No. 11];

- *Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees, and (II) Granting Related Relief* [Docket No. 12];

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Related Prepetition Obligations, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees, and (D) Maintain the Customs Bond Program, and (II) Granting Related Relief* [Docket No. 13];

- *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Post-Petition Financing Secured by Senior Liens, (II) Authorizing the Debtors to Use Cash Collateral (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 16];

- *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, (C) Maintain Existing Business Firms and Books and Record and (II) Granting Related Relief* [Docket No. 26].

On March 27, 2023, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, (C) Maintain Existing Business Forms and Books and Records, and (II) Granting Related Relief* [Docket No. 267]. On May 3, 2023, the Bankruptcy Court entered the Final DIP Order.

### 2. Employment Applications

**The following orders approving employment applications for the Debtors' Professionals were entered in these Chapter 11 Cases:**

- Jackson Walker LLP ("JW"): On March 28, 2023, the Bankruptcy Court entered an order approving the retention of JW as counsel for the Debtors. [Docket No. 273].

- Lincoln International LLC ("Lincoln"): On March 27, 2023, the Bankruptcy Court entered an order approving the retention of Lincoln as investment banker for the Debtors [Docket No. 263].

- Law Office of Liz Freeman ("Freeman"): on April 3, 2023, the Bankruptcy Court entered an order approving the retention of The Law Office of Liz Freeman, PLLC as co-counsel and conflicts counsel for the Debtors [Docket No. 320].

- Triple P RTS, LLC ("Portage Point"): on March 28, 2023, the Bankruptcy Court entered an order approving the retention of Portage Point as restructuring advisor to the Debtors [Docket No. 272].

- B. Riley Advisory Services ("B. Riley"): on May 1, 2023, the Bankruptcy Court entered an order approving the retention of B. Riley as the inventory valuation and appraisal advisor to the Debtors [Docket No. 447].

- B. Riley Real Estate, LLC ("BRRE"): on April 11, 2023, the Bankruptcy Court entered an order approving the retention of BRRE as real estate advisors to the Debtors [Docket No. 360].

- Ordinary Course Professionals: On April 10, 2023, the Bankruptcy Court entered the Ordinary Course Professionals Order.

### 3. Schedules and Statements

On March 31, 2023, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs [Docket Nos. 292304]. On March 31, 2023, the Debtors filed their Statements of Financial Affairs [Docket Nos. 305318]. Interested parties may review the Schedules by visiting the Document Website.

### 4. 341 Meeting

On March 9, 2023, the Debtors conducted the first 341 meeting of creditors. The 341 meeting of creditors was continued to and concluded on April 6, 2023 [Docket No. 201].

### 5. General Bar Date and Governmental Bar Date

On March 13, 2023 the Bankruptcy Court entered the Bar Date Order setting the General Bar Date to occur on May 1, 2023 at 5:00 p.m., prevailing Central Time and setting the Governmental Bar Date to occur on July 31, 2023 at 5:00 p.m., prevailing Central Time [Docket No. 222].

All proofs of claim must be actually received on or before the applicable Bar Date.

**E.**      **Summary of Treatment of Classified Claims and Equity Interests and Estimated Recoveries**

The following chart provides a summary of treatment of each Class of Claims and Equity Interests (other than Administrative Expense Claims, Priority Tax Claims, and DIP Facility Claims) based on an estimate of the recoveries of each Class.  The treatment provided in this chart is for informational purposes only and is qualified in its entirety by Article IIIC of this Plan and Disclosure Statement.

| Class | Estimated Allowed Claims[3] | Treatment / Voting Status | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 1—Priority Claims | $7 million | Unimpaired / Presumed to Accept | 100% |
| Class 2—General Unsecured Claims | $170 million | Impaired / Entitled to Vote | 10% |
| Class 3—Equity Interests | $323 million | Impaired / Deemed to Reject | 0% |

**ARTICLE III**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

All Claims and Interests, except for those Claims set forth in Article IIIA below, are classified for voting and Distribution pursuant to this Plan and Disclosure Statement as set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, and DIP Facility Claims are not classified herein.  A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any remainder of such Claim or Interest qualifies within the description of such other Classes.

**A.**      **Unclassified Claims**

**1.**      **Payment of Administrative Expense Claims**

a.      Administrative Expense Claims in General

Unless otherwise agreed by the Holder of an Administrative Expense Claim and the Debtors or the Plan Agent, or unless an order of the Bankruptcy Court provides otherwise, each Holder of an Allowed Administrative Expense Claim will receive, in full and final satisfaction, settlement, and release and in exchange for, its Administrative Expense Claim, Cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, which payments shall be made at the Debtors' option (i) in the ordinary course of business or (ii) on the latest to occur of (i) the Effective Date (or as soon as reasonably practicable thereafter), (ii) the date such Claim becomes an Allowed Administrative Expense Claim (or as soon as reasonably practicable thereafter), and (iii) such other date as may be agreed upon by the Plan Agent and the Holder of such Claim.  As set forth in the 9019 Order and the Settlement Term

---

[3]      These amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by Creditors in proofs of claim or otherwise. The Debtors have not completed their analysis of Claims filed in the Chapter 11 Cases and objections to such Claims have not been fully litigated. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

Sheet, the DIP Lender shall be responsible for funding payment of all Allowed Administrative Expense Claims to the extent such Claims cannot be paid from the DIP Facility, the Debtors' Cash on hand, or proceeds of the Debtors' accounts receivable.

        **b.**        **Statutory Fees**

Administrative Expense Claims for fees payable pursuant to 28 U.S.C. § 1930 ("U.S. Trustee Fees") will be paid in Cash equal to the amount of such Administrative Expense Claims. The Debtors shall pay any U.S. Trustee Fees due and owing as of the Effective Date, and the Plan Agent shall pay any U.S. Trustee Fees accrued from and after the Effective Date until the closing of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code. The DIP Lender shall be responsible for funding payment of all U.S. Trustee Fees associated with the issuance of the GUC Payment and GUC Claim Reconciliation Fund, to the extent such fees cannot be paid from the DIP Facility, the Debtors' Cash on hand, or proceeds of the Debtors' accounts receivable.

The Debtors shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Plan Agent shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made during the applicable period, attested to by the Plan Agent. The obligation to file quarterly reports and pay U.S. Trustee Fees shall continue until the earliest of the Debtors' cases being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

        **c.**        **Professional Compensation**

        **i.**        **Final Fee Applications and Payment of Professional Fee Claims**

All final requests for payment of Professional Fee Claims may be made any time after the Effective Date, but shall be filed no later than forty-five (45) days after the Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.

        **ii.**        **Payment of Professional Fees Accrued Post-Effective Date**

From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate. All Professional Fee Claims accrued from and after the Effective Date shall be paid in the ordinary course of business. This provision of the Plan and Disclosure Statement shall be effective immediately upon Confirmation of the Plan notwithstanding the occurrence of the Effective Date.

        **iii.**        **Professional Fee Escrow Account**

Within fourteen (14) days after the Confirmation and not later than the Effective Date, the Debtors shall establish and fund a Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, or the Plan Agent.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Claims are Allowed by a Final Order. The DIP Lender shall be responsible for funding the Professional Fee Escrow Account and payment of all Allowed Professional Fee Claims to the extent such amounts cannot be paid from the DIP Facility, the

Debtors' Cash on hand, or proceeds of the Debtors' accounts receivable. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

iv.      Estimation of Professional Fees and Expenses

Professionals shall reasonably estimate their unpaid Professional Fee Claims against the Debtors incurred before and as of the Confirmation Date, and shall deliver such estimate to the Debtors within five Business Days after the Confirmation Date; *provided* that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.

v.      Post-Effective Date Professional Fees and Expenses

Except as otherwise specifically provided in this Plan, from and after the Effective Date, subject only to the terms of the Plan, the Plan Agent and GUC Trustee may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court. Any such funding for Plan Agent professionals and/or expenses shall be paid from the Wind Down Amount. Any such funding for GUC Trustee professionals and/or expenses shall be paid from the GUC Claim Reconciliation Fund. From and after the Effective Date, the Plan Agent shall promptly pay the reasonable fees and expenses of American Entertainment Properties Corp.'s professionals related to these Chapter 11 Cases and the Wind Down from the Wind Down Amount.

d.      Bar Date for Administrative Expense Claims

Except with respect to Professional Fee Claims or otherwise as set forth in this Plan, unless previously Filed, requests for payment of Administrative Expense Claims must be Filed and served on the Notice Parties pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than the Administrative Expense Bar Date, which is thirty (30) days after the Effective Date. Holders of Administrative Expense Claims that are required to File and serve a request for payment of such Administrative Expense Claims and that do not File and serve such a request by the Administrative Expense Bar Date will be forever barred from asserting such Administrative Expense Claims against the Debtors, the Plan Agent or their respective property, and such Administrative Expense Claims will be deemed satisfied for all purposes as of the Effective Date. Objections to such requests must be Filed and served on the Notice Parties and the requesting party by the later of (a) thirty 30 days after the Filing of the applicable request for payment of Administrative Expense Claims or (b) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Expense Claims.

**2.      Payment of Priority Tax Claims**

a.      Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of a Priority Tax Claim and the Debtors or the Plan Agent, as applicable, each Holder of an Allowed Priority Tax Claim will receive, at the option of the Debtors or the Plan Agent, as applicable, in full and final satisfaction, settlement, and release, and in exchange for, its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Plan Agent as they become due.

22

          b.        Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding anything to the contrary in this Plan and Disclosure Statement, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the Holder (other than as the Holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the Debtors, the Plan Agent or their respective property.

    **3.**        **Treatment of DIP Facility Claims**

On the Effective Date, DIP Facility Claims shall receive, up to the full amount of the DIP Facility Claims:

          a.        100% of the Sale Proceeds up to and including $205 million; and (b) for any Sale Proceeds above $205 million, 75% of the Sale Proceeds; and

          b.        All Cash of the Debtors and their Estates on the Effective Date in excess of the Wind-Down Budget and the Disputed Claims Reserve.

After the Effective Date, the DIP Facility Claims shall receive, up to the full amount of the DIP Facility Claims:

          a.        All proceeds of the Debtors' accounts receivable in excess of the Wind-Down Budget;

          b.        All Cash of the Wind-Down Debtors at the conclusion of the Wind-Down Transactions; and

          c.        Any other Distribution pursuant to the Settlement Term Sheet and 9019 Order.

    **4.**        **510(b) Claims**

All 510(b) claims are waived, extinguished, and forever barred as of the Effective Date.

**B.**        **Classification of Claims and Interests**

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for the purposes of voting and Distribution pursuant to this Plan, as set forth herein. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class. Except as otherwise specifically provided for herein, the Confirmation Order or any other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; *provided* that in the event no Holder of a Claim with respect to a specific Class timely submits a Ballot in compliance with the Disclosure Statement Order indicating acceptance or rejection of this Plan, such Class will be deemed to have accepted this Plan. The Debtors may seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

**C.**        **Treatment of Claims and Interests**

Each Holder of an Allowed Claim shall receive under the Plan the treatment described below in full and final satisfaction, settlement, and release and in exchange for such Holder's Allowed Claim, except to the extent different treatment is agreed to by the Debtors (prior to the Effective Date) or the Plan Agent (on or after the Effective Date) and the Holder of such Allowed Claim. Unless otherwise indicated, the Holder of an Allowed Claim shall receive

such treatment on the later of (i) the Effective Date or as soon as reasonably practicable thereafter, (ii) on the date on which such claim is due in accordance with its terms in the ordinary course of business, and (iii) the date on which the applicable Claim becomes an Allowed Claim.  Notwithstanding any other provision of the Plan or this Order, the Debtors shall not receive a discharge pursuant to 11 U.S.C. § 1141(d)(3) of the Bankruptcy Code.  Any provision in the Plan that violates 11 U.S.C. § 1141(d)(3) of the Bankruptcy Code shall have no force or effect. In the event there is a conflict between the provisions of this Order and the Plan (including any attachments, exhibits, or supplements to the Plan), this Order shall control.

1. **Priority Claims (Class 1)**

   a. <u>Classification</u>.  Class 1 consists of all Priority Claims.

   b. <u>Treatment</u>.  On the applicable Distribution Date, each Holder of an Allowed Priority Claim shall receive, at the option of the Debtors (prior to the Effective Date) or the Plan Agent (on or after the Effective Date), up to the full amount of its Allowed Priority Claim: (i) payment in full in Cash; or (ii) such other treatment as is necessary to render such Claim Unimpaired.

   c. <u>Voting</u>.  Claims in Class 1 are Unimpaired.  Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2. **General Unsecured Claims (Class 2)**

   a. <u>Classification</u>.  Class 2 consists of all General Unsecured Claims.

   b. <u>Treatment</u>.  On the applicable Distribution Date, each Holder of an Allowed General Unsecured Claim shall receive, up to the full amount of its Allowed General Unsecured Claim its Pro Rata share of the GUC Pool.

   c. <u>Voting</u>.  Claims in Class 2 are Impaired.  Holders of Claims in Class 2 are entitled to vote on this Plan.

3. **Equity Interests in the Debtors (Class 3)**

   a. <u>Classification</u>.  Class 3 consists of all Equity Interests in the Debtors.

   b. <u>Treatment</u>.  On the Effective Date, all Equity Interests in the Debtors shall be canceled.  No Distribution shall be made on account of Equity Interests in the Debtors.

   c. <u>Voting</u>.  Class 3 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 3 is not entitled to vote to accept or reject the Plan.

**D.   Reservation of Rights Regarding Claims**

Except as otherwise provided in this Plan or in other Final Orders of the Bankruptcy Court, including the DIP Orders and 9019 Order, nothing shall affect the rights or defenses of the Debtors, Plan Agent, the GUC Trust, or GUC Trustee, as applicable, whether legal or equitable, with respect to any Claim, including all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**E.   Postpetition Interest on Claims**

Except as required by applicable bankruptcy law or the DIP Orders, postpetition interest shall not accrue or be payable on account of any Claim.

**F.      Insurance**

Notwithstanding anything to the contrary herein, if any Allowed Claim is covered by an Insurance Policy, and proceeds of the Insurance Policy satisfies such Allowed Claim, such Claim shall be paid from the available proceeds of such Insurance Policy in accordance with and subject to all in respects the terms and conditions of such Insurance Policy (including, without limitation, any terms and conditions related to any Deductible or SIR), with the balance, if any, treated in accordance with the provisions of this Plan governing the Class applicable to such Claim.

**G.      Confirmation Without Acceptance by All Impaired Classes**

The Debtors request Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept this Plan pursuant to section 1126 of the Bankruptcy Code. This Plan and Disclosure Statement shall constitute a motion for such relief.

**H.      Class Without Voting Claim Holders**

If Holders of Claims in a particular Impaired Class of Claims are entitled to vote to accept or reject this Plan, but no Holders of Claims in such Impaired Class of Claims vote to accept or reject this Plan, then such Class of Claims shall be deemed to have accepted this Plan.

**ARTICLE IV**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.      The Plan Agent and the Wind-Down Debtors**

**1.      Vesting of Assets**

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated herein or therein, on the Effective Date, the Assets shall revest in the Estates for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, the Wind-Down Debtors may, at the direction of the Plan Agent, and subject to the Confirmation Order, use, acquire, or dispose of property, and compromise or settle any Non-GUC Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**2.      Wind-Down Debtors**

On and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (a) resolving Claims that are not General Unsecured Claims, (b) making distributions on account of Allowed Non-GUC Claims, (c) establishing and funding the Disputed Claims Reserve, GUC Claim Reconciliation Fund, Professional Fee Escrow Account, and any other similar amounts in accordance with the terms of this Plan, (d) filing appropriate Tax returns, (e) liquidating all Assets of the Debtors and winding down the Estates, and (f) otherwise administering the Plan. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, without the need or requirement for the Plan Agent to file a motion or otherwise substitution as a parties or counsel in any matter.

**3.      The Plan Agent**

The Plan Agent shall have the sole and exclusive corporate authority to act for the Debtors and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan and Confirmation Order. On the Effective Date, the authority, power, and incumbency of the Persons acting as managers, directors, and officers of the Debtors shall vest in the Plan Agent. The Plan Agent shall be appointed as the sole manager, sole director, and sole officer of the Debtors, and shall succeed to the powers of the Debtors' managers, directors, and officers.

From and after the Effective Date, the Plan Agent shall be the sole Representative of the Debtors. The Plan Agent shall have the authority to sell, liquidate, or otherwise dispose of any and all of the Debtors' Assets without any additional notice to or approval from the Bankruptcy Court.

The Plan Agent shall have the sole authority to file and prosecute objections to Non-GUC Claims.

The Plan Agent may retain any advisors, attorneys, or agents the Plan Agent deems necessary or advisable to carry out the terms of this Plan. The fees and expenses of any such advisors, attorneys, or agents shall be paid after the Effective Date without further order of the Bankruptcy Court.

Without limiting the foregoing, the Plan Agent shall have the sole authority to (a) perform all actions and execute all agreements, instruments and other documents necessary to implement this Plan; (b) establish, maintain and administer any bank accounts of the Wind-Down Debtors; (c) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, supervise, prosecute, settle, and protect, as applicable, the Assets that revest in the Wind-Down Debtors (directly or through its professionals or a Third Party Disbursing Agent), in accordance with this Plan; (d) review, reconcile, settle or object to all Non-GUC Claims; (e) calculate and make Distributions to creditors other than General Unsecured Creditors; (f) retain, compensate, and employ professionals to represent the Plan Agent; (g) file appropriate Tax returns and other reports on behalf of the Wind-Down Debtors and pay Taxes or other obligations owed by the Wind-Down Debtors; (h) file, to the extent reasonably feasible, appropriate Tax returns on behalf of the Debtors and pay Taxes or other obligations arising in connection therewith; (i) exercise such other powers as may be vested in the Wind-Down Debtors pursuant to this Plan, or as are deemed by the Plan Agent to be necessary and proper to implement the provisions of this Plan; (j) take such actions as are necessary or appropriate to close the Debtors' Chapter 11 Cases; and (k) dissolve the Wind-Down Debtors including the effectuation of the Wind-Down Transactions.

### 4. Post-Effective Date Corporate Governance

Effective as of the Effective Date, the existing board of managers of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholder, or members, and any remaining officers, directors, managers, or managing members of the Debtors shall be dismissed without any further action required in connection therewith. As set forth above, the Plan Agent shall act as the sole manager, sole director, and sole officer of the Debtors with respect to its affairs.

### 5. Dissolution of the Debtors

Upon a certification to be Filed with the Bankruptcy Court by the Plan Agent of all Distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Plan Agent, including the filing of any documents with the secretary of state for the state in which the Debtors are formed or any other jurisdiction. Notwithstanding the foregoing, the Plan Agent shall retain the authority to take all necessary actions to dissolve the Wind-Down Debtors in, and withdraw the Wind-Down Debtors from, applicable states and provinces to the extent required by applicable law.

Subject in all respects to the terms of this Plan, the Plan Agent shall have the power and authority to take any action necessary to wind-down and dissolve the Wind-Down Debtors, and may: (a) file a certificate of dissolution for the Wind-Down Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Wind-Down Debtors under the applicable laws of the Debtors' state of formation; (b) complete and file all final or otherwise required federal, state, and local Tax returns and shall pay Taxes required to be paid for the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid Tax liability of any of the Debtors or their Estates for any Tax incurred during the administration of the Debtors' Chapter 11 Cases, as determined under applicable tax laws; and (c) represent the interests of the Debtors or the Estates before any taxing authority in all Tax matters, including any action, suit, proceeding, or audit.

Any filing by the Plan Agent of the Wind-Down Debtors' certificates of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholder, members, board of directors, or board of managers of the Debtors or any of their Affiliates.

As the Wind-Down Debtors will be dissolved upon completion of the administration of this Plan, no new corporate organizational documents will be executed.

**B.        Settlement of Claims**

Except as otherwise provided in this Plan, and subject to the terms of the Plan Agent Agreement, on or after the Effective Date, the Plan Agent shall have sole authority to compromise or settle any Non-GUC Claims, other than any Professional Fee Claims, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for liquidating expenses, professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of applications for payment of Professional Fee Claims) without application to the Bankruptcy Court.

Except as otherwise provided in this Plan, and subject to the terms of the GUC Trust Agreement, on or after the Effective Date, the GUC Trustee shall have sole authority to compromise or settle any General Unsecured Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and my pay the charges that it incurs on or after the Effective Date for liquidating expenses, Professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

Notwithstanding the foregoing, the Plan Agent and GUC Trustee shall have the right to submit to the Bankruptcy Court any question or questions regarding which the Plan Agent or GUC Trustee may desire to have explicit approval of the Bankruptcy Court for the any specific action it wishes to take during the execution of its duties under the Plan or applicable Plan Supplement.

**C.        Abandonment of Assets by the Plan Agent**

After the Effective Date, the Plan Agent may abandon any Assets that the Plan Agent determines in his or her reasonable discretion to be of de minimis value or burdensome to the Plan Agent.  After the Effective Date, the GUC Trustee may abandon any GUC Trust Asset, as that term is defined in the GUC Trust Agreement, that the GUC Trustee determines in his or her reasonable discretion to be of de minimis value or burdensome to the GUC Trust.

**D.        Cancellation and Surrender of Instruments, Securities and Other Documentation**

Except as provided in (a) any contract, instrument or other agreement or document entered into or delivered in connection with this Plan, or (b) any of the Asset sales effectuated during the pendency of the Debtors' Chapter 11 Cases, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article VI hereof, all notes, instruments, certificates and other documents evidencing Claims or Interests shall be deemed canceled and surrendered and of no further force and effect against the Debtors, without any further action on the part of the Debtors.

**E.        Release of Liens**

Except as otherwise provided in this Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Plan, any and all Liens on the property of the Estates, other than the DIP Liens, shall be fully satisfied, settled, and released, and all of the right, title and interest of any Holder of such Liens shall be satisfied, settled, and released upon such Holder receiving its Distribution in accordance with the terms of this Plan.  Any Holder of such Liens shall be authorized and directed to release any collateral or other property of the Debtors held by such Holder (or the applicable agent for such Holder) and to take such actions as may be reasonably requested by the Debtors or the Plan Agent, as applicable, to evidence the release of such Liens, including the execution, delivery, and filing or recording of all documents reasonably requested by the Debtors or the Plan Agent, as applicable.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local

agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.

To the extent that any Holder of a Secured Claim that has been satisfied or satisfied in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or Plan Agent, as applicable, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Debtors or Plan Agent, as applicable, shall be entitled to make any such filings or recordings on such Holder's behalf.

### F. Effectuating Documents; Further Transactions

The Debtors (prior to the Effective Date) and the Plan Agent (on or after the Effective Date) are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of this Plan in the name of and on behalf of the Debtors without the need for any approvals, authorization or consents except those expressly required pursuant to this Plan.

### G. Release of Avoidance Actions

All of the Debtors' Avoidance Actions are forever released and extinguished pursuant to and in accordance with the terms of the 9019 Order and this Plan, regardless of whether the defending party or parties to such Avoidance Actions are Released Parties under this Plan. Notwithstanding anything to the contrary in this Plan, the release of the Debtors' Avoidance Actions shall be interpreted broadly, and shall preclude the use of Avoidance Actions by any Person as a defense to liability or for setoff purposes.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, each of the Debtors' Executory Contracts or Unexpired Leases shall be deemed automatically rejected in accordance with the provisions of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date unless any such Executory or Unexpired Lease: (1) has previously been assumed by the Debtors by Final Order of the Bankruptcy Court; (2) is listed on the schedule of Retained Contracts included in the Plan Supplement; (3) is the subject of a motion to assume or reject pending as of the Effective Date; or (4) is a Chubb Insurance Contract.

Except as otherwise previously approved by an order of the Bankruptcy Court, entry of the Confirmation Order by the Bankruptcy Court shall constitute an order, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, approving the assumptions and the rejections of such Executory Contracts and Unexpired Leases as set forth in the preceding paragraph. Unless otherwise indicated herein, assumptions and rejections of Executory Contracts and Unexpired Leases pursuant to this Plan shall be effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order and not assigned to a third party on or before the Effective Date shall revest in the Estates and shall be fully enforceable by the Plan Agent in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing its assumption pursuant to section 365 of the Bankruptcy Code; *provided* that if an assignment is pending as of the Effective Date, the Plan Agent shall be authorized to take any and all actions necessary to implement such assignment.

To the maximum extent permitted by law, to the extent any provision (including any "change of control" provision) in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the assumption and assignment

28

contemplated by this Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto, except for asserting and pursuing a Cure Amount. Notwithstanding anything to the contrary in this Plan, the Debtors reserve the right to alter, amend, modify or supplement the Plan Supplement prior to the Effective Date on no less than one days' notice to any counterparty to an Executory Contract or Unexpired Lease affected thereby.

**B.      Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of any Executory Contracts and Unexpired Leases pursuant to this Plan must be Filed with the Claims and Noticing Agent within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any proofs of Claim arising from the rejection of any Executory Contracts and Unexpired Leases that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, or against any Assets administered by the Plan Agent or the GUC Trust without the need for any objection by those Persons or Entities or further notice to or action, order, or approval of the Bankruptcy Court.

The GUC Trustee reserves the right to object to, settle, compromise, or otherwise resolve any Claim Filed on account of a rejected Executory Contract or Unexpired Lease to the extent that Claim is a General Unsecured Claim. The Plan Agent reserves the right to object to, settle, compromise, or otherwise resolve any Claim Filed on account of a rejected Executory Contract or Unexpired Lease to the extent the Claim is a Non-GUC Claim.

Holders of Claims arising from the rejection of Executory Contracts and Unexpired Leases with respect to which no proof of Claim is timely Filed will be forever barred from asserting a Claim against the Debtors, the Estates, or any Assets administered by the Plan Agent or the GUC Trust unless otherwise expressly allowed by the Bankruptcy Court.

**C.      Insurance Provisions**

**1.      General Insurance Provisions**

All rights of the Debtors under any and all Insurance Policies under which the applicable Debtor is an insured shall automatically become vested in the Wind-Down Debtors as of the Effective Date without necessity for further approvals or orders. To the extent that any such Insurance Policies are deemed Executory Contracts, then, unless such Insurance Policies have been rejected pursuant to an order of the Bankruptcy Court (including the Confirmation Order), notwithstanding anything to the contrary in this Plan, this Plan shall constitute a motion by the Debtors to assume those policies, permit such policies to "ride through," or ratify such Insurance Policies. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute both approval of such assumption pursuant to section 365 of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption is in the best interests of the Estates. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed upon by the parties prior to the Effective Date, no payments shall be required to cure any defaults existing as of the Confirmation Date with respect to any Insurance Policy assumed by the Estates pursuant to this Article V. Each applicable Insurer is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to the Chapter 11 Cases, this Plan or any provision within this Plan, including the treatment or means of liquidation set out within this Plan for any insured Claims or Causes of Action. Nothing in this Plan shall impair the rights of Estates with respect to (or affect the coverage under) any Insurance Policy.

The Holder of a Claim covered by an Insurance Policy may pursue such Claim to final judgment, including any appeals, in any court(s) having competent jurisdiction, or settlement, solely to the extent relief from the Plan injunction is granted, and solely to the extent of available insurance proceeds. The applicable Debtors may be named in the litigation as a party defendant(s) subject to the provisions herein. Nothing in the Plan, the Plan Supplement, or any Definitive Document releases the applicable Debtor(s) from their liability for Claims covered by an Insurance Policy, *provided, however*, their liability is limited to the amount of available proceeds of any applicable Insurance Policy.

The bankruptcy court shall have exclusive jurisdiction to determine any requests for relief from the order confirming the Plan and estimation of claims, as provided for herein and as otherwise consistent with the Plan and Bankruptcy Code.

For the avoidance of doubt, with respect to any insurance policies under which the Debtors and non-debtor entities are named insureds, nothing within this Plan shall reject, terminate, or otherwise affect any non-debtor entities' rights under or related to such policies, including rights of coverage, and such policies shall be unimpaired with respect to covered non-Debtor Entities; provided, further, for the avoidance of doubt; any collateral posted with or for the benefit any insurer by any non-Debtor Entity related to such policies, including any letters of credit and cash deposits, shall continue to collateralize any such policies solely with respect to claims covered by an Insurance Policy against the applicable non-Debtor Entities.

The bankruptcy court shall have exclusive jurisdiction to determine any requests for relief from the order confirming the Plan and estimation of claims, as provided for herein and as otherwise consistent with the Plan and Bankruptcy Code.

## 2. Provisions Governing the Chubb Companies

Notwithstanding anything to the contrary in the Plan (including, without limitation and for the avoidance of doubt, any of the foregoing paragraphs in this Article V.C of the Plan), the Disclosure Statement, the Plan Supplement, the Confirmation Order, the 9019 Order, the Settlement, the Settlement Term Sheet, any Sale Orders, any Asset Purchase Agreement or any other document related to any Sale Transaction or other sale, any notice or schedule of Retained Contracts and/or Cure Amounts, the Bar Date Order, any bar date notice, any claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, or confers Bankruptcy Court jurisdiction):

(a) on the Effective Date, the Wind-Down Debtors shall assume all of the Chubb Insurance Contracts which identify one of the Debtors as the first named insured or as a counterparty thereto in their entireties pursuant to sections 105 and 365 of the Bankruptcy Code;

(b) on the Effective Date, all of the Debtors' rights and obligations under all of the Chubb Insurance Contracts shall vest, unaltered and in their entireties, with the Plan Agent, and, on and after the Effective Date, the Plan Agent, on behalf of the Wind-Down Debtors, shall become and remain liable in full for all of its, the Debtors', and the Wind-Down Debtors' obligations under the Chubb Insurance Contracts, including, without limitation, any outstanding SIR or Deductible amounts, regardless of whether such obligations arise before or after the Effective Date, without the need or requirement for the Chubb Companies to file or serve any objection to a proposed Cure Amount or a request, application, claim, Proof of Claim or motion for payment or allowance of any Administrative Expense Claim and without the Chubb Companies being subject to any Bar Date, Administrative Expense Bar Date or similar deadline governing Cure Amounts or other Claims;

(c) all of the Chubb Insurance Contracts, the terms and conditions thereof and all legal, equitable or contractual rights, obligations, and defenses of the Chubb Companies, the Debtors (or, after the Effective Date, the Plan Agent or Wind-Down Debtors), the Non-Debtor Affiliates, or any other individual or entity, as applicable, under the Chubb Insurance Contracts, whether arising before or after the Effective Date, including, without limitation, the Chubb Companies' right to seek payment or reimbursement from the Debtors (or, after the Effective Date, the Plan Agent or Wind-Down Debtors) and/or the Non-Debtor Affiliates or to draw on any collateral or security therefor (and any rights, claims, defenses or interest of the Non-Debtor Affiliates related to such collateral or security or draws on the same, whether with respect to Chubb Companies, the Debtors, or any other individual or entity), shall survive and shall not be amended, modified, waived, released, discharged or impaired in any respect, and all such rights and obligations shall be determined under the Chubb Insurance Contracts and applicable non-bankruptcy law;

(d) nothing shall permit or otherwise effect a sale, assignment or other transfer and/or an abandonment of any Chubb Insurance Contract and/or any rights, benefits, claims, proceeds, rights to payment, or recoveries under and/or relating to any Chubb Insurance Contract except as permitted under and subject to and in accordance with the terms and conditions of the applicable Chubb Insurance Contract;

(e) nothing, including the automatic stay of section 362(a) of the Bankruptcy Code and/or the injunctions set forth in Article VIII of the Plan, stays or enjoins (i) any claims that are or may be asserted under any of the Chubb Insurance Contracts to the extent any such claims are solely against any of the Non-Debtor Affiliates and/or (ii) the Chubb Companies' right to draw on or against, use or apply any or all of the collateral or security provided to the Chubb Companies in connection with the Chubb Insurance Contracts in accordance with the terms of the Chubb Insurance Contracts for or in connection with any claim against any Non-Debtor Affiliate or any claim against any Debtor with respect to which the stay and/or injunctions set forth in Article VIII of the Plan do not apply or have been lifted by an order of the Bankruptcy Court;

(f) if and to the extent a Claim is covered by any Chubb Insurance Contract, and provided that the automatic stay of section 362(a) of the Bankruptcy Code and/or the injunctions set forth in Article VIII of the Plan, each if and to the extent applicable, are lifted with respect to such Claim under the Plan or by or through an order entered by the Bankruptcy Court, the Holder of such Claim may proceed with such Claim (whether arising prior to or subsequent to the Petition Date) in the appropriate judicial or administrative forum in accordance with the terms and conditions of the applicable Chubb Insurance Contract(s), and nothing shall impact, affect, impair, waive, release, reduce, or expand the coverage provided for such Claim under the applicable Chubb Insurance Contract(s) pursuant to the terms and conditions thereof and/or the rights and defenses of the Chubb Companies relating to or in connection with such Claim pursuant to the terms and conditions of the Chubb Insurance Contracts and/or applicable non-bankruptcy law;

(g) to the extent the automatic stay of section 362(a) of the Bankruptcy Code is not applicable as of the Plan Effective Date, the injunctions set forth in Article VIII of the Plan shall not prohibit: (I) claimants with valid workers' compensation claims or direct action claims against any of the Chubb Companies under applicable non-bankruptcy law to proceed with their claims; (II) the Chubb Companies to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any of the Chubb Companies under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article VIII of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; (III) the Chubb Companies to draw on or against, use or apply any or all of the collateral or security provided by or on behalf of the Debtors (and the Plan Agent or Wind-Down Debtors, as applicable) and/or the Non-Debtor Affiliates at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Plan Agent or Wind-Down Debtors, as applicable) and/or the Non-Debtor Affiliates and/or apply such proceeds to the obligations of the Debtors (and the Plan Agent or Wind-Down Debtors, as applicable) and/or the Non-Debtor Affiliates under the Chubb Insurance Contracts, in such order as the Chubb Companies may determine; and (IV) the Chubb Companies to cancel any Chubb Insurance Contract, and take other actions relating to the Chubb Insurance Contracts (including effectuating a setoff), to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Chubb Insurance Contracts; and

(i) the Chubb Companies and any Non-Debtor Affiliates shall have standing and the right to participate in any subsequent matters related to the implementation of this Article V.C to the extent any rights or interests of any of the Chubb Companies or the Non-Debtor Affiliates, respectively, may be affected.

**3.        Provisions Governing Safety National Contracts**

Notwithstanding any provision in the Disclosure Statement, Plan, Plan Supplement, Confirmation Order, 9019 Order, Settlement, Sale Orders, any Asset Purchase Agreement, any documents related to any Sale Transaction or other sale, any notice or schedule of Retained Contracts and/or Cure Amounts, any agreements between the Debtors, Plan Agent, and the GUC Trustee, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (collectively the "Bankruptcy Pleadings and Orders"):

(1) Each of the Debtors' Insurance Policies with Safety National Casualty Corporation and related agreements (the "Safety National Insurance Policies") and any agreement, documents, or instructions relating thereto, are treated as Executory Contracts under the Plan and shall be assumed under the Plan and vested in the Estate as of the Effective Date.

(2) Notwithstanding any provision in the Disclosure Statement, Plan, Plan Supplement, Confirmation Order, any agreements with the Debtors, the Plan Agent, the GUC Trustee, the Bankruptcy Pleadings and Orders, or any

other related document, nothing shall alter, modify, amend, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of Safety National Casualty Corporation ("Safety National"), the Debtors (or, after the Effective Date, the Wind-Down Debtors) or any other individual or entity, as applicable, under any of the Safety National Polices. Any such rights and obligations shall be determined under the Safety National Insurance Policies and applicable non-bankruptcy law. For the avoidance of doubt, all of the Safety National Insurance Policies, the terms and conditions thereof and all legal, equitable or contractual rights, obligations, and defenses of Safety National, the Debtors (or, after the Effective Date, the Plan Agent or Wind-Down Debtors), the Non-Debtor Affiliates, or any other individual or entity, as applicable, under the Safety National Insurance Policies, whether arising before or after the Effective Date, including, without limitation, Safety National's right to seek payment or reimbursement from the Debtors (or, after the Effective Date, the Plan Agent or Wind-Down Debtors) and/or the Non-Debtor Affiliates or to draw on any collateral or security therefor (and any rights, claims, defenses or interest of the Non-Debtor Affiliates related to such collateral or security or draws on the same, whether with respect to Safety National, the Debtors, or any other individual or entity), shall survive and shall not be amended, modified, waived, released, discharged or impaired in any respect, and all such rights and obligations shall be determined under the Safety National Insurance Policies and applicable non-bankruptcy law.

(3) Nothing in the Bankruptcy Pleadings and Orders shall establish a cure amount, and all amounts due and owing under the Safety National Insurance Policies, if any, shall remain an obligation of the Wind-Down Debtors. In the event there is any dispute as to any cure amount under the Safety National Insurance Policies, the Court reserves jurisdiction to resolve any such disputes.

(4) As proscribed under the Safety National Insurance Policies, after the Effective Date, the Debtors and/or Wind-Down Debtors, through the Plan Agent, shall maintain a duty to cooperate and assist in the defense of any claim, proceeding, or suit against the Debtors for damages payable by the Safety National Insurance Policies. Pursuant to Federal Rule of Bankruptcy Procedure 9001(5), the Plan Agent shall be designated as the person authorized to act on behalf of the Debtors (or, after the Effective Date, the Wind-Down Debtors) in defense of any claim, proceeding, or suit against the Debtors for the purpose of liquidating the claim to seek to collect against the Safety National Insurance Policies. The Plan Agent shall be further authorized to assist in the defense of such claims including by, though not limited to, providing documents and information required in the defense of any claims, proceeding, or suit, and signing interrogatory answers and other discovery responses. The Plan Agent shall be authorized to execute such discovery materials based upon knowledge and information gained from the review of documents or other information in the Plan Agent's possession "to the best of the Plan Agent's knowledge, information and belief" and not based on personal knowledge of the Plan Agent. The intent of this paragraph is to provide adequate provisions of the Debtors' defense obligations under the Safety National Insurance Policies, and nothing in this paragraph shall alter, modify, amend, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Debtors (or, after the Effective Date, the Wind-Down Debtors) or Safety National under the Safety National Insurance Policies.

(5) To the extent the automatic stay of section 362(a) of the Bankruptcy Code is not applicable as of the Plan Effective Date, the injunctions set forth in Article VIII of the Plan shall not prohibit Safety National to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court.

(6) The rights of Safety National to satisfy any of the Debtors' and/or Wind-Down Debtors' obligations under the Safety National Polices shall be determined under the Safety National Insurance Policies and applicable non-bankruptcy law.

## ARTICLE VI
## PROVISIONS REGARDING DISTRIBUTIONS

**A.      Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in this Article VI, Distributions to be made on the Effective Date to Holders of Allowed Claims shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable by the Debtors or the Plan Agent.

**B.**     **Method of Distributions to Holders of Claims**

All Distributions to be made under this Plan to Holders of Non-GUC Claims shall be made by the Plan Agent or such Third Party Disbursing Agents as Plan Agent may employ in its sole discretion. Each Disbursing Agent may serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by this Plan, if approved by the Plan Agent.

**C.**     **Disbursing Agent**

**1.**     **Powers of the Disbursing Agent**

The Disbursing Agent shall be empowered to:  (a) make all Distributions contemplated in this Plan; (b) effectuate all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan; and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**2.**     **Expenses Incurred on or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including Taxes) and any reasonable compensation to the Disbursing Agent for services rendered shall be paid in Cash by the Plan Agent.

**3.**     **No Liability**

Except on account of gross negligence or willful misconduct, the Disbursing Agent shall have no (a) liability to any party for actions taken in accordance with this Plan or in reliance upon information provided to it in accordance with this Plan or (b) obligation or liability to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a Distribution is made or who does not otherwise comply with the terms of this Plan.

**D.**     **Disputed Claims Reserves**

**1.**     **Establishment of Disputed Claims Reserves**

On the Effective Date or as soon thereafter as is reasonably practicable, the Plan Agent shall establish a Disputed Claims Reserve for Disputed Non-GUC Claims, and the GUC Trustee shall establish a Disputed Claims Reserve for Disputed General Unsecured Claims.  Each Disbursing Agent shall reserve, in Cash or other property, the expected recovery that such Disputed Claim would receive if it were ultimately determined to be an Allowed Claim (or such lesser amount as may be determined or estimated by the Bankruptcy Court after notice and a hearing in accordance with Article VII hereof) with respect to each such Disputed Claim.  For the avoidance of doubt, each Disbursing Agent may administer its respective Disputed Claims Reserves by book entry.

**2.**     **Maintenance of Disputed Claims Reserves**

To the extent that the property placed in a Disputed Claims Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account.  The property in the Disputed Claims Reserves shall be held in trust for the benefit of the Holders of Claims ultimately determined to be Allowed in each applicable Class.  Each Disputed Claims Reserve shall be closed by the applicable Disbursing Agent when all Distributions required to be made under this Plan to the Holders of Claims in the applicable Class will have been made in accordance with the terms of this Plan.  Upon closure of a Disputed Claims Reserve, all Cash (including any investment yield on the Cash) and other property held in that Disputed Claims Reserve shall be distributed in accordance with this Plan.

**E.       Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**1.       Delivery of Distributions**

Distributions to Holders of Allowed Claims will be made by the applicable Disbursing Agent: (a) at the addresses set forth on the respective proofs of Claim Filed by Holders of such Claims or requests for payment of Administrative Expense Claims, as applicable; (b) at the address for a Claim transferee set forth in a valid and timely notice of transfer of Claim Filed with the Bankruptcy Court; (c) at the addresses set forth in any written notice of address change Filed with the Bankruptcy Court or delivered to the applicable Disbursing Agent after the date of Filing of any related proof of Claim; (d) at the addresses reflected in the Debtors' Schedules if no proof of Claim has been Filed and the applicable Disbursing Agent has not received a written notice of a change of address; or (e) if clauses (a) through (d) are not applicable, at the last address directed by such Holder after such Claim becomes an Allowed Claim.

**2.       Undeliverable Distributions Held by Disbursing Agents**

**a.       Holding of Undeliverable Distributions**

If any Distribution to a Holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further Distributions will be made to such Holder unless the applicable Disbursing Agent is notified by written certification of such Holder's then-current address within 60 days after the date of Distribution. If the Holder of an Allowed Claim whose Distribution is returned to Disbursing Agent as undeliverable fails to timely provide the applicable Disbursing Agent written certification of such Holder's then-current address, the Disbursing Agent shall have no further obligation to make any Distribution to the Holder of the Allowed Claim. Nothing contained in the Plan shall require the Disbursing Agent or the Plan Agent to attempt to locate any Holder of an Allowed Claim.

**b.       After Distributions Become Deliverable**

On each Distribution Date, the applicable Disbursing Agent will make all Distributions that became deliverable to Holders of Allowed Claims after the most recent Distribution Date; *provided* that the applicable Disbursing Agent, in its sole discretion, may establish a record date prior to each Distribution Date, such that only Claims Allowed as of the record date will participate in such periodic Distribution. Notwithstanding the foregoing, the applicable Disbursing Agent reserves the right, if it determines a Distribution on any Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a Distribution Date.

**c.       Failure to Claim Undeliverable Distributions**

Any Holder of an Allowed Claim that does not assert its right to an undeliverable Distribution prior to the date that is sixty (60) days after the Distribution Date will be forever barred from asserting any such Claim against the Debtors, the Estates, or any Assets administered by the Plan Agent or GUC Trust. In such cases, (a) the undeliverable Distributions shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code, (b) the Allowed Claims with respect to such Distributions shall be automatically cancelled, (c) the right of the Holders entitled to those Distributions shall be waived and forever barred, and (d) the undeliverable Distributions will be maintained in the applicable Account for redistribution to other claimants entitled to Distribution from such Account.

**F.       Distribution Record Date**

As of 5:00 p.m. (prevailing Central Time) on the Distribution Record Date, the transfer registers for Claims shall be closed. The Disbursing Agent shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make Distributions only to those Holders who are Holders of Claims as of 5:00 p.m. on the Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Central Time) on the Distribution

Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

**G.      De Minimis Distributions**

No Distribution of less than $100 shall be made by the Disbursing Agent.  Any Distribution less than $100 shall be held until a Distribution Date on which the Distribution exceeds $100, at which time the Disbursing Agent shall make such Distribution.  At the time of any final Distribution, no Disbursing Agent shall issue a Distribution of less than $100.  Any amounts due to Holders of Allowed Claims of less than $100 shall revest in the Estates or GUC Pool, as applicable, for distribution to Holders of other Allowed Claims in the applicable Class in accordance with this Plan.

**H.      Compliance with Tax Requirements**

In connection with this Plan, to the extent applicable, the Debtors, Plan Agent, and the GUC Trust, as applicable, shall comply with all Tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to generate sufficient funds to pay applicable withholding Taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate.  The Disbursing Agent shall have the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, Liens and encumbrances.

The Disbursing Agent shall be authorized to require each Holder of a Claim to provide it with a complete, accurate, and executed Form W-9, Form W-8 or other appropriate tax form or documentation as a condition precedent to being sent a Distribution.  The applicable Disbursing Agent shall provide advanced written notice of such requirement to each Holder of a Claim affected thereby.  The notice shall provide each Holder of a Claim with a specified time period after the date of mailing of such notice to provide complete, accurate, and executed Form W-9, Form W-8 or other tax form or documentation to the Disbursing Agent.  The GUC Trust shall require Holders of General Unsecured Claims to return complete, accurate, and executed Form W-9 or Form W-8, as the case may be, not later than ninety (90) days after such a request.  If a Holder of an Allowed Claim does not provide the Disbursing Agent with a complete, accurate, and executed Form W-9, Form W-8 or other tax form or documentation within the time period specified in such notice, or such later time period agreed to by the Disbursing Agent in writing in its discretion, then the Disbursing Agent, in its sole discretion, may (a) make a Distribution net of any applicable maximum withholding or (b) determine that such Holder shall be deemed to have forfeited the right to receive any Distribution, in which case, any such Distribution shall revert to the Estates or GUC Pool, as the case may be, for Distribution on account of other Allowed Claims and the Claim of the Holder originally entitled to such Distribution shall be waived and forever barred without further order of the Bankruptcy Court.  If a Holder of an Allowed Claim refuses to provide the Disbursing Agent with a complete, accurate, and executed Form W-9, Form W-8, or other tax form or documentation, certain IRS penalties may apply to such Holder.

**I.      Manner of Payment Under the Plan**

Unless a Holder of an Allowed Claim and the Disbursing Agent otherwise agree, any Distribution to be made in Cash shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank.  Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**J.      Time Bar to Cash Payments**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 180 days after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Disbursing Agent

by the Entity to whom such check was originally issued. Any Claims in respect of such voided check shall be waived and forever barred and such unclaimed Distribution shall be maintained in the applicable Account for redistribution to other claimants entitled to Distribution from such Account, notwithstanding any federal or state escheat laws to the contrary.

**K.      Setoffs**

Except with respect to Claims satisfied, settled, and released pursuant to this Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Claim (and the Distributions to be made on account of such Claim), counterclaims, rights and causes of action of any nature that the Debtors may hold against the Holder of such Claim: *provided*, *however*, that the failure to effectuate such a setoff shall not constitute a waiver or release by the Debtors, the Disbursing Agent or the Plan Agent of any Causes of Action that the Debtors or the Estates may possess against the Holder of a Claim.

**L.      Allocation Between Principal and Accrued Interest**

Interest shall not accrue on any Holder's Claim entitled to a Distribution from Assets in respect of the period from the Petition Date to the date a final Distribution is made on such Claim. To the extent that any Allowed Claim entitled to a Distribution from Assets consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

**M.      Distributions to Holders of Disputed Claims**

Notwithstanding any other provision of this Plan: (a) no Distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever; and (b) except as otherwise agreed to by the relevant parties, no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, any Distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan. On the Distribution Date that is at least 30 days after a Disputed Claim becomes an Allowed Claim (or such lesser period as the Disbursing Agent may determine), the Holder of such Claim shall receive any Distribution to which such Holder would have been entitled under the Plan as of the Effective Date (including any Distribution such Holder would have been entitled to on the Distribution Date on which such Holder is receiving its initial Distribution) if such claim had been Allowed as of the Effective Date, without any interest to be paid on account of such Claim.

**N.      Claims Paid or Payable by Third Parties**

**1.      Claims Paid by Third Parties**

To the extent that the Holder of an Allowed Claim receives a Third Party Payment, the Plan Agent shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of the Third Party Payment, and such Claim shall be disallowed or deemed satisfied, as applicable, to the extent of the Third Party Payment without an objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

**2.      Claims Payable by Insurance**

No Distributions shall be made on account of any Allowed Claim that is paid pursuant to one of the Insurance Policies. To the extent that any of the Insurers agrees to pay in full or in part an Allowed Claim, then immediately upon such Insurers' agreement, such Claim may be noted on the claims register as expunged to the extent of any such

payment without an objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise provided in this Plan, payments to Holders of Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including Insurers, under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

**ARTICLE VII**
**DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS**

**A.      Allowance of Claims**

After the Effective Date, the Wind-Down Debtors, the Plan Agent, the GUC Trust, and the GUC Trustee, as applicable, shall have any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or satisfied, settled, and released under this Plan. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

**B.      Prosecution of Objections to Claims**

**1.      Authority to Prosecute and Settle Claims**

Except as otherwise specifically provided in this Plan, the Debtors (prior to the Effective Date), the Plan Agent (after the Effective Date), shall have the authority to: (a) File, withdraw or litigate to judgment, objections to Non-GUC Claims; (b) settle or compromise any Disputed Non-GUC Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (c) direct the Claims and Noticing Agent to adjust the claims register to reflect any such resolutions without any further notice to or action, order or approval by the Bankruptcy Court. The DIP Lender shall have the right and authority to object to any Administrative Expense Claims, and the Debtors or Plan Agent, as applicable, shall consult with the DIP Lender concerning the filing or resolution of Administrative Expense Claims objections.

The GUC Trustee shall have the sole authority to: (a) File, withdraw or litigate to judgment, objections to General Unsecured Claims; (b) settle or compromise any Disputed General Unsecured Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (c) direct the Claims and Noticing Agent to adjust the claims register to reflect any such resolutions without any further notice to or action, order or approval by the Bankruptcy Court. To the extent that the Debtors and/or the Committee Filed objections to General Unsecured Claims that remain pending as of the Effective Date, the GUC Trustee shall be substituted as the objecting party without further action of the parties or order of the Bankruptcy Court.

**2.      Application of Bankruptcy Rules**

To facilitate the efficient resolution of Disputed Claims, the Plan Agent and the GUC Trustee shall, notwithstanding Bankruptcy Rule 3007(c), be permitted to File omnibus objections to Claims.

**3.      Authority to Amend Schedules**

After the Effective Date, and upon prior reasonable notice to the GUC Trustee, the Wind-Down Debtors, and the Plan Agent, as applicable, will have the authority to amend the Schedules with respect to any Claim and the Plan Agent and GUC Trust and any applicable Disbursing Agent shall be authorized to make distributions based on such

amended Schedules (if no proof of Claim is timely Filed in response thereto) without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtors or the Plan Agent, will provide the Holder of such Claim with notice of such amendment and parties-in-interest will have 30 days to File an objection to such amendment in the Bankruptcy Court.

**C.      Estimation of Claims**

At any time, the Plan Agent may (but are not required to) request that the Bankruptcy Court estimate any Non-GUC Claim and the GUC Trustee may (but is not required to) request that the Bankruptcy Court estimate any General Unsecured Claim that is contingent or unliquidated (including without limitation any tort claim or other Claim subject to any Insurance Policy) pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain exclusive jurisdiction to estimate any such Claim (including without limitation any tort claim or other Claim subject to any Insurance Policy), including during the litigation of any objection to such Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under this Plan (including for purposes of Distributions), and the Debtors, Wind-Down Debtors, or the Plan Agent (as the case may be) may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim. To the extent the Bankruptcy Court does not have jurisdiction or constitutional authority to enter a final order on any such Claim, the Bankruptcy Court shall issue a report and recommendation to the District Court.

**D.      Offer of Judgment**

The Debtors, before the Effective Date, and the Plan Agent or the GUC Trustee, after the Effective Date, as applicable, are authorized to serve upon a Holder of a Disputed Claim an offer to allow judgment to be taken on account of such Disputed Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment. To the extent the Holder of a Disputed Claim must pay the costs incurred by the Debtors, Plan Agent, or GUC Trustee, as applicable, after the making of such offer, such amounts may be set off against the amount of any Distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.
## CONFIRMATION OF THE PLAN

**A.      Conditions Precedent to Confirmation**

1.      The proposed Confirmation Order shall be in form and substance satisfactory to the Debtors and the DIP Lender, and the Committee.

2.      Any exhibits or schedules incorporated as part of the Plan and Disclosure Statement shall be reasonably acceptable in form and substance to the Debtors and the DIP Lender.

**B.      Conditions Precedent to the Effective Date**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the following conditions have been satisfied or duly waived pursuant to Article VIIIC below:

1.      The Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect.

2.      All other documents and agreements necessary to implement this Plan on the Effective Date (if any), shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Unit in accordance with applicable laws, and all other actions required to be taken in connection with the Effective Date shall have occurred.

3.        The Plan Agent shall have been appointed and have accepted his or her appointment.

4.        The GUC Trustee shall have been appointed and have accepted his or her appointment.

5.        The GUC Payment shall have been funded as described in the Settlement Term Sheet.

6.        The GUC Claim Reconciliation process shall have been funded with $500,000 by the Debtors as described in the 9019 Motion and Settlement Term Sheet.

7.        The Professional Fee Escrow Account shall be created and funded as set forth herein.

8.        Each of the Sale Transactions shall have closed.

9.        The Debtors and the DIP Lender shall have established an agreed upon Wind-Down Budget subject to change only with the mutual agreement of the DIP Lender or Icahn Entities, as applicable, and the Debtors or Wind-Down Debtors, as applicable.

10.      All statutory fees and obligations then due and payable to the U.S. Trustee shall have been paid in full.

**C.       Waiver of Conditions to Confirmation or the Effective Date**

Each condition to Confirmation set forth in Article VIIIA or to the Effective Date set forth in Article VIIIB, except for the conditions in clauses 1 and 4–6 of Article VIIIB, may be waived in whole or in part at any time by agreement of the Debtors and the DIP Lender, without an order of the Bankruptcy Court.

**D.       Notice of Occurrence of Effective Date**

Within five (5) days after occurrence of the Effective Date, the Debtors shall File with the Bankruptcy Court and serve a Notice of Occurrence of Effective Date stating the date on which the Effective Date occurred.

**E.       Effect of Nonoccurrence of Conditions to the Effective Date**

The Debtors reserve the right to seek to withdraw this Plan at any time prior to the Effective Date. If this Plan is withdrawn by the Debtors: (1) each of the provisions of this Plan and the Confirmation Order shall be null and void in all respects, including with respect to (a) the assumption, assumption or rejection of Executory Contracts and Unexpired Leases and (b) the releases described in Article VIIIF; and (2) nothing contained in this Plan or the Confirmation Order shall (a) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtors or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

**F.       Effect of Confirmation**

**1.       Binding Effect**

The Plan shall be binding upon all present and former Holders of Claims and Interests and their respective successors and assigns. To opt-out of the Releases by Releasing Parties provision, Holders of Claims must (a) validly opt out of the releases contained in this Plan by checking the designated box on such Holder's Ballot or notice of non-voting status, (b) File an objection to the releases contained in the Plan by the Plan Objection Deadline, or (c) timely vote to reject the Plan.

**2.       Dissolution of Official Committees**

Upon the Effective Date, the Committee shall remain in place at its members discretion for the limited purposes of: (i) GUC Claim Reconciliation, (ii) participating in update calls with the Wind-Down Debtors or Plan Agent on a reasonable basis, and (iii) consulting with the GUC Trustee regarding outstanding matters under the Plan,

but shall be discharged from all other further duties, responsibilities, and obligations related to the Case. The Committee's professionals shall be permitted to assert Professional Fee Claims for services rendered and expenses incurred with respect to the Committee's limited authority, and shall further be permitted to: (i) prepare, File, and if necessary, litigate final applications for compensation and (ii) object to final fee applications Filed by other Professionals. Any fees or reimbursable expenses of the Committee's professionals accruing on or after the Confirmation Date, and any reimbursable expenses of the Committee members, which accrue after the Confirmation Date, shall be paid solely from the GUC Claim Reconciliation Fund. Upon the Final Distribution Date for Class 2 General Unsecured Claims, the Committee shall be deemed permanently dissolved. Members of the Committee may withdraw from the Committee at any time following the Effective Date, provided that a GUC Trustee has been appointed and approved in accordance with the terms hereof.

3. **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be hereby conclusively, absolutely, irrevocably, and forever released by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and Representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Wind-Down Debtors, or their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Debtors' capital structure, management, ownership, or operation thereof, the Sale Transactions, the sale and marketing process, the Wind Down, the Chapter 11 Cases, and any successor cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Loan Documents, any Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Sale Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan (including, for the avoidance of doubt, the Plan Supplement), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including any Wind-Down Transactions, issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date or relating to any of the forgoing. In addition to the forgoing, for good an valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and Representatives, are hereby deemed to have conclusively, absolutely, irrevocably, and forever released any and all Avoidance Actions.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Wind-**

Down Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

Notwithstanding anything contained herein to the contrary (except for Article VIII.G, if applicable), the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Wind-Down Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any Claim or obligation arising under the Plan (iii) any obligations of any party under a Sale Transaction or any document, instrument, or agreement executed to implement a Sale Transaction, (iv) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, or (v) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan.

For the avoidance of doubt, and notwithstanding anything to the contrary herein, the terms of the Settlement and the 9019 Order are not modified, amended, or affected by the releases under this Article VIII.F.3.

4. **Releases by Releasing Parties**

In exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on (i) the Settlement Effective Date and (ii) the Plan Effective Date, each Released Party is deemed to be hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each of the Releasing Parties (including any successor trustee or other representative in the Chapter 11 Cases and any successor cases), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action owned by the Releasing Parties, directly or derivatively, by, through, for, or because of the foregoing Entities on behalf of the Releasing Parties, from any and all direct or derivative Claims and Causes of Action asserted on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Releasing Party or other Entity, or that any Holder of any Claim against, or Interest in, a Releasing Party or other Entity could have asserted on behalf of the Releasing Party, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between one or more of the Debtors and one or more of the Debtors or their affiliates, the Chapter 11 Cases and any successor cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Loan Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), Wind-Down Transaction, or any Sale Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the DIP Loan Documents, or the Plan, the Plan Supplement, the filing of the Chapter 11 Cases and any successor cases, the pursuit of Confirmation and the Settlement, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the distribution of property in a manner consistent with the Settlement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before, in respect of the foregoing clause (i), the Settlement Effective Date, and, in respect of the foregoing clause (ii), the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (a) any rights and remedies of any Holder of a Claim solely against any Debtor or its Estate, arising in the ordinary course of business prior to the Petition Date, including an administrative expense claim under section 503(b) of the Bankruptcy Code, to prosecute such Claim against the applicable Debtor and its Estate, and to defend any objection to such Claim; (b) any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Sale Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any Claim or obligation arising under the Plan, (c) any ordinary course

obligations between the Debtors and Icahn Entities arising or to be performed on or after the Petition Date, including under that certain Transition Services Agreement dated as of December 31, 2021, (d) the Committee's right to appoint an entity to be charged with the objection, reconciliation, and distribution of the GUC Payment (as defined in the Settlement Term Sheet), or (e) any Claims or Causes of Action arising under the DIP Orders or DIP Facility.

5.      Exculpation

Except as expressly provided herein or in the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Cause of Action for any claim arising on or after the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, including the DIP Orders, the Plan (including the Plan Supplement), the Disclosure Statement, the filing of the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination, filing or Consummation of any Sale Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Sale Transaction or the Plan, the pursuit of confirmation, Consummation, administration, and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, the solicitation of votes on the Plan, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or after the Petition Date through the Effective Date related or relating to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence, or willful misconduct but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan, or such distributions made pursuant to the Plan.

This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth in the Plan shall not be construed as exculpating any party or Entity from its post-Effective Date obligations under the Plan, any Sale Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

6.      Injunction

Except as otherwise expressly provided in this Plan or for Distributions required to be paid or delivered pursuant to this Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to this Plan to the maximum extent permitted under applicable law, permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests satisfied, settled, and released pursuant to this Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim, by accepting, or being eligible to accept, distributions under the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F.6.

### 7. Gatekeeper Provision

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Claim, Cause of Action, or Covered Claim of any kind against any Released Party, or the Plan Agent, in each case that arose or arises from or is reasonably likely to relate to any act or omission (a) in connection with, (b) relating to, or (c) arising out of a Claim, Cause of Action, or Covered Claim against, in the case of each of (a) – (c) any Debtor or any of the Estates, as applicable, subject to Articles VIII.C.3, VIII.C.4, VIII.C.5, or VIII.C.6, in each case without first (i) requesting a determination from the Bankruptcy Court, after notice to all affected parties and a hearing, that such claim or cause of action represents a colorable claim against a Released Party and is not a claim that the Debtors released under the Plan, which request (x) must attach the complaint or petition proposed to be filed by the requesting party and (y) include a proposed attorney fee reserve, subject to court modification, that will be deposited to the Bankruptcy Court's registry to indemnify the Released Party or Parties, and/or Plan Agent Trustee named in the complaint or petition attached to the request, as applicable, against costs associated with the successful defense of any claim that is allowed to proceed and (ii) obtaining from the Bankruptcy Court specific authorization for such party to bring such claim or cause of action against any such Released Party. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claims or causes of action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by applicable law.

No party may assert a claim on any basis against the GUC Trust, the GUC Trustee or any of their professionals, agents, or representatives (collectively, the "GUC Trust Parties") arising out of or related to their roles, either prior to or after the Effective Date, in these cases without first seeking authority from the Bankruptcy Court in each case without first (i) requesting a determination from the Bankruptcy Court, after notice to all affected parties and a hearing, that such claim or cause of action represents a colorable claim against the GUC Trust Parties and is not a claim that was released under the Plan, which request (x) must attach the complaint or petition proposed to be filed by the requesting party and (y) include a proposed attorney fee reserve, subject to court modification, that will be deposited to the Bankruptcy Court's registry to indemnify the GUC Trust Parties named in the complaint or petition attached to the request, as applicable, against costs associated with the successful defense of any claim that is allowed to proceed and (ii) obtaining from the Bankruptcy Court specific authorization for such party to bring such claim or cause of action against any such GUC Trust Party. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claims or causes of action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by applicable law.

## G. Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and their Representatives will be deemed to have participated in good faith and in compliance with the Bankruptcy Code. None of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan, if applicable.

# ARTICLE IX
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A. Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of (1) any request for payment of any Administrative Expense Claim and (2) any and all objections to the amount, allowance, priority or classification of Claims or Interests;

B. Grant or deny any applications for allowance of any Professional Fee Claims for periods ending on or before the Confirmation Date;

C. Resolve any matters related to the assumption or rejection of any Executory Contract or Unexpired Lease to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount;

D. Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

E. Decide or resolve any motions, adversary proceedings, contested matters and any other matters Filed in the Bankruptcy Court involving the Debtors that may be pending on the Effective Date or brought thereafter;

F. Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Chapter 11 Cases, this Plan, the Disclosure Statement, or the Confirmation Order;

G. Resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan, the Confirmation Order or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to this Plan, the Confirmation Order or the Sale Transaction;

H. Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with this Plan in such manner as may be necessary or appropriate to consummate this Plan and the transactions contemplated hereby;

I. Hear and determine any matter, case, controversy, suit, dispute, or Cause of Action regarding the existence, nature and scope of the releases, and injunctions provided under this Plan, and issue injunctions, enforce the injunctions contained in this Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to implement, enforce or restrain interference by any Entity with respect to the Consummation, implementation or enforcement of this Plan or the Confirmation Order, including the releases, and injunctions provided under this Plan;

J. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or if Distributions pursuant to this Plan are enjoined or stayed;

K. Determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

44

L.     Hear and determine any Retained Causes of Action;

M.     Enforce, clarify, or modify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

N.     Enter a final decree closing the Chapter 11 Cases;

O.     Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

P.     Assist in recovery of all Assets of the Debtors and their Estates, wherever located; and

Q.     Hear any other matter over which the Bankruptcy Court has jurisdiction.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

### A.     Modification of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify this Plan before the Effective Date.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court.  Holders of Claims that have accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented, if the proposed amendment, modification or supplement does not materially and adversely change the treatment of such Claim; *provided*, *however*, that any Holders of Claims who were deemed to accept this Plan because such Claims were Unimpaired shall continue to be deemed to accept this Plan only if, after giving effect to such amendment, modification or supplement, such Claims continue to be Unimpaired.

### B.     Revocation of the Plan or Non-Occurrence of the Confirmation Date or Effective Date

The Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date or at the Confirmation Hearing.  If this Plan is revoked or withdrawn, or if the Confirmation Date or the Effective Date does not occur, then this Plan shall be null and void in all respects solely with respect to the Debtors, and nothing contained in this Plan shall:  (a) prejudice in any manner the rights of the Debtors or any other party in interest; (b) constitute a waiver or release of any claims by or against, or any interests in, any of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

### C.     Reservation of Rights Regarding Certain Matters

If the requisite Classes do not vote to accept this Plan or the Bankruptcy Court does not confirm this Plan, the Debtors reserve their rights to exercise their fiduciary duties regarding the resolution of the Chapter 11 Cases.

### D.     Exhibits and Schedules

All exhibits and schedules to this Plan, including the Plan Supplement, are incorporated into and constitute a part of this Plan as if set forth herein.

### E.     Severability

If prior to the entry of the Confirmation Order, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court may, at the request of the Debtors, alter and interpret such term or provision to the extent necessary to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remaining terms and provisions of this Plan shall remain in full force and effect and

shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**F.**     **Successors and Assigns**

Except as expressly provided otherwise in this Plan, the rights, benefits and obligations of any Person named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, Representative, beneficiary or guardian, if any, of each Person.

**G.**     **Service of Documents**

Any pleading, notice or other document required by this Plan or the Confirmation Order to be served on or delivered to counsel to the Debtors must be sent via electronic mail, overnight delivery service, or hand delivery on:

>     IEH Auto Parts Holding LLC, et al
>
>     with a copy, which shall not constitute notice, to:
>
>     Jackson Walker LLP
>     1401 McKinney Street, Suite 1900
>     Houston, TX  77010
>     Attention:          Matthew Cavenaugh
>                             Veronica A. Polnick
>                             Vienna F. Anaya
>                             Emily Flynn Meraia
>
>     E-mail:              mcavenaugh@jw.com
>                             vpolnick@jw.com
>                             vanaya@jw.com
>                             emeraia@jw.com
>
>     Law Office of Liz Freeman
>     PO Box 61209
>     Houston, TX 77208
>     Attention:          Elizabeth C. Freeman
>
>     Email:               liz@lizfreemanlaw.com

**ARTICLE XI**
**CONFIRMATION OF THE PLAN**

**A.**     **VOTING PROCEDURES AND REQUIREMENTS**

The Debtors are providing copies of this Plan and Disclosure Statement and Ballots to all known holders of Impaired Claims who are entitled to vote on the Plan. The procedures for voting were approved by the Bankruptcy Court by Order entered on May 2, 2023 [Docket No. 474].

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims against the Debtors that are "Impaired" under the terms and provisions of the Plan and entitled to receive a Distribution thereunder are entitled to vote to accept or reject the Plan. Accordingly, Classes of Claims or Interests that are not Impaired under the terms and provision of the Plan are *not* entitled to vote on the Plan.   In addition, Classes of Claims or Interests that are not entitled to a distribution under the terms and provisions of the Plan are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

Under the Plan, Holders of Class 2 Claims are, or may be determined to be, Impaired and are entitled to vote. Holders of Class 1 Claims are not Impaired and are deemed to have accepted the Plan. Holders of Class 3 Interests are Impaired and deemed to reject the Plan.

**Ballots will be accepted by via the internet through the Claims and Noticing Agent's website and regular mail.**

**B.** **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (2) the Debtors complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, in addition to others, as applicable, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

**1.** **The Best Interest of Creditors Test**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder

of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable Distribution to Holders of each Impaired Class of Claims and Interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' Assets if these Chapter 11 Cases were converted to chapter 7 Case under the Bankruptcy Code. Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that would be incurred as a result of the ineffectiveness associated with replacing existing management and professionals in a chapter 7 case.

To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the Debtors' Chapter 11 Cases were converted to a chapter 7 case and the Assets of the Debtors' Estates were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of a Claim or Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such Holder's liquidation distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as compensation of counsel and other professionals retained by the trustee, Asset disposition expenses, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 Case, litigation costs, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

In this case, notwithstanding the difficulty in quantifying recoveries to Holders of Allowed Claims, as described below, the Debtors believe that anticipated recoveries to each Class of Impaired Claims under the Plan implies a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

## 2. Liquidation Analysis

The Debtors are selling substantially all of their Assets. The Debtors believe that liquidation under chapter 11 is more beneficial to the Holders of Claims than a liquidation under chapter 7 because the Plan allows the Debtors' remaining Assets to be promptly administered by the Plan Agent. To that end, the Plan provides that all of the Debtors' remaining Assets will revest in the Estates. The Plan Agent will distribute the proceeds from these remaining Assets to the Holders of Allowed Claims in accordance with the priorities set forth in the Plan. Attached as **Exhibit A** to this Disclosure Statement is a liquidation analysis (the "Liquidation Analysis"). As set forth in the Liquidation Analysis, if these Chapter 11 Cases were to be converted to chapter 7 case, the Asset available for general unsecured creditors would be reduced as the GUC Payment is only available to general unsecured creditors in a chapter 11 context and not in a chapter 7 and the Debtors' Estates would incur the additional costs of a chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. These costs would reduce or eliminate potential distributions to all Classes of Claims on a dollar for dollar basis. Conversion also would likely delay the liquidation process and the ultimate distribution, if any, to unsecured creditors. Accordingly, the Debtors believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to a chapter 7 case.

## 3. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the Debtors' liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan clearly complies with this requirement because all of the Debtors' remaining Assets will be distributed pursuant to the terms of the Plan and, provided the Plan is confirmed and consummated, the Debtors' Estates will no longer exist to be subject to future

reorganization or liquidation. Since no further reorganization of the Debtors will be possible, the Debtors believe that the Plan meets the financial feasibility requirement. The Debtors believe that sufficient funds will exist to make all payments required by the Plan.

**4.  Acceptance by an Impaired Class**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a Chapter 11 plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A Class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance. For a class of impaired equity interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by Equity Interest Holders that hold at least two-thirds in amount of the allowed equity interests of such class, counting only those equity interests that actually voted to accept or reject the plan. Thus, a Class of Equity Interests will have voted to accept the plan only if two-thirds in amount actually voting cast their Ballots in favor of acceptance.

The Claims in Class 1 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and their votes will not be solicited.

The Claims in Class 2 are Impaired under the Plan. This Class will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of Class 2 (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The Interests in Class 3 are Impaired under the Plan and will not receive a distribution under the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, the Holders of such Class 3 Interests are deemed to reject the Plan and their votes will not be solicited.

**5.  Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it if the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

a.  No Unfair Discrimination

This test applies to classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

        b.       Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.,* secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

*Secured Claims:* The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the Debtors or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the Debtors' property subject to the liens.

*Unsecured Claims:* The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

*Equity Interests:* The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled, or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

Because Class 3 is deemed to reject the Plan, the Debtors seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan and any exhibits thereto or the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The Debtors submit that if it prosecutes a "cramdown" of the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan will be structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## ARTICLE XII
## PLAN-RELATED RISK FACTORS

### A.      GENERAL BANKRUPTCY LAW AND PLAN RELATED CONSIDERATIONS

#### 1.      Parties in Interest May Object to the Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created certain Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      **Failure to Satisfy Vote Requirement**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan or may be forced to liquidate under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

3.      **The Debtors May Not Be Able to Secure Confirmation of the Plan or Confirmation May Be Delayed**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of the Disclosure Statement or whether the Solicitation Procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the Solicitation Procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

The Confirmation and Consummation of the Plan also are subject to certain other conditions. No assurance can be given that these conditions will be satisfied.

If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims and Equity Interests would ultimately receive in respect of their Claims and Equity Interests. It is possible that any alternative could provide Holders of Claims with less than they would have received pursuant to the Plan.  Moreover, an inability to confirm the Plan could result in an extended chapter 11 proceeding.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.

4.      **Nonconsensual Confirmation - "Cramdown"**

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the Debtors' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

Although the Debtors believe that the Plan will meet such tests, the Debtors cannot be certain that the Bankruptcy Court would reach the same conclusion. If the Bankruptcy Court does not confirm the Plan, the Debtors may pursue one of the following alternatives: (a) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (b) dismissal of the Chapter 11 Cases, or (c) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

5.      **The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

6.      **Risk of Nonoccurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

7.      **Risk Affecting Potential Recoveries of Holders of Claims in Voting Classes**

The Debtors cannot state with any degree of certainty what recovery will be available to Holders of Claims in Voting Classes. Three unknown factors make certainty impossible. First, the Debtors cannot know, at this time, how much money will remain after paying all Allowed Claims which are senior to the Claims of Holders in the Voting Classes. Second, the Debtors cannot know with any certainty, at this time, the number or size of Claims in the Voting Classes which will ultimately be Allowed. Third, the Debtors cannot know with certainty, at this time, the number or size of Claims in Classes senior to the Voting Classes, or Claims that are unclassified, which will ultimately be Allowed.

B.      **RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS**

**The financial information contained in this Disclosure Statement has not been audited.**  In preparing this Plan and Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors used their reasonable business judgment to ensure the accuracy of the financial information provided in this Plan Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

C.      **DISCLOSURE STATEMENT DISCLAIMER**

1.      **Information Contained Herein Is for Soliciting Votes**

The information contained in this Plan and Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

2.      **This Plan and Disclosure Statement Was Not Reviewed or Approved by the Securities and Exchange Commission**

This Plan and Disclosure Statement was not filed with the Commission under the Securities Act or applicable state securities laws.  Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3.      **This Plan and Disclosure Statement May Contain Forward Looking Statements**

This Plan and Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections or other information contained herein and attached hereto are

estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

### 4. No Legal or Tax Advice Is Provided to You by this Plan and Disclosure Statement

This Plan and Disclosure Statement is not legal advice to you. The contents of this Plan and Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Plan and Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 5. No Admissions Made

The information and statements contained in this Plan and Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Plan Agent, Holders of Allowed Claims or Equity Interest or any other parties in interest.

### 6. Failure to Identify Litigation Claims or Projected Objections

**No reliance should be placed on the fact that a particular litigation Claim, Cause of Action, or projected objection to Claim is, or is not, identified in this Plan and Disclosure Statement. The Debtors, Plan Agent, or GUC Trustee, as applicable, may seek to investigate, file and prosecute litigation Claims, Causes of Action, and projected objections to Claims after the Confirmation or Effective Date irrespective of whether this Plan and Disclosure Statement identifies any such claims or objections to claims.**

### 7. No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or of the Plan Agent (or any party in interest, as the case may be) to object to that Holder's Allowed Claim.

### 8. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' advisors.

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

### 9. Potential Exists for Inaccuracies, and the Debtors have No Duty to Update

The statements contained in this Plan and Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Plan and Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors used their reasonable business judgment to ensure the accuracy of all of the information provided in this Plan and Disclosure Statement, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Plan and Disclosure Statement. Further, although the Debtors may subsequently update the information in this Plan and Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 10. No Representations Outside the Plan and Disclosure Statement are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Plan and Disclosure Statement. Any

representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in, or included with, this Plan and Disclosure Statement, should not be relied upon by you in arriving at your decision.

## D.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords the Holders of Claims the potential for a better realization on the Debtors' Assets than a chapter 7 liquidation, and therefore, is in the best interests of such Holders.  If, however, the Plan is not confirmed, the theoretical alternatives include (a) formulation of an alternative plan or plans of liquidation under chapter 11 or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Each of these possibilities is discussed in turn below.

### 1.    Alternative Plan(s) of Liquidation

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors could attempt to formulate and propose a different plan or plans of liquidation.

With respect to an alternative liquidation plan, the Debtors explored alternatives in connection with the negotiation process involved in the formulation and development of the Plan.  The Debtors believe that the Plan enables creditors to realize the greatest possible value under the circumstances because it maximizes the consideration available to distribute to creditors via the 9019 Motion, the Sale Transactions, and that, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated.

### 2.    Liquidation under Chapter 7

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to a liquidation case under chapter 7 of the Bankruptcy Code. In a case under chapter 7 of the Bankruptcy Code, a trustee would be appointed to liquidate the assets of the Debtors. It is impossible to predict what the Debtors' Assets would be following a conversion or precisely how the proceeds of a liquidation in chapter 7 would be distributed to Holders of Claims against the Debtors.

### 3.    Dismissal of the Chapter 11 Cases

If the Plan is not confirmed, the Debtors or other parties in interests may seek dismissal of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code.  Without limitation, dismissal of the Chapter 11 Cases would terminate the automatic stay and would likely lead to an elimination of support for the Debtors' wind down operations and a lack of funding for the insurance deductibles.  Accordingly, the Debtors believe that dismissal of the Chapter 11 Cases would reduce the value of the Debtors' Estates.

## ARTICLE XIII
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

## A.    General Tax Considerations

THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES EXPECTED TO RESULT FROM THE CONSUMMATION OF THE PLAN, IS FOR GENERAL INFORMATION PURPOSES ONLY, AND SHOULD NOT BE RELIED UPON FOR PURPOSES OF DETERMINING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST. THIS DISCUSSION DOES NOT PURPORT TO BE A COMPLETE ANALYSIS OR LISTING OF ALL POTENTIAL TAX CONSIDERATIONS. THIS DISCUSSION DOES NOT ADDRESS ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST SUBJECT TO SPECIAL TREATMENT UNDER FEDERAL INCOME TAX LAWS (SUCH AS FOREIGN TAXPAYERS, BROKER DEALERS, BANKS, THRIFTS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, REGULATED INVESTMENT COMPANIES, REAL ESTATE INVESTMENT TRUSTS AND PENSION PLANS AND OTHER TAX EXEMPT INVESTORS), AND DOES NOT DISCUSS ANY ASPECTS OF STATE, LOCAL OR FOREIGN TAX LAWS. FURTHERMORE, THIS SUMMARY DOES NOT ADDRESS ALL OF THE FEDERAL INCOME TAX

CONSEQUENCES THAT MAY BE RELEVANT TO A HOLDER OF A CLAIM OR EQUITY INTEREST, SUCH AS THE POTENTIAL APPLICATION OF THE ALTERNATIVE MINIMUM TAX.

THIS DISCUSSION IS BASED ON EXISTING PROVISIONS OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "IRC"), EXISTING AND PROPOSED TREASURY REGULATIONS PROMULGATED THEREUNDER, AND CURRENT ADMINISTRATIVE RULINGS AND COURT DECISIONS. LEGISLATIVE, JUDICIAL, OR ADMINISTRATIVE CHANGES OR INTERPRETATIONS ENACTED OR PROMULGATED AFTER THE DATE HEREOF COULD ALTER OR MODIFY THE ANALYSES SET FORTH BELOW WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN. ANY SUCH CHANGES OR INTERPRETATIONS MAY BE RETROACTIVE AND COULD SIGNIFICANTLY AFFECT THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

NO RULING HAS BEEN REQUESTED OR OBTAINED FROM THE INTERNAL REVENUE SERVICE (THE "IRS") WITH RESPECT TO ANY TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN SOUGHT OR OBTAINED WITH RESPECT THERETO. NO REPRESENTATIONS OR ASSURANCES ARE BEING MADE TO THE HOLDERS OF CLAIMS OR EQUITY INTERESTS WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES DESCRIBED HEREIN.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN.

**Internal Revenue Service Circular 230 Disclosure: to ensure compliance with requirements imposed by the United States Internal Revenue Service, any tax advice contained in this Disclosure Statement (including any attachments) is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax related penalties under the Tax Code. Tax advice contained in this Disclosure Statement (including any attachments) is not written to support the promotion, marketing or promotion of the transactions or matters addressed by the disclosure statement. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

**B.     Certain Federal Income Tax Consequences to the Debtors**

Generally, a discharge or cancellation of a debt obligation by the Debtors for an amount less than the debt's adjusted issue price (in most cases, the amount the Debtors received on incurring the obligation, with certain adjustments) gives rise to cancellation of indebtedness ("COD") income, which must be included in the Debtors' income. However, COD income is not includable in gross income if it occurs in a case of bankruptcy or to the extent of the Debtors' insolvency immediately before the COD income is recognized. The Debtors' COD income, if any, resulting from the Plan should satisfy these requirements and, therefore, should not result in recognition of gross income to the Debtors.

COD income that is excluded from gross income will reduce certain attributes of the taxpayer, including net operating losses, capital loss carryovers, the tax basis of assets, and foreign tax credit carryforwards, in a specified order of priority beginning with net operating losses, unless a taxpayer elects to have the reduction applied first to the tax basis of depreciable assets. In general, any reduction in tax attributes does not occur until the end of the tax year, after such attributes have been applied to determine the tax for the year or, in the case of any asset basis reduction, the first day of the taxable year following the tax year in which COD income occurs.

**C.     Certain Federal Income Tax Consequences to Holders of Claims**

The following discusses certain tax consequences of the transactions contemplated by the Plan to Holders that are "United States holders," as defined below. The tax consequences of the transactions contemplated by the Plan to Holders (including the character, timing and amount of income, gain or loss recognized) will depend on, among

other things: (1) whether the Claim and the consideration received in respect of it are "securities" for tax purposes; (2) the manner in which a Holder acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion of it) in the current tax year or any prior tax year; (6) whether the Holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the Holder's method of tax accounting; and (8) whether the Claim is an installment obligation for tax purposes. Holders, therefore, should consult their own tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan.

For purposes of the following discussion, a "United States holder" is a Holder that is: (1) a citizen or individual resident of the United States; (2) a partnership, limited liability company, or corporation created or organized in the United States or under the laws of the United States, a political subdivision of the United States, or a State of the United States; (3) an estate whose income is subject to United States federal income taxation regardless of its source; or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust, or (ii) the trust was in existence on August 20, 1996, and properly elected to be treated as a United States person.

### 1.    Gain or Loss Generally

Each Holder of a Claim may be permitted to recognize a loss or may be required to recognize gain on its distributions under the Plan. Generally, the loss or gain to be recognized by the Holder of an Allowed Claim will equal the positive difference in the case of a loss (and negative difference in the case of a gain) between (1) the adjusted tax basis such Holder has in its Claim (excluding any adjusted tax basis attributable to accrued but unpaid interest), and (2) the fair market value of the beneficial interest distributed (or deemed distributed) to the Holder of the Claim (excluding any Cash or other property received or deemed received attributable to accrued interest).  Depending on the manner in which the Claim arose, applicability of the market discount rules and other factors, such loss or gain may be capital or ordinary in nature. Due to limitations in the Code, a Holder of an Allowed Claim that recognizes a capital loss relating to its Claim may not be able to use such capital loss in the taxable year it arises or ever.

Although many Holders of Claims will not be required to recognize gain or income as a result of the property distributions (including Cash distributions) made or deemed to be made to them under the terms of the Plan, certain situations may exist that will require a Holder of a Claim to do so.  For example, if a Claim relates to a transaction under which the Holder is required to recognize gain on payment (for example, an installment sale), the Holder may be required to recognize gain as a result of the actual or deemed distributions made to it under the Plan.  Moreover, if (1) a Holder of a Claim previously took a deduction or loss relating to the partial or entire worthlessness of its Claim, and (2) the fair market value of the property (including Cash) it receives or is deemed to receive for its Claim under the Plan exceeds the remaining adjusted tax basis, if any, it has in its Claim, such Holder will be required to recognize gain or income.  Similarly, a Holder of a Claim that purchased its Claim at a discount may be required to recognize gain if the amount received in satisfaction of the Claim exceeds such Holder's adjusted tax basis in the Claim.  There are several other reasons why a Holder of a Claim may be required to recognize gain or income as a result of the actual or deemed distributions made to it under the Plan. Therefore, each Holder of a Claim should consult its own tax advisor to determine the tax consequences of the receipt of or deemed receipt of property (including Cash) under the Plan.

### 2.    Accrued But Untaxed Interest

To the extent that any amount received under the Plan by a Holder is attributable to accrued but untaxed interest, such amount should be taxable to the Holder as ordinary income, if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes.  Conversely, a Holder may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent that any accrued interest was previously included in the Holder's gross income but was not paid in full by the Debtors.

The extent to which amounts received by a Holder will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such Holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a bankruptcy plan is binding for U.S.

federal income tax purposes. However, the IRS could take the position that the consideration received by a Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 3. Market Discount

Holders who exchange Claims for Cash or other property may be affected by the "market discount" provisions of the sections 1276 through 1278 of the IRC. Under these rules, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory *de minimis* amount. To the extent that a Holder has not previously included market discount in its taxable income, gain recognized by a Holder on the disposition of a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the Holder's period of ownership. A holder of a market discount bond that is required to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on the disposition of such bond. In addition, any partial principal payment received by a Holder that is attributable to a market discount bond will generally be treated as ordinary interest income to the extent such payment does not exceed the market discount accrued on such bond during the Holder's period of ownership.

### 4. Original Issue Discount

The original issue discount ("OID") rules provide an extremely detailed and complex method for determining and taxing the interest components of debt instruments. A holder of a debt instrument containing OID must include a portion of the OID in gross income in each taxable year in which the holder holds the debt instrument, regardless of whether any cash payments are received. OID is defined as the difference between the issue price and the stated redemption price at maturity of a debt instrument. As the OID rules are extremely complex, it is not certain how they will apply to the transactions contemplated by the Plan. Accordingly, each Holder must consult its own tax advisor.

### 5. Holders of Disputed Claims

Distributions deemed issued to a Holder of a Claim on Consummation of the Plan will not include any distribution held in reserve for Holders of Disputed Claims. As a result, in determining the amount of loss or gain recognized by a Holder of a Claim on Consummation of the Plan, the Holder will not be treated as receiving any property attributable to the assets that are held by or for the benefit of Holders of Disputed Claims. As discussed below, when a Disputed Claim becomes Disallowed in whole or in part, the Holders of a Claim will be treated as receiving additional consideration in respect of their Claim at that time. It is possible, however, that the IRS or a court may conclude that the amount of consideration deemed received for tax purposes by a Holder of a Claim on Consummation of the Plan should be determined by disregarding the Disputed Claims and treating any distribution held in reserve for Holders of Disputed Claims as proportionately distributed to the Holders of Claims. In such case, appropriate downward adjustments would be made on the allowance of a Disputed Claim in whole or in part. Holders of Claims should consult with their tax advisors as to the proper amount of consideration deemed received on Consummation of the Plan.

Holders of Disputed Claims will not be treated as receiving any consideration in respect of their Claims on Consummation of the Plan. On the allowance of a Disputed Claim, the Holder of the Disputed Claim will be treated as realizing in satisfaction of its Claim the amount of Cash distributed to the Holder at such time plus the fair market value of any property distributed to such Holder. On the disallowance of a Disputed Claim, the distribution attributable to such Disputed Claim will be cancelled and the Cash attributable to the Disallowed Disputed Claim and held in reserve will be released from the reserve. While not entirely clear, at such time, Holders will likely be treated as having received additional consideration in satisfaction of their Claims equal to their proportional shares of (i) the

Cash released from the reserve, less (ii) the fair market value of the cancelled distributions. If the Disputed Claim becomes disallowed in the year in which the Plan is consummated, then such additional consideration would either reduce the loss or increase the gain that was recognized with respect to Holders' Claim on Consummation of the Plan and would possess the same character (i.e., capital or ordinary) as the gain or loss recognized on Consummation of the Plan. If the Disputed Claim becomes disallowed after the year in which the Plan is consummated, then the additional amount deemed received on disallowance of the Disputed Claim will be treated as gain with the same character (i.e., capital or ordinary) as the gain or loss recognized on Consummation of the Plan. Holders of a Claim would increase the tax bases in their distribution by the additional amounts deemed received on the disallowance of a Disputed Claim. Similarly, in the event that undeliverable Distributions are redistributed to other claimants entitled to Distribution, such recipients will likely be subject to comparable tax treatment as discussed in this paragraph.

### 6. Reinstatement of Claims

Holders of Claims generally should not recognize gain, loss or other taxable income upon the reinstatement of their Claims under the Plan. Taxable income, however, may be recognized by those holders if they are considered to receive interest, damages or other income in connection with the reinstatement or if the reinstatement is considered for tax purposes to involve a substantial modification of the Claim.

### 7. Bad Debt and/or Worthless Securities Deduction

A Holder who, under the Plan, receives in respect of a Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction in some amount under Section 166(a) of the IRC or a worthless securities deduction under Section 165(g) of the IRC. The rules governing the character timing and amount of bad debt and/or worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 8. Information Reporting and Backup Withholding

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting (for example, by filing the appropriate Form 1099) by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances.

Under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax. Amounts subject to backup withholding are credited against a Holder's United States federal income tax liability, and a Holder may obtain a refund of any excess backup withholding by filing an appropriate claim for refund with the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC.

### 9. Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**D.**       **Reservation of Rights**

      **This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this Article XIII and the other tax related sections of the Plan prior to the date by which objections to Confirmation of the Plan must be filed and served.**

**CONCLUSION, RECOMMENDATION, AND CONFIRMATION REQUEST**

      The Debtors believe that Confirmation of the Plan is desirable and in the best interests of all holders of Claims and Interests. The Debtors urge you to vote to accept the Plan and to evidence such acceptance by returning the Ballot(s) so they will be received by the Voting Deadline.

      The Debtors request Confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code.

Dated:  June 16, 2023                  Respectfully submitted,

                                     IEH Auto Parts Holding, LLC, et al.,

                                   By:      *John Michael Neyrey*
                                   Name:    John Michael Neyrey
                                   Title:      Chief Executive Officer
                                               IEH Auto Parts Holding LLC

Exhibit A

Liquidation Analysis

**AutoPlus**
*Liquidation Analysis*
US$ in 000's

DRAFT – SUBJECT TO MATERIAL CHANGE
PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408

| Item | Notes | Chapter 7 Distributable Value | | | | Chapter 11 Distributable Value | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Low | | High | | Low | | High | |
| Illustrative Sale Proceeds | (1) | $ | 50,000 | $ | 70,000 | $ | 90,000 | $ | 110,000 |
| Est. Ending Cash | | | 12,000 | | 12,000 | | 12,000 | | 12,000 |
| Est. Accounts Receivable | | | 40,000 | | 40,000 | | 40,000 | | 40,000 |
| **Total Proceeds** | | $ | 102,000 | $ | 122,000 | $ | 142,000 | $ | 162,000 |
| Est. Chapter 7 Trustee Fees | | $ | (3,100) | $ | (3,700) | | NA | | NA |
| Est. Chapter 7 Professional Fees | | | (2,200) | | (2,200) | | NA | | NA |
| Est. Professional Fee Carve Out | | | NA | | NA | | (1,900) | | (1,900) |
| Administrative & Priority Claims Backstop | (2) | | NA | | NA | | 29,650 | | 29,650 |
| General Unsecured Claims ("GUC") Payment | (2) | | NA | | NA | | 17,000 | | 17,000 |
| GUC Claim Reconciliation Fund | | | NA | | NA | | (500) | | (500) |
| **Total Distributable Value** | | $ | 96,700 | $ | 116,100 | $ | 186,250 | $ | 206,250 |

| | Notes | Est. Claim | | Chapter 7 Recovery (Low Case) | | Chapter 7 Recovery (High Case) | | Chapter 11 Recovery (Low Case) | | Chapter 11 Recovery (High Case) | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | $ | % | $ | % | $ | % | $ | % |
| DIP Claims - New Money | (3) | $ | 19,127 | $ 19,127 | 100% | $ 19,127 | 100% | $ 19,127 | 100% | $ 19,127 | 100% |
| DIP Claims - Roll-Up | (4) | | 189,716 | 77,323 | 41% | 96,723 | 51% | 120,473 | 64% | 140,473 | 74% |
| *Administrative Claims* | (5) | | | | | | | | | | |
| Est. 503(b)(9) | | $ | 13,000 | $ - | 0% | $ - | 0% | $ 13,000 | 100% | $ 13,000 | 100% |
| Est. Post-Petition Accounts Payable | (6) | | - | - | N/A | - | N/A | - | N/A | - | N/A |
| Est. Contract Cures | | | 3,500 | - | 0% | - | 0% | 3,500 | 100% | 3,500 | 100% |
| Est. Employee Costs | | | 6,500 | - | 0% | - | 0% | 6,500 | 100% | 6,500 | 100% |
| Est. Accrued & Unpaid U.S. Trustee Fees | | | 250 | 250 | 100% | 250 | 100% | 250 | 100% | 250 | 100% |
| **Total Administrative Claims** | | $ | 23,250 | $ 250 | 1% | $ 250 | 1% | $ 23,250 | 100% | $ 23,250 | 100% |
| Other Secured Debt | (7) | $ | - | $ - | N/A | $ - | N/A | $ - | N/A | $ - | N/A |
| Est. Priority Claims | (8) | | 6,400 | - | 0% | - | 0% | 6,400 | 100% | 6,400 | 100% |
| Est. GUC | (9) | | 170,000 | - | 0% | - | 0% | 17,000 | 10% | 17,000 | 10% |
| Equity | (10) | | 322,867 | - | 0% | - | 0% | - | 0% | - | 0% |
| **Total Recovery** | | $ | 731,360 | $ 96,700 | 13% | $ 116,100 | 16% | $ 186,250 | 25% | $ 206,250 | 28% |

1) These numbers will not be known with finality until the Auction has concluded and the Wind-Down of the remaining assets has been completed. You should consult with your attorney to determine how this impacts your rights and interests.
2) Per the terms outlined in the Settlement Between the IEH Debtors, AEP, Pep Boys, the Committee, and the Committee Members ("Settlement Agreement") [Dkt. 444]. Funded by the Debtors' cash or accounts receivable or proceeds of the loan under the DIP Facility, provided that if such sources of funding are insufficient, such payments will be the responsibility of AEP.
3) Represents estimated DIP draw, commitment fees and accrued interest.
4) Represents the total roll-up loan amount per the DIP credit agreement.
5) Assumes full payment of all allowed administrative claims by AEP outlined in the Settlement Agreement [Dkt. 444].
6) Assumes post-petition accounts payable is assumed by potential acquirers.
7) Once all claims have been reconciled, it is estimated that there will not be any other secured claims outside of the DIP Claims that were not paid from Sale Proceeds.
8) Assumes full payment of all allowed priority claims by AEP outlined in the Settlement Agreement [Dkt. 444].
9) Assumes $17 million payment funded to holders of GUC per the Settlement Agreement [Dkt. 444].
10) Represents book value of equity as of March 2023.

Exhibit B

9019 Order with attachments

Docket #469  Date Filed: 5/2/2023

ENTERED
Southern District of Texas
May 02, 2023
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| IEH AUTO PARTS HOLDINGS LLC, *et al.*,[1] | ) | Case No. 23-90054 (CML) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) | **Re: Docket No. 444** |

## ORDER APPROVING DEBTORS'
## EMERGENCY MOTION FOR ENTRY OF AN ORDER
## APPROVING THE SETTLEMENT BETWEEN THE IEH DEBTORS,
## AEP, PEP BOYS, THE COMMITTEE, AND THE COMMITTEE MEMBERS

**CAME ON FOR CONSIDERATION** the *Debtors' Emergency Motion for Entry of an Order Approving the Settlement Between the IEH Debtors, AEP, Pep Boys, the Committee, and the Committee Member.* (the "Motion").  Upon consideration of the Motion; and this Court having jurisdiction to consider the Motion and the relief requested pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted; and it

---

[1] The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: IEH Auto Parts Holding LLC (6529); AP Acquisition Company Clark LLC (4531); AP Acquisition Company Gordon LLC (5666); AP Acquisition Company Massachusetts LLC (7581); AP Acquisition Company Missouri LLC (7840); AP Acquisition Company New York LLC (7361); AP Acquisition Company North Carolina LLC (N/A); AP Acquisition Company Washington LLC (2773); Auto Plus Auto Sales LLC (6921); IEH AIM LLC (2233); IEH Auto Parts LLC (2066); IEH Auto Parts Puerto Rico, Inc. (4539); and IEH BA LLC (1428). The Debtors' service address is: 112 Townpark Drive NW, Suite 300, Kennesaw, GA 30144.

2390054230502000000000011

appearing that the relief requested in the Motion is in the best interests of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

It is hereby ORDERED that

1.     The Plan Settlement, the terms of which are set forth in the executed Term Sheet attached to this Order as Exhibit A, is approved.

2.     The Debtors and are authorized to take all actions necessary or appropriate to effectuate the relief granted in this Order.

3.     The Releases, as set forth in Exhibit A to the Term Sheet, shall be effective upon funding of the GUC Payment by AEP.

4.     Nothing in this Order or the Term Sheet shall amend, alter, or otherwise modify the validity or priorities of pre-petition liens and interests or liens and interests established by the *Corrected Interim Order (I) Authorizing Post-Petition Financing Secured by Senior Liens, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 90], or any future financing orders (including the Final DIP Order), unless otherwise provided therein.

5.     For the avoidance of doubt, any tax liens of the Texas Taxing Authorities[2], shall attach to the proceeds of the sale of any of the Debtors' assets located within the jurisdiction of the applicable Texas Taxing Authority to the same extent and with the same priority as such tax liens

---

[2]   The Texas Taxing Authorities include: City of Mesquite, Dallas County, Fort Bend County WCID #2, Fort Bend County, Galveston County, Harris County, Irving Independent School District, Tarrant County, Texas City Independent School District, Richardson Independent School District, Plano Independent School District, Pasadena Independent School District, City of Houston, Clear Creek Independent School District, Dickinson Independent School District, Brazoria County, City of Pearland, Brazoria County Drainage District #4, Brazoria County Special Road & Bridge Fund, Pearland Independent School District, Wichita Falls City, Wichita Falls Independent School District, Wichita County, City of Vernon, Wilbarger General Hospital ,Vernon College, Vernon Independent School District, Lubbock Central Appraisal District, Dallam County Appraisal District, Dallam County, and Stephens County.

attached to such assets immediately prior to the closing of such sale. The rights of any party to contest the validity, priority, or enforceability of any purported lien of any Texas Taxing Authority are reserved. For the avoidance of doubt, the Texas Taxing Authorities' right to object to the distribution of sale proceeds to any creditor, including AEP and holders of GUCs, is reserved and preserved.

6.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

7.      This Order shall be binding upon any successors and assigns of the Debtors, including any trustee appointed in these chapter 11 cases or in any superseding proceeding under chapter 7 of the Bankruptcy Code.

8.      This Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Signed:  May 02, 2023

Christopher Lopez
United States Bankruptcy Judge

**EXHIBIT A**

# IEH DEBTORS, AMERICAN ENTERTAINMENT PROPERTIES CORP, COMMITTEE AND AEP-RELATED ENTITIES GLOBAL RESOLUTION

1. <u>Agreement</u>.  The IEH Debtors, American Entertainment Properties Corp ("AEP"), Committee and Non-Debtor Affiliates agree that the following terms will be incorporated into a Bankruptcy Rule 9019 Motion (the "9019 Motion") and consensual plan.  The 9019 Motion shall be heard on May 2, 2023, subject to the Court's calendar.

2. <u>GUC Payment</u>:  A payment to GUCs of $17 million (the "GUC Payment") shall be used solely to fund allowed GUC claims and not any other claims or for any other purpose.  The GUC Payment shall be funded upon the earlier of the sale effective date or the plan effective date or July 31st whichever is earlier and deposited into an account established by the Debtors for such purpose.  The GUC Payment shall be funded from the DIP Financing, the Debtors' cash on hand, or the Debtors' accounts receivable, <u>provided</u> that if such sources of funding are insufficient, such payments will be the responsibility of AEP.

3. <u>Administrative and Priority Claims</u>:  AEP is responsible for and shall fund the payment of all allowed administrative and priority claims.  AEP reserves its right to object to all administrative (including professional fees) and priority fees.  The administrative and priority claims shall be funded from the Debtors' cash on hand, the proceeds of the Debtors' accounts receivable, or the DIP Financing, <u>provided</u> that if such sources of funding are insufficient, such payments will be the responsibility of AEP.

4. <u>Sale Process</u>: AEP shall be entitled to Credit Bid at the Auction. AEP shall be entitled to all of the proceeds from the Auction and up to and including $205 million. Amounts over and above the $205 million from the Auction shall be split 25% (GUCs) and 75% (AEP) until AEP is reimbursed in full for the DIP Claim. Thereafter, all additional proceeds from the Auction shall be paid to the GUCs. AEP shall be entitled to the Debtors' cash and accounts receivables balance as of the Effective Date of the Debtors liquidating plan.

5. <u>Global Release</u>: See Exhibit A.

6. <u>Bankruptcy Rule 9019</u>: This Agreement will be approved as part of a Bankruptcy Rule 9019 Motion and the parties will file an agreed upon plan of liquidation shortly thereafter. The Debtors, Committee and AEP-Related Entities shall use good faith and cooperate to file the 9019 Motion as soon as reasonably possible and use best reasonable efforts to cause same to be approved. The releases contained in the 9019 Motion shall be effective upon the funding of the GUC Payment.

7. <u>GUC Claim Reconciliation</u>: The Committee shall appoint an entity to be charged with the objection, reconciliation and distribution of the GUC Payment to allowed GUCs (the "Claim Process"). The Debtors shall provide in the liquidating plan for the payment of $500,000 (in addition to the GUC Payment) to fund the Claim Process.

8. <u>Avoidance Actions</u>. All Chapter 5 causes of action shall be released, extinguished and discharged.

9. <u>AEP and Non-Debtors' Affiliates and Insiders (AEP-Related Entities)</u>. Subject to the 9019 Motion, order approving same and

the agreement of the parties set forth herein, AEP expressly
reserves all rights to enforce its secured claim and DIP-related
Claims.  Subject to the preceding sentence, all AEP-Related
Entities shall waive, disclaim and discharge and otherwise agree
not to assert any deficiency claims, administrative claims, priority
claims, rejection claims and general unsecured claims.

10. <u>Committee Agreement</u>:   In conjunction with the approval of the
9019 Motion, the Committee shall withdraw its objection to the
DIP Financing, shall not file its Challenge Claim to AEP's liens
and claims, and support the 9019 Motion and Debtors' liquidating
Plan.  Notwithstanding the forgoing, the provision in the interim
and final DIP Financing Order limiting the Committee's
investigation and prosecution of claims against and liens asserted
by AEP shall be eliminated from the Final Order and shall be of no
force or effect.  If the 9019 Motion is not approved by the
Bankruptcy Court, then the DIP Financing Motion shall be set on
or after seven business days after the 9019 Motion is not approved
and the Committee, Debtors and AEP in such event reserve all
rights.

APPROVED

DRiV AUTOMOTIVE, INC.

BY: _Michael Duffy_ (signature)

NAME: _MICHAEL DUFFY_

TITLE: _DIRECTOR ACCOUNTS RECEIVABLE_

DATE: _4/26/23_



HIGHLINE WARREN

BY:_____

NAME:_____

TITLE: _____

DATE: _____



STANDARD MOTOR PRODUCTS, INC.

BY:_____

NAME:_____

TITLE: _____

DATE: _____

INTERSTATE BATTERIES, INC.

BY: _Heather Catelotti_

NAME: _Heather Catelotti_

TITLE: _VP, Finance_

DATE: _4/27/23_


YBM INDUSTRIES CO LIMITED

BY:_____

NAME:_____

TITLE: _____

DATE: _____


AXALTA COATING SYSTEMS, LLC

BY:_____

NAME:_____

TITLE: _____

DATE: _____

DRiV AUTOMOTIVE, INC.

BY: _____

NAME: _____

TITLE: _____

DATE: _____


HIGHLINE WARREN

BY: _Anestis Derakis_____

NAME: _Anestis Derakis_____

TITLE: _Dir. Credit on Accts Receivable_

DATE: _04/26/2023_____


STANDARD MOTOR PRODUCTS, INC.

BY: _____

NAME: _____

TITLE: _____

DATE: _____

DRiV AUTOMOTIVE, INC.

BY:_____

NAME:_____

TITLE: _____

DATE: _____



HIGHLINE WARREN

BY:_____

NAME:_____

TITLE: _____

DATE: _____



STANDARD MOTOR PRODUCTS, INC.

BY: _____

NAME:___Erin Pawlish_____

TITLE: ___Treasurer_____

DATE: ___4/26/23_____

DORMAN PRODUCTS

BY: _Lauren Miller_

NAME: _Lauren Miller_

TITLE: _Director, Financial Shared Services_

DATE: _4/26/2023_

INTERSTATE BATTERIES, INC.

BY:_____

NAME:_____

TITLE: _____

DATE: _____

YBM INDUSTRIES CO LIMITED

BY:_____

NAME:_____

TITLE: _____

DATE: _____

AXALTA COATING SYSTEMS, LLC

BY: *Amit Shah*_____

NAME:___Amit Shah_____

TITLE: ___Assistant Secretary_____

DATE: ___April 26, 2023_____

INTERSTATE BATTERIES, INC.

BY:_____

NAME:_____

TITLE: _____

DATE: _____


YBM INDUSTRIES CO LIMITED

BY:_____

NAME:_____

TITLE: _____

DATE: _____


AXALTA COATING SYSTEMS, LLC

BY:_____

NAME:_____

TITLE: _____

DATE: _____

10051639 v3 (74089.00002.000)

OFFICIAL UNSECURED CREDITORS COMMITTEE

BY:_____

NAME:_____

TITLE: _____

DATE: _____


AMERICAN ENTERTAINMENT PROPERTIES CORP.

BY:_____

NAME:___David Willetts_____

TITLE: ___President_____

DATE: ___4/27/23_____


IEH DEBTORS

BY:_____

NAME:_____

TITLE: _____

DATE: _____

## AMERICAN ENTERTAINMENT PROPERTIES CORP.

BY: _____

NAME: _____

TITLE: _____

DATE: _____


## IEH DEBTORS

BY: _____

NAME: _MOHSIN Y. MEGHJI_____

TITLE: _DIRECTOR_____

DATE: _APRIL 25/2023_____


## JUDGE DAVID JONES

BY: _____

NAME: _David R. Jones_____

TITLE: _Mediator_____

DATE: _4-28-2023_____

THE PEP BOYS—MANNY, MOE & JACK HOLDING CORP.

BY: _____

NAME: Matthew C Flannery

TITLE: Chief Legal Officer + Secretary

DATE: 4/28/23

**Exhibit A**

**Releases**

1. <u>Defined Terms</u>.

    a.   "<u>Affiliate</u>" has the meaning set forth in section 101(2) of the Bankruptcy Code.

    b.   "<u>Avoidance Actions</u>" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent and voidable transfer laws.

    c.   "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing that are made retroactive to the Petition Date, as the same may exist on any relevant date to the extent applicable to the Chapter 11 Cases and any successor cases.

    d.   "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of Texas or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Southern District of Texas.

    e.   "<u>Cause of Action</u>" or "<u>Causes of Action</u>" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) Avoidance Actions, (d) claims pursuant to sections 362 or 543 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any claim under any state or foreign law, including, without limitation, any fraudulent transfer or similar claim.

    f.   "<u>Chapter 11 Cases</u>" means, when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

g. "Claim" means any claim, as defined in section 101(5) of the Bankruptcy Code.

h. "Committee" means the official statutory committee of unsecured creditors appointed by the Office of the United States Trustee pursuant to section 1102 of the Bankruptcy Code for the Chapter 11 Cases.

i. "Confirmation" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

j. "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

k. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtors.

l. "Consummation" means the occurrence of the Plan Effective Date.

m. "Debtors" means IEH Auto Parts Holding LLC; AP Acquisition Company Clark LLC; AP Acquisition Company Gordon LLC; AP Acquisition Company Massachusetts LLC; AP Acquisition Company Missouri LLC; AP Acquisition Company New York LLC; AP Acquisition Company North Carolina LLC (N/A); AP Acquisition Company Washington LLC; Auto Plus Auto Sales LLC; IEH AIM LLC; IEH Auto Parts LLC; IEH Auto Parts Puerto Rico, Inc.; and IEH BA LLC.

n. "DIP Facility" means a multiple-draw delayed draw term loan facility in the aggregate maximum principal amount of $75 million.

o. "DIP Lender" means American Entertainment Properties Corp.

p. "DIP Loan Documents" means the DIP Term Sheet attached as Exhibit 1 to the Interim DIP Order and any other agreement related to the DIP Facility.

q. "DIP Orders" means the Interim DIP Order and Final DIP Order.

r. "Disclosure Statement" means the disclosure statement for the Plan, including all exhibits and schedules thereto, which shall be materially consistent with the Settlement Term Sheet.

s. "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

t. "Estate" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

u. "<u>Final DIP Order</u>" means any final order approving the Debtors' debtor-in-possession financing.

v. "<u>Holder</u>" means an Entity holding a Claim or Interest, as applicable.

w. "<u>Icahn Entities</u>" means Icahn Enterprises Holdings, L.P. and all of its direct and indirect subsidiaries other than the Debtors. The Icahn Entities include, for the avoidance of doubt, the Pep Boys Entities.

x. "<u>Interest</u>" means collectively, (a) any equity or ownership interest (including any such interest in a partnership, limited liability company, corporation, or other Entity), in any Debtor, (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor, and (c) any and all Claims that are otherwise determined by the Bankruptcy Court to be an equity interest, including any Claim or debt that is recharacterized as an equity interest.

y. "<u>Interim DIP Order</u>" means interim order approving the Debtors' debtor-in-possession financing [Docket No. 40].

z. "<u>Pep Boys Entities</u>" means The Pep Boys—Manny, Moe & Jack Holding Corp., Icahn Automotive Service LLC, and each of their respective direct and indirect subsidiaries.

aa. "<u>Person</u>" has the meaning set forth in section 101(41) of the Bankruptcy Code.

bb. "<u>Plan</u>" means the Debtors' plan of liquidation to be filed in the Chapter 11 Cases, which shall be materially consistent with the Settlement Term Sheet.

cc. "<u>Plan Effective Date</u>" means the date that is the first calendar day after the Confirmation Date on which all conditions precedent to the effective date as set forth in the Plan have been satisfied or waived in accordance with the Plan and the Confirmation Order, and the Plan is declared effective.

dd. "<u>Plan Supplement</u>" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules), which shall be materially consistent with the Settlement Term Sheet.

ee. "<u>Related Party</u>" means, with respect to any Person or Entity, such Person's or Entity's current or former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, Affiliates,

managed accounts or funds, and each of their respective current and former equity holders, directors, managers, owners, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, investment bankers, consultants, representatives, other professionals and the respective successors and assigns thereof.

ff. "<u>Released Party</u>" means, each of, and in each case in its capacity as such: (a) the Debtors and their Estates; (b) the Icahn Entities; (c) the Committee, in its capacity as such; (d) the members of the Committee in their individual capacities, and (e) each Related Party of each Entity in clause (a) through clause (d).

gg. "<u>Releasing Party</u>" means, each of, and in each case in its capacity as such: (a) the Debtors and their Estates; (b) the Icahn Entities; (c) the Committee, in its capacity as such; (d) the members of the Committee in their individual capacities, and (e) each Related Party of each Entity in clause (a) through clause (d) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law.

hh. "<u>Settlement Effective Date</u>" means the effective date of the Settlement.

ii. "<u>Settlement Term Sheet</u>" means the term sheet describing the principal terms of the Settlement.

jj. "<u>Settlement</u>" means the global settlement by and among the Debtors, the Committee, and the DIP Lender.

kk. "<u>Wind-Down Transactions</u>" means the transactions necessary to liquidate and wind down the Debtors that will be described in the Plan.

2. <u>Releases</u>. In exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on (i) the Settlement Effective Date and (ii) the Plan Effective Date, each Released Party is deemed to be hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each of the Releasing Parties (including any successor trustee or other representative in the Chapter 11 Cases and any successor cases), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action owned by the Releasing Parties, directly or derivatively, by, through, for, or because of the foregoing Entities on behalf of the Releasing Parties, from any and all direct or derivative Claims and Causes of Action asserted on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Releasing Party or other Entity, or that any Holder of any Claim

against, or Interest in, a Releasing Party or other Entity could have asserted on behalf of the Releasing Party, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between one or more of the Debtors and one or more of the Debtors or their affiliates, the Chapter 11 Cases and any successor cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Loan Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Wind-Down Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the DIP Loan Documents, or the Plan, the Plan Supplement, the filing of the Chapter 11 Cases and any successor cases, the pursuit of Confirmation and the Settlement, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the distribution of property in a manner consistent with the Settlement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before, in respect of the foregoing clause (i), the Settlement Effective Date, and, in respect of the foregoing clause (ii), the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (a) any rights and remedies of any Holder of a Claim solely against any Debtor or its Estate, arising in the ordinary course of business prior to the Petition Date, including an administrative expense claim under section 503(b) of the Bankruptcy Code, to prosecute such Claim against the applicable Debtor and its Estate, and to defend any objection to such Claim; (b) any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Wind-Down Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any Claim or obligation arising under the Plan, (c) any ordinary course obligations between the Debtors and Icahn Entities arising or to be performed on or after the Petition Date, including under that certain Transition Services Agreement dated as of December 31, 2021, (d) the Committee's right to appoint an entity to be charged with the objection, reconciliation, and distribution of the GUC Payment (as defined in the Settlement Term Sheet), or (e) any Claims or Causes of Action arising under the DIP Orders or DIP Facility.